UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2019 JUL 22 P 4: 25 *cc*

| | | |
|---|---|---|
| **MEAGHAN DOHERTY** | * | **CIVIL ACTION NO.** 19-11790 |
| | * | |
| **VERSUS** | * | **JUDGE:** |
| | * | |
| **NATIONAL BOARD OF** | * | **MAGISTRATE:** SECT. T MAG 5 |
| **MEDICAL EXAMINERS** | * | |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

**UNDER SEAL**

## PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY A PRELIMNARY INJUNCTION SHOULD NOT ISSUE

**NOW INTO COURT,** comes Plaintiff, Meaghan Doherty, through undersigned counsel, who, pursuant to Rule 65 of the Federal Rules of Civil Procedure, hereby applies for a temporary restraining order ("TRO") with other equitable relief against the NATIONAL BOARD OF MEDICAL EXAMINERS ("NBME"). In support of her application, Plaintiff respectfully presents the following, to wit:

### JURISDICTION AND VENUE

1. Plaintiff brings this action for a temporary restraining order and injunctive relief for violations of the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. §12101, et seq.; specifically, violations of Title III of the ADA, 42 U.S.C. §§12181-12189.

2. Plaintiff's cause of action for disability discrimination under the ADA is authorized by 42 U.S.C. § 12188(a)(1) and 42 U.S.C. 2000a-3(a).

Fee _You_
Process_____
X Dktd_____
___ CtRmDep._____
___ Doc. No._____

1

3. This Honorable Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1331 and §1343(a)(4).

4. Injunctive relief is authorized by 28 U.S.C. §§ 2201 & 2202 and Fed. R. Civ. Proc. 65.

5. Venue is proper to the Eastern District of Louisiana as a substantial part of the events or omissions giving rise to the present claim occurred in this District, and Plaintiff is a natural person domiciled and residing in this judicial circuit. 28 U.S.C. §1391(b) and (c).

## PLAINTIFF

6. Plaintiff, Meaghan Doherty, is a person of the full age of majority, a native of, and domiciled in, the Parish of Orleans, State of Louisiana. She is 25 years old, enrolled in the Tulane University School of Medicine[1], and is starting her senior year of medical school.

7. Plaintiff, Meaghan Doherty, is disabled in reading: rate; ADHD Combined Type and Generalized Anxiety Disorder. (Exhibit#2 at 32-33)

8. Plaintiff is required to take and pass the NBME Step 2-CK (Clinical Knowledge) Test as a condition of graduation from an accredited U.S. Medical School, here, the Tulane University School of Medicine. Plaintiff applied for the test and requested test-taking accommodations of additional time (Exhibit #2 at 3) under the Americans with Disabilities Act of 1990 and the ADA Amendments Act of 2008, based on her diagnosis

---

[1] Plaintiff specifically provides this disclaimer-- that the opinions, statements of law and legal conclusions contained in this Civil Action should not be ascribed to Tulane University, and are solely the opinions/position of plaintiff and not of Tulane University or of any healthcare institution (i.e. hospital, clinic or healthcare system) in which she works. She makes this disclaimer in accordance with Tulane University School of Medicine Handbook - Policy on Social Media and Out – of – Work Conduct, Section C, page 35.

of Learning Disability with Impairment in Reading: rate; ADHD Combined Type, and Generalized Anxiety Disorder. (Exhibit #2 at 32-33)

9.  NBME Step 2- CK (Clinical Knowledge) Test is a nine-hour 316 multiple choice question test divided into eight 60-minute blocks with a total of 45-minutes of break time for authorized breaks, inclusive of lunch, and for computer transitions between blocks. If a block is completed early the unused time will be added to the break time, not the test taking time. Once the time for each section has expired there is no returning to the section to complete the section.  Each question is a written passage which must be read with options to select written multiple-choice answers. Any unanswered question will be counted as a wrong answer. (Exhibit #17 at 11, and Exhibit #21)

10. NBME Step 1 is a similar testing format (*Id.*) and as will be explained, plaintiff applied and was not granted accommodations and performed well below her predicted abilities.

**DEFENDANT**

11. Defendant NBME is a private, non-profit organization, incorporated in the District of Columbia. Its offices and principal place of business are located in Philadelphia, Pennsylvania.

12. With the Federation of State Medical Boards, Defendant NBME sponsors the United States Medical Licensing Examination (USMLE), a standardized examination used to evaluate applicants' competence for the purposes of medical licensure in the United States. State medical boards rely upon successful completion of the three USMLE component exams, or "Steps," as an integral element in the process of licensing physicians. These exams are referred to as Step 1, Step 2-CK and Step 2- CS (Measuring

3

Clinical Skills is not a timed multiple-choice test) and Step 3 which is taken post-graduation from medical school and upon completion of the first year of residency program (or "intern year".) (Exhibit #12 at 1, ¶¶ 1-3)

13. Pursuant to Title III of the ADA, as a private entity that administers examinations related to professional licensing, the NBME must offer examinations in a place and manner accessible to persons with disabilities. 42 U.S.C. §12189, and its related implementing regulations, 28 C.F.R. §36.309, as well as all other requirements specified within Title III of the ADA, 42 U.S.C. §§12181-12189. (See also Exhibit 12 at 1, ¶5)

## FACTS PRECIPITATING TRO REQUEST

14. On Monday, July 15, 2019, Defendant emailed notification to Plaintiff that her Step 2 registration was complete, however Plaintiff could not schedule a test date until she received her "scheduling permit"; that her scheduling permit was on "hold because you indicated in your application that you are requesting test accommodations. Your permit will be issued as soon as Disability Services processes your request for test accommodations." (Exhibit #13 at 3, ¶¶ 1-2)

15. On Tuesday, July 16, 2019, Defendant emailed notification to Plaintiff (in an attached PDF letter dated July 15, 2019) that it had **denied** her request for accommodations on the Step 2 Test. (Exhibit #1 at 2) & (Exhibit #13 at 4)

16. On Thursday, July 18, 2019 at 1:04 a.m., Defendant emailed notification to Plaintiff that "[y]our USMLE Step 2 CK scheduling permit is now available." (Exhibit #13 at 5, ¶ 1) The scheduling permit is attached. (Exhibit #13 at 6).

17. Plaintiff opened the above referenced email at 6:00 a.m. the same day and began the process of scheduling her Step 2 Test, despite the denial of accommodations. The first available test date was August 6, 2019 within 300 miles of New Orleans.

18. On July 18, 2019 at 6:32 a.m., Defendant's third-party exam proctor, Prometric.com, emailed notification to Plaintiff that she was officially scheduled to take the computer-based Step 2 CK Test at 8:00 a.m. on Tuesday, August 6, 2019 at the NBME test center at 2424 Edenborn Ave., Metairie, LA 70001. (Exhibit #13 at 7).

19. Plaintiff must pass the USMLE Step 2- CK Exam in order to graduate from medical school. She will not be allowed to complete medical school or to graduate with a medical degree without passing Step 2-CK. (Exhibit #18 at 12)

20. Plaintiff must take Step 2-CK on August 6, 2019 if she is to remain in good standing and in hopes of competing –based on her achievement and knowledge – for a residency placement in September 2019. Residency placement in the field of desired study is the holy grail for all US Medical school seniors.  Participation and success in the Main Residency Match program (NRMP), also called "The Match," is the requisite next step in the US Medical licensing requirements. (Exhibit #19)

21. Main Residency Match occurs in September of each year.  Applications are sent to programs through the Electronic Residency Application Services (ERAS), a service of the Association of American Medical Colleges.  After applicants apply to programs, the applications are reviewed on a rolling basis, underscoring that time is of essence in obtaining positions in residency programs.  Candidates are then selected for interviews held between October and February.  After the interview period is over, programs and

applicants each compile "rank order lists" in which applicants are ranked in order from most to least preferred as to whom they wish to train. (Exhibits #20 and #21)

22. September 15, 2019 opens the 2020 Match registration period.  November 30, 2019 ends the application deadline which requires that both Step 2- CK and Step 2- CS be completed and scores made available.  Scores are typically returned four weeks later. (Exhibit #19)

23. Obtaining a residency position is highly competitive. In 2018, 37,103 active applicants vied for the 30,232 first year and 2,935 second year residency position. (Exhibit #22, page 2)

24. The USMLE Step 2-CK is a critical component of the ranking of applicants. Scores on USMLE Step2-CK are used by residency programs to decide admissions with the assumption that the test score is an indicator of the applicant's abilities. (Exhibit #22, at iii)

25. Further, Plaintiff must take and pass the USMLE Step 2-CK Exam by September 15, 2019 which is the ERAS (Electronic Residency Application System) deadline for application processing for Residency Programs for post-graduation placement. If Plaintiff has not passed Step 2-CK by that deadline:

    a.  She will not be able to timely apply for a post-graduate residency placement, and

    b.  Any application submitted after that date will be date stamped and reviewed after the timely applications are submitted.

    c.  She may be put in a position to have to wait until the following year for an opportunity for a residency placement.

26. If she receives a failing score on Step 2-CK plaintiff would then be competing with a new cohort of medical school seniors, it being readily apparent that she had to sit out a year due to failing Step 2-CK, where her only two options would be to attempt to explain a poor performance as an inaccurate reflection on her aptitude or achievement level because of her disability, which HIPAA otherwise protects, thus incurring the stigma of disability which the ADA was enacted to overcome and placing a permanent brand on her professional record. Her other choice is to remain silent and the evaluators will process and rank her application for residency against other non-disabled candidates, thereby allowing them to consider her low performance on Step as an accurate reflection of her aptitude or achievement level, or lack thereof, when in actuality the scores on a non - accommodated test would reflect her disability rather than accurately reflect her abilities. Either way, Plaintiff finds herself trapped between the Scylla and Charybdis of the NBME and the National Residency Matching Program which views Step scores as indicators of abilities and achievement.

27. Plaintiff applied to NBME for accommodations in advance of Step 1 which is the first of the series of tests taken after the second year of medical school and her request was similarly denied. She consequently took the Step 1 exam without accommodations. Plaintiff passed by only a few points, scoring a 200 with a minimum passing score of 194. (Exhibit # 5)[2] The score, though not technically failing, was so low that plaintiff is not in any of the percentiles of individuals who received matches with any residency programs in their selected field based on data generated in 2018. (Exhibit #22 at 9) Ironically, if she had failed she would have been allowed to take the test again before the

---

[2] In 2018, "Overall, U.S> allopathic seniors who matched to their preferred specialty have mean USMLE step 1 scores of 232.8 (s.d. =17.5) well above the 2018 minimum passing score of 194." Exhibit 22, at 9.

current Match period, but the very low pass score prevented that. Plaintiff is in the

dilemma of having to overcome the passing, but abysmally low, Step 1 score in order to

be considered for *any* residency program, much less her chosen field of OB/GYN and/or

her chosen geographic location of New Orleans[3]. She has already suffered the

consequence of not being provided accommodations for the Step 1 with no means of

addressing the harm other than to do well on the Step 2 CK and demonstrate her true

abilities.

28. If she were to receive the score she received on Step 1 she would fail as a passing score

    would be in the 209 range. (Exhibit #23, at 1)

29. If she is not able to take the test on August 6, 2019, with the accommodations she has

    requested, she will suffer irreparable injury as outlined above.

30. It is essential that she be allowed to take the Step 2 CK test with accommodations so that

    her true abilities are measured rather than her disabilities in accordance with law.

### APPLICABLE ADA DEFINITIONS, PROVISIONS & REGULATIONS

31. Congress stated its intent in the ADA is to provide a clear and comprehensive national

    mandate for the elimination of discrimination against individuals with disabilities, and to

    provide clear, strong, consistent, enforceable standards addressing discrimination against

    individuals with disabilities. 42 U.S.C. §12101(b).

32. Under the ADA, the term "disability" for an individual means a physical or mental

    impairment that substantially limits one or more major life activities of such individual, a

---

[3] Meaghan Doherty is a native New Orleanian who is married to first year Tulane Medical Student, Steven Fielkow. It is their intention to raise their family in New Orleans and serve the New Orleans community to which they are dedicated after they become licensed medical doctors.

record of such an impairment, or being regarded as having such an impairment. 42 U.S.C.
§12102(1).

33. Under the definition of "disability," the statute specifies that a "major life activity"
(among other things) the activities of "learning, *reading, concentrating, thinking,
communicating*, and working." 42 U.S.C. §12102(2)(A). [Emphasis added]

34. Congress stated the definition of disability "shall be construed in favor of broad coverage
of individuals under this chapter, to the maximum extent permitted by the terms of this
chapter." 42 U.S.C. §12101(4)(A).

35. Congress further stated the ADA's term "substantially limits" in the definition of
disability "shall be interpreted consistently with the findings and purposes of the ADA
Amendments Act of 2008." 42 U.S.C. §12102(4)(B).

36. The ADA provides that an impairment that substantially limits one major life activity
need not limit other major life activities in order to be considered a disability. 42 U.S.C.
§12102(4)(C).

37. Based on the foregoing, Plaintiff is an individual with a "disability" as that concept is
defined by the American with Disabilities Act of 1990, as amended. 42 U.S.C. §12101.

38. Pursuant to Title III of the ADA, private entities that administer examinations related to
professional licensing must offer the examinations in a place and manner accessible to
individuals with disabilities or must offer alternative accessible arrangements for such
individuals. 42 U.S.C. §12189 and 28 C.F.R. §36.309(A).

39. Pursuant to 28 C.F.R. §36.309, private entities that administer such examinations are
required to provide reasonable modifications to the examination and appropriate auxiliary
aids and services (i.e., testing accommodations) for individuals with disabilities. Private

entities must ensure that such examinations are selected and administered "so as to best ensure that, *when the examination is administered to an individual with a disability* that impairs sensory, manual, or speaking skills, *the examination results accurately reflect the individual's aptitude or achievement level* or whatever other factor the examination purports to measure, *rather than reflecting the individual's impaired sensory, manual, or speaking sills* (except where those skills are the factors that the examination purports to measure.)." 28 C.F.R. §36.309(b)(1)(i). [Emphasis added]

40. Moreover, when considering requests for modifications and accommodations, a private entity administering such examinations must ensure that it "*gives considerable weight* to *documentation of past modifications, accommodations, or auxiliary aids or services* received in similar testing situations. 28 C.F.R. §36.309(b)(1)(v). [Emphasis added]

41. Finally, the ADA's implementing regulations specifically provide that required modifications and accommodations "may include *changes in the length of time permitted for completion of the examination*" as well as adaptation of the manner in which the examination is given. 28 C.F.R. §36.309(b)(2). [Emphasis added]

## PLAINTIFF'S DOCUMENTED DIAGNOSIS & DISABILITY

42. In 2003, when she was ten years old, Plaintiff was diagnosed with dyslexia. Her overall cognitive ability was calculated to be 91%, but her achievement skills were at 57%. Noting this "substantial difference," Denise Nagim, the education evaluator, sought an explanation in Plaintiff's "Phon /Graph Knowledge" or the ability to use sounds along with graphemes/letters" yielded her lowest score of 31%. The evaluator noted "symptoms of dysgraphia are identified in writing and affect written expression. Meaghan is unable

to reach potential as evidenced by her Spontaneous Writing score of 10 percent according to the TOWL-3." (Exhibit #12 at 3)

43. In November 2004, Plaintiff was again evaluated due to problems in school, particularly spelling, writing, test taking, and overall paying attention. Dr. Sarah Ducey, a licensed Louisiana Psychologist, found Plaintiff's Full-Scale IQ fell in the Very Superior range at the 98th percentile. However, her "Working Memory (WMI)" was in the 42nd percentile. The evaluator found that "[o]verall. Meaghan's subtest scores ranged from Low Average to Very Superior." (Exhibit #11 at 7)

44. Dr. Ducey diagnosed Plaintiff with mild dyslexia "characterized by difficulties with accurate learning and/or fluent word recognition and poor spelling and decoding abilities." She added "[s]econdary consequences may include problems in reading comprehension and reduced reading experience." (Exhibit #11 at 7)

45. Plaintiff continued through her elementary and high school years struggling in classes with writing essays, yet doing well enough in other areas that she was always at the top of her class. In her own words: "as a child, the discrepancy between my high intellectual ability and my low reading and spelling ability was a source of serious consternation for my parents. I assumed they were being overly dramatic or hyper-critical because my grades were always excellent, and I didn't think that my way of learning or writing was different from that of my friends." She had been tested in kindergarten as gifted and was also in a French Immersion program. "I attributed my inadequacy" to that. Her parents changed schools in 3rd grade to get her in a smaller class size, but "the discrepancies in my performance on standardized tests, particularly, spelling, did not improve, and my parents decided to have me evaluated." After the evaluations found dyslexia and ADHD,

11

"I was afraid I would be put in a separate program and treated differently." She even "refused all the accommodations the school offered me. I didn't think they would help." (Exhibit #7 at 1)

46. In August 2006, Plaintiff tested into the 8th Grade honors programs at Dominican High School. "The leap in academic expectations was the first time I struggled in school and was unable to keep up on my own." She then was prescribed Adderall for the ADHD. "I quickly realized it was a big help." (Exhibit 7 at 2)

47. In August 2007, Plaintiff began 9th grade at Benjamin Franklin Senior High School. There, for the first time, she became comfortable admitting her diagnosis and medication when she realized other students were suffering from ADHD and were on Adderall. However, she still resisted applying for testing accommodations as "a badge of honor: I was smart enough to well even without the recommended accommodations." For Plaintiff, "accommodations and the stigma they carry, was an admission that there was something wrong with me; that I was inadequate compared to my classmates." (Exhibit #7 at 2)

48. She continued taking Adderall through her college years at the University of Wisconsin, Madison, and she excelled, but worked very, very hard.

49. When she got to Tulane University School of Medicine, her performance on the first semester exams made her realize this was a different academic environment from what she had succeeded in before. She read and studied constantly, but her test grades were borderline with some failures. She realized "it was not a lack of preparation, knowledge, or understanding, but a lack of time" that was the source of her poor performance. It was time to ask for accommodations.

50. In her NBME Personal Statement, Plaintiff stated "[t]he basis for my belief" was the "correlation between my performance on a medical school exam and the type of questions on the exam. On exams where the majority of questions were "NBME" style (usually a paragraph long) my average score was around a 67 – which is failing. However, for exams that were mostly short questions (a sentence or two), my average score was 85 – which is the class average exam result. When I noticed this disparity in my performance, I realized extra-time may be an accommodation that would help my performance, and more importantly, one that would more accurately reflect my knowledge and ability." (Exhibit #7 at 2)

51. In January 2017, the start of her second semester of medical school, she applied for test time accommodations based on her diagnosis and medication. Tulane University granted her accommodations on written tests of time and a half. (Exhibit #7 at 1) Since then she had done well on her exams and is performing at the same average as her classmates, and sometimes better.

52. In 2018, Plaintiff requested test-time accommodations in her application to the NBME for the Step 1 Exam. She submitted the evaluations from her elementary and high school years, as well as an evaluation by James Barbee,[4] M.D., a licensed Louisiana psychiatrist, and that of M. Patricia Brockman,[5] Ph.D., a licensed Louisiana psychologist, which completed a comprehensive psychological evaluation and psychometric testing results. See (Exhibit #s 9, 10, 11, & 12)

---

[4] In 1982, Dr. Barbee joined the faculty of the Department of Psychiatry at LSU School of Medicine and held positions as Residency Director, Vice Chairman of the Department and Director of the Department Outpatient Clinics. He was The George C. Dunne Professor of Psychiatry and a Professor in the LSU School of Medicine until he entered private practice in 2009. He continues teaching residents in the department, where he is currently a Clinical Professor of Psychiatry.
[5] Dr. Brockman specializes in Child, Adolescent, School, and Family Services and has been in private practice for over thirty years.

53. Plaintiff requested accommodations based on diagnosed disabilities, the first being: Specific Learning Disorder with impairment in Reading: rate (DSM-V 315.00 ICD-10 F81.0). Accommodation Requested: Extended (150%) time for testing.

54. Dr. Barbee, who remains Plaintiff's treating psychiatrist, confirmed her ADHD diagnosis in June 2014, and continued her on Adderall. (Exhibit #9 at 1)

55. Dr. Brockman found "timed measures consistently underestimated Meaghan's skill's, even in areas where she was successful." (Exhibit #10 at 17) "The most remarkable observation was Meaghan's slow reading and decoding speed" *Ibid.* "On the timed Nelson-Denny subtest Meaghan's Reading Speed fell in the borderline or slow learner range." *Id.* Dr. Brockman found this creates a Functional Impairment for which the "accommodation of extended time is needed to produce fair and unbiased measures of Meaghan's skills on academic and daily tasks where reading is required."

56. The second disability was "Attention Deficit/Hyperactivity Disorder-Combined Type (DSM-V 314.01 ICD-10 F*). Accommodation requested: Testing room conditions that are free from distractions.

57. Dr. Brockman found "behavioral ratings by Meaghan and other informants (her father and fiancé) on several measure indicated clinically significant symptoms of Attention Deficit/Hyperactivity Disorder." (Exhibit #10 at 17)

58. The third disability was "Generalized Anxiety Disorder (DSM-V 300.02 ICD-10 F41.1). Accommodation requested: Additional breaks during testing.

59. Dr. Barbee recommended a testing environment with minimal distractions for this disorder. (Exhibit #9 at 2)

60. Dr. Brockman recommended a testing room free of distractions to help Plaintiff focus, as well as regular breaks during standardized testing. (Exhibit #10 at 18)

## DEFENDANT'S VIOLATIONS OF THE ADA of 1990 & ADA AMENDMENTS ACT OF 2008

61. As a direct and proximate result of Defendant's disregard for Plaintiff's ADA protections and Defendant's own ADA obligations to provide reasonable accommodations, Defendant has violated the ADA by discriminating directly and personally against Plaintiff in several ways, including, without limitation, to the following:

    a.  Defendant has violated 28 C.F.R. § 36.309(b)(1)(v) by not giving "considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received" by Plaintiff "in similar testing situations."

        i.  Plaintiff presented written documentation from Tulane University School of Medicine to Defendant that Tulane has been providing Plaintiff with testing accommodations on all written exams ("similar testing situations") consisting of "extended time (x1.5)" due to "Specific Learning Disorder, Impairment in Reading" since January 2017. (Exhibit #7)

        ii.  Remarkably, the Defendant's Denial of Accommodations letter of July 15, 2019, makes no reference to, or acknowledgement of, the "past accommodations" which (1) Tulane University determined Plaintiff was entitled; (2) that Tulane provided extended time (x1.5) accommodations (the same accommodation Defendant denied her); (3) that the accommodations Tulane provided were for "similar testing situations," namely, written examinations; or (4) that Tulane has granted to Plaintiff

these accommodation for the past two years. The NBME Denial letter to Plaintiff was silent on this point on which Defendant has a statutory obligation to give "considerable weight."

b. Defendant has violated its duty under 28 C.F.R. § 36.309(b)(1) that it "must assure that the Step 2 CK test shall be:

"administered so as to best ensure that, *when the examination is administered to an induvial with a disability* that impairs sensory, manual, or speaking skills, *the examination results accurately reflect the individual's aptitude or achievement level* or whatever other factor the examination purports to measure, *rather than reflecting the individual's impaired sensory, manual, or speaking skills*." 28 C.F.R. § 36.309(b)(1)(i) [Emphasis added]

i. Plaintiff presented Defendant with written documentation from one licensed Louisiana psychiatrist and two licensed Louisiana psychologists, who, as qualified professionals have personally observed Plaintiff in a clinical setting, in accordance with generally-accepted diagnostic criteria (DSM-V), as supported by reasonable documentation, have determined – in their clinical judgment – that Plaintiff is substantially limited in one or more major life activities within the meaning of the ADA, and is therefore in need of the requested test accommodation of extended time in order to demonstrate her ability and achievement level on the Step 2 test.

c. Defendant has violated its duty to Plaintiff under 42 U.S.C. § 12189 to offer its Step 2 CK licensing examination "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangement for such individuals" in that:

i. Defendant has denied Plaintiff's request for testing accommodations under 28 C.F.R. §36.309(b)(2), to wit: "changes in the length of time permitted

16

for completion of the examination and adaptation of the manner in which the examination is given," and

ii. Defendant has denied, despite the written documentation available to it presented by Plaintiff, that Plaintiff is not "currently substantially limited" in the major life activities of learning, reading, concentrating or thinking – all major life activities specified in the text of the ADA and implementing regulations.

62. For the reasons set out above in Paragraphs 19-30, Plaintiff will suffer irreparable injury by Defendant's denial of her request for ADA accommodations on the Step 2 test, with which she is without adequate remedy at law.

## GROUNDS FOR TRO WITH EQUITABLE RELIEF AND REQUEST FOR PRELIMINARY INJUNCTION

63. As Plaintiff now has a scheduled test date for the Step 2 Test and Defendant has rejected her request for testing accommodations, Defendant NBME is in violation of the ADA of 1990 and the ADA Amendments Act of 2008 for discrimination against persons with disabilities in a professional licensing examination by refusing to provide plaintiff with reasonable and statutorily available testing accommodations.

64. Pursuant to Fed. R. Civ. P. 65(b), Plaintiff has provided actual notice to Defendants as of the time of the making of this application and has provided copies of all pleadings and papers filed in this action to date, by email. A certificate of counsel accompanies this motion.

65. Pursuant to 42 U.S.C. § 12188 and 42 U.S.C. §2000A-3(a), Plaintiff has provided notice of this civil action, including a copy of all pleadings and papers filed to date via email, to

the U.S. Department of Justice, Civil Rights Division, Disability Rights Section, and requests that this Honorable Court permit the Attorney General of the United States to intervene if he certifies that "the case is of general public importance."

66. A memorandum in support of TRO and proposed TRO Order are filed concurrently.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's application for temporary restraining order with equitable relief and order to show cause with a preliminary injunction should not issue, by entering the proposed TRO Order attached hereto, and enter judgment against Defendant, National Board of Medical Examiners, providing the following relief:

1) Entrance of an injunction directing Defendant National Board of Medical Examiners and its officers, employees, and agents to cease discriminating against Plaintiff in violation of the ADA and grant Plaintiff's application for reasonable testing accommodations of time and a half (50% additional time) when she takes the Step 2 CK Examination on Tuesday, August 6, 2019 at 2424 Edenborn Avenue, Metairie, LA 70001, beginning at 8:00 a.m. and continuing through the end of the testing session on that date.

2) Entrance of an injunction directing Defendant NBME, and its officers, employees, agents, contractors, and any third part test-proctor who administers the actual Step 2 CK Exam on NBME's behalf, voluntarily or contractually, to provide Plaintiff with reasonable testing accommodations of time and a half (50% additional time) to Plaintiff on her Step 2 Examination on Tuesday, August 6, 2019 at 2424 Edenborn Avenue, Metairie, LA 70001, beginning at 8:00 a.m. and continuing through the end of the testing session on that date.

3) Temporarily restraining and enjoining Defendant NBME and its officers, employees, agents, contractors, and any third part test-proctor who administers the actual Step 2CK Exam on NBME's behalf, voluntarily or contractually, from withholding test-taking time accommodations of time and a half (50% additional time) to Plaintiff on her Step 2 Examination on Tuesday, August 6, 2019 at 2424 Edenborn Avenue, Metairie, LA 70001, beginning at 8:00 a.m. and continuing through the end of the testing session on that date.

4) Entrance of an injunction directing Defendant NBME, and its officers, employees, agents, contractors, and any third part test-proctor who administers the actual Step 2 CK Exam on NBME's behalf, voluntarily or contractually, directing same to expedite the grading of Plaintiff's Step 2 CK Exam and to provide Plaintiff , MEAGHAN DOHERTY, with the results of same by email not later than 4:00 p.m. on Friday, August 30, 2019.

5) Award Plaintiff the costs of this action, and reasonable attorneys' fees pursuant to 42 U.S.C. §12188 and 42 U.S.C. §2000a-3(b).

6) Pursuant to 42 U.S.C. § 12188 and 42 U.S.C. §2000A-3(a), permit the Attorney General of the United States, through the Civil Rights Division, Disability Rights Section, to intervene in this civil action if he certifies that "the case is of general public importance."

7) Provide such other relief as the Court deems to be just and equitable.

Respectfully submitted,

WILLIAM MARTIN MCGOEY, Esq., LSBA #14205
1828 Rose Street
Arabi, Louisiana 70032
Telephone: 504-250-3293
bmcgolaw@yahoo.com

FRANCES M. OLIVIER, ESQ. LSBA No. 17895
2341 Metairie Road
Metairie, Louisiana 70001
Telephone: 504-483-6334; Fax: 504-483-6344
folivier@olivierlawfim.com

Attorneys for Plaintiff Meaghan Doherty

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above has been forwarded to all parties of record via the Electronic E-mail, U.S. Mail, and or/or the Court's ECF system when not under protective seal, on July 22, 2019.

WILLIAM M. MCGOEY