# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MEAGHAN DOHERTY** | * | **CIVIL ACTION NO.** 19 - 11790 |
| | * | |
| **VERSUS** | * | **JUDGE:** |
| | * | |
| **NATIONAL BOARD OF** | * | **MAGISTRATE:** SECT. T MAG 5 |
| **MEDICAL EXAMINERS** | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## UNDER SEAL

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

**MAY IT PLEASE THE COURT:**

Plaintiff, Meaghan Doherty, respectfully presents this Memorandum in Support of her Application for Temporary Restraining Order with equitable relief and Order to Show Cause Why a Preliminary Injunction Should Not Issue against Defendant, National Board of Medical Examiners, for reasons more fully explained below.

## I.    FACTS

Plaintiff is a twenty-five-year-old senior at Tulane University School of Medicine who requested testing-accommodations from Defendant NBME of extended time (x1.5) under the ADA for the Step 2 CK Exam she must take in order to be eligible for Residency Placement and for graduation with a medical degree. Defendant denied her request for accommodations. Plaintiff filed the underlying Application for Temporary Restraining Order with equitable relief and Order for Rule to Show Cause why a Preliminary Injunction should not Issue.

1

## II.   LAW AND ARGUMENT

### A. The ADA Amendments Act of 2008

The U.S. Department of Justice succinctly explained the background and purpose of the ADA Amendments Act of 2008 in the introduction to its notice of rule making authority under the act, to wit: "The ADA Amendments Act retains the ADA's basic definition of "disability" as: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. 12102(1)(A)-(C). However, it provides rules of construction necessary to ensure that the definition is construed broadly and without extensive analysis. Id. at 12102(4).

"Congress enacted the ADA Amendments Act in response to a series of Supreme Court decisions in which the Court interpreted the definition of "disability" narrowly, thus eliminating protection for many individuals that Congress intended to protect when it first enacted the ADA. Public Law 110-325, sec. 2. For example, in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), the Court ruled that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures. Id. at 482. In Sutton, the Court also adopted a restrictive reading of the meaning of being "regarded as" disabled under the ADA's definition of disability, holding that the plaintiff could not prevail under this prong of the definition of disability without first demonstrating that the employer believed the plaintiff's impairment to be substantially limiting. Id. at 490. Subsequently, in Toyota Motor Manufacturing, Kentucky, Inc., v. Williams, 534 U.S. 184 (2002), the Court held that the terms "substantially" and "major" in the definition of disability "need to be interpreted strictly to create a demanding standard for qualifying as disabled" under the ADA, and that to be substantially limited in performing a major life activity under the ADA, "an individual must have

an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Id. at 197–98.

"As a result of these Supreme Court decisions, lower courts ruled in numerous cases that individuals with a range of substantially limiting impairments were not individuals with disabilities and thus not protected by the ADA. See 154 CONG REC. S8841 (daily ed. Sept. 16, 2008) (Statement of the Managers) ("After the Court's decisions in Sutton that impairments must be considered in their mitigated state and in Toyota that there must be a demanding standard for qualifying as disabled, lower courts more often found that an individual's impairment did not constitute a disability. As a result, in too many cases, courts would never reach the question whether discrimination had occurred.").

"While the vast majority of these court decisions arose in the area of employment, the narrowing of the definition of disability had an adverse impact on individuals seeking the protection of the ADA in circumstances involving entities covered by titles II and III, particularly individuals seeking reasonable modifications for learning disabilities in education programs at colleges and universities and in licensing and testing situations. See, e.g., Gonzales v. National Board of Medical Examiners, 60 F. Supp. 2d 703 (E.D. Mich. 1999); and Wong v. Regents of University of California, 410 F.3d 1052 (9th Cir. 2005).

"Congress concluded that Sutton, Toyota, and their progeny interpreted the definition of disability more narrowly than what Congress had originally intended. Congress determined that these decisions, coupled with the EEOC's 1991 ADA regulation, which had defined the term "substantially limits" as meaning "significantly restricted," unduly precluded many individuals from being covered under the ADA. See Public Law 110-325, sec. 2; see also 154 Cong. Rec. S8840–41 (daily ed. Sept. 16, 2008) (Statement of the Managers) ("Thus, some 18 years later we

are faced with a situation in which physical or mental impairments that would previously have been found to constitute disabilities are not considered disabilities under the Supreme Court's narrower standard" and "[t]he resulting court decisions contribute to a legal environment in which individuals must demonstrate an inappropriately high degree of functional limitation in order to be protected from discrimination under the ADA."). [Emphasis added] For that reason, Congress passed the ADA Amendments Act of 2008 [to clarify the following points:]

• That the term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA;

• That an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population;

• That the primary issue in a case brought under the ADA should be whether the covered entity has complied with its obligations and whether discrimination has occurred, not the extent to which the individual's impairment substantially limits a major life activity;

• That in making the individualized assessment required by the ADA, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADA Amendments Act;

• That the comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence;

• That mitigating measures other than "ordinary eyeglasses or contact lenses" shall not be considered in assessing whether an individual has a "disability";

• That an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active; and

• That an impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.[1]

## ADA STATUTORY DEFINITIONS

The ADA definition of "disability" with respect to an individual" is three pronged:

---

[1] Office of the Attorney General, 28 CFR Parts 35 and 36, CRT Docket No. 24; AG Order No. RIN 1190-A59; Amendment of Americans with Disabilities Act Title II and Title III Regulations to Implement ADA Amendments Act of 2008. https://www.ada.gov/nprm_adaaa/nprm_adaaa.htm

(i) A <u>physical or mental impairment</u> that substantially limits one or more of the major life activities of such individual;

(ii) <u>A record of such an impairment</u>; or

(iii) Being regarded as having such an impairment as described in paragraph (f) of this section. 28 C.F.R. 36.105(a)(1) [Emphasis added]

In its "Rules of Construction," Congress bluntly stated how this definition is to be applied, at

28 C.F.R. 36.105(a)(2):

(i) The definition of "disability" <u>shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.</u> [Emphasis added]

(ii) An individual may establish coverage <u>under any one</u> or more of the three prongs of the definition of "disability" in paragraph (a)(1) of this section, <u>the "actual disability" prong</u> in paragraph (a)(1)(i) of this section, <u>the "record of" prong</u> in paragraph (a)(1)(ii) of this section, <u>or the "regarded as" prong</u> in paragraph (a)(1)(iii) of this section. [Emphasis added]

Plaintiff is proceeding under Prongs (i) and (ii) of the ADA definition of disability.


## DISABILITY DEFINITION PRONG (i)

The ADA states "**physical or mental impairment**" means:

(ii) Any mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and <u>specific learning disability</u>. 28 C.F.R. 36.105(b)(1)(ii): [Emphasis added]

(2) Physical or <u>mental impairment includes,</u> but is not limited to, contagious and noncontagious diseases and conditions such as the following: Orthopedic, visual, speech and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, intellectual disability, <u>emotional illness, dyslexia and other specific learning disabilities, Attention Deficit Hyperactivity Disorder,</u> Human Immunodeficiency Virus infection (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism. 28 C.F.R. 36.105(b)(2) [Emphasis added]

Plaintiff produced written documentation from licensed Louisiana professionals who

clinically observed her that she has three mental impairments: (Exhibit #8, #9, & #10)

(1) A specific Learning Disability: Impairment of reading: rate;

(2) Attention Deficit Hyperactivity Disorder; and

(3) General Anxiety Disorder

Plaintiff submitted to the NBME documentation of her impairments. The issue becomes whether her "mental impairments" fall under the definition of a "major life activity," which definition is found in 28 C.F.R. 36.105(c)(1)(i) and includes the activities listed:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, <u>learning, reading, concentrating, thinking, writing, communicating</u>, interacting with others, and working; [Emphasis added]

Again, it its "Rules of construction" under this definition, Congress was clear as to how it is to be construed, as found at 28 C.F.R. 36.105(c)(1)(2):

(i) In determining whether an impairment substantially limits a major life activity, <u>the term major shall not be interpreted strictly to create a demanding standard</u>. [Emphasis added]

(ii) Whether an activity is a major life activity is not determined by reference to whether it is of central importance to daily life.

Plaintiff submits that her "mental impairments" as outlined above, fall under the statutory categories of "learning, reading, concentrating, thinking, writing, communicating" and qualify as "major life activities."

The inquiry now focuses on what the ADA means by "substantially limits" in regard to a "major life activity." Here to, Congress has been specific, as found at 28 C.F.R. 36.105(d):

(1) The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity.

(i) The term "substantially limits" shall be <u>construed broadly</u> in favor of <u>expansive coverage</u>, to the <u>maximum extent permitted</u> by the terms of the ADA. "Substantially limits" is <u>not meant to be a demanding standard</u>. [Emphasis added]

(ii) <u>The primary object of attention</u> in cases brought under title III of the ADA <u>should be whether public accommodations have complied with their obligations and whether discrimination has occurred</u>, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, <u>the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis</u>. [Emphasis added]

(iii) An impairment that substantially limits one major life activity does not need to limit other major life activities in order to be considered a substantially limiting impairment.

(iv) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(v) An impairment is a disability within the meaning of this part <u>if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population</u>. An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(vi) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term <u>"substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for substantially limits applied prior to the ADA Amendments Act</u>. [Emphasis added]

(vii) <u>The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence</u>. Nothing in this paragraph (d)(1) is intended, however, to prohibit or limit the presentation of scientific, medical, or statistical evidence in making such a comparison where appropriate. [Emphasis added]

(viii) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

Plaintiff submits her written documentation of clinical findings meets the statutory standard. The inquiry now turns to the issue of how to measure Plaintiff's performance of the "major life activities" of "learning, reading, thinking" in comparison to "most people in the general population." Significantly, on this point, the ADA provides that this inquiry will "usually will not require scientific, medical, or statistical evidence." 28 C.F.R. 36.105(d)(1)(vii).

"Most People In the General Population": With Whom is Plaintiff Compared?

Bearing in mind always, that the ADA requires "expansive coverage, to the maximum extent permitted by the terms of the ADA," (28 C.F.R. §1630.2(i), Patrick Yingling in his article, <u>Disabilities and the ADA: Licensing Exam Accommodations in the Wake of the ADA</u>

7

Amendments of 2008, 59 Cleveland State L. Rev. 291, 309 (2011), extensively explores this

issue and concludes that an analysis that requires comparisons with the general population as

opposed to Plaintiff's peers, can only be based on the authority of Toyota Motor Manufacturing,

Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) and Sutton v. United Airlines, Inc., 527 U.S.

471 (1999) – which are the exact cases that Congress intended to overturn with the ADA

Amendment Act of 2008. See Singh v. George Washington University School of Medicine and

Health Sciences, 508 F. 3d 1097, 1100-1101 (D.C.Cir. 2007);[2]  Accord Wong v. Regents of the

University of California, 410 F.3d 1052, 1065 (9th Cir. 2005).

      Jenkins v. National Bd. of Medical Examiners, 2008 WL 410237 (W.D.Ky. 2008), was

reversed exactly on this point. 2009 WL 331638 (6th Cir. 2009). See Yingling, *supra*. In Singh,

the Court of Appeal agreed that the plain text of the ADA "never speaks of making a

comparison." 506 F. 3d 1097. The District Court had said,

"these regulations do not require a comparison to the general population in all cases. As for the
EEOC regulations, quite clearly, when an ADA plaintiff claims a limitation in the major life
activity of working, her limitation is assessed in comparison to others of comparable training,
skills, and abilities. It is not surprising that the EEOC, concerned with employment practices and
empowered by Congress to issue some ADA interpretive regulations in the employment context,
see 42  U.S.C. §12116, would offer a more particular and detailed definition of "substantially
limits" with respect to working while devising a more generalized definition for other activities.
For many of the other listed activities, a person's training, skills, and abilities are far less relevant
to assessing whether that person is substantially limited in that activity. See Duncan v. WMATA,
240 F.3d 1110, 1121-22 (D.C. Cir. 2001) (en banc) (Edwards, C.J., dissenting). But see Wong v.
Regents of the U. of Cal., 379 F.3d 1097, 1108 (9th Cir. 2004) (importing, without convincing
analysis, the "entire population" comparison requirement from the physical disability context to
deny relief to a learning-impaired medical student dismissed after receiving poor grades,
discovering his impairment, and requesting accommodations). For example, whether a blind or
deaf or paraplegic person has a college degree is of no moment to assessing whether she is
substantially limited as to seeing, hearing, or walking. In this respect, learning, is more like
working that other major life activities. When learning, a person always finds herself amongst
people with similar academic background, In pre-school, children, have almost no prior
educational training. At graduate school, at medical school, every student has a degree from a

[2] A number of courts continue to cite Singh and Wong despite this. Rawdin v. American Bd. of Pediatrics, 985 F.
Supp. 2d 636 (E.D.Pa. 2013); Rumbin v. Ass'n of Am. Med. Colis., 803 F. Supp. 2d 83, 85 (D.Conn. 2011); Biber v.
National Bd. of Osteopathic Medical Examiners, Inc., 2016 WL 1404157 (E.D. Pa. 2016).

four-year college. Students generally compared to their peers on examinations, and that is how their substantial success or limitation in learning is measured. Cf. Bartlett, 970 F. Supp. At 1126 (comparing plaintiff seeking bar exam accommodations to fellow law students when concluding she is substantially impaired in activity of working as a lawyer). Defendants would compare plaintiff, a graduate medical student, to a high school graduate or perhaps even a pre-school student to determine whether she is substantially limited in her ability to learn. They would apply the general definition of "substantially limited" when the more specific definition, that for working which accounts for a person's training, is more applicable. Using a more specific definition makes sense. The EEOC regulations, therefore, do not require a plaintiff to show that she is substantially limited in learning compared to the rest of the world, but as compared to people of similar age and educational background. The Department of Justice regulation is not at all inconsistent, advising that a comparison be made to "most people." Most people is by no means all people, and the language's ambiguity would permit the agency or other entity to shape the appropriate comparison given the circumstance."

In Bartlett v. N.Y. State Bd. of Law Examiners, 2001 WL 930792 (S.D.N.Y. 2001),

Justice Sotomayor, then a Circuit judge sitting by designation, noted that the comparison to the

average person in the general population could not be based on a test score alone[3] or on

plaintiff's ability "to self-accommodate." She concluded (at slip 3):

When considering both the positive and negative effects of plaintiff's self-accommodations, plaintiff is substantially limited in the major life activity of reading when compared to the average reader by her slow reading rate and by the fatigue caused by her inability to read with automaticity."

She noted further, at 22:

Plaintiff's experts have convinced me…that learning disabilities cannot be captured by psychometric measures alone and that clinical observations are essential to a diagnosis of learning disabilities.

And she concluded that plaintiff's reading disability "substantially limit[ed] her major life

activity of reading." Id. at 29[4] citing, inter alia, Root v. Ga. State Bd. of Veterinary Med. 114 F.

Supp. 1324 (N.D. Ga. 2000), reversed in part, vacated in part on other grounds, 252 F. 3d 443

---

[3] "All of the experts, including defendant's experts, agree that no psychometric tests directly measure automaticity." "Nor do such tests properly diagnose "reading rate problems." Id. at 22. Such tests are also "extremely limited in their application to adults." Id.

[4] Note that she is relying on the restrictive ADA readings of Sutton, et al, decided prior to the ADAAA of 2008.

(11th Cir. 2001)[5] (distinguishing between measures that improved abilities to overcome

disabilities and other disabilities). In doing so, *Id.* at 35, the Court noted the requirements of

distinguishing "between the mitigating measures plaintiff uses that affect her ability to read and

those that merely assist her in functioning in her daily life."

Justice Sotomayor concluded:

In order to find that plaintiff had a reading disability, I must find that she is substantially limited
in reading in comparison to "most people." 28 C.F.R. Pt. 35, App. A §35.104. Dr. Ferguson
contends that "most people" should be defined in reference to a bell curve on standardized tests.
Specifically, she testified that individuals can only be substantially limited when compared to
"most people" if their scores fall outside the average range of the 16th or 84th percentiles.
(Flanagan Aff. 9(a)(i); Tr. at 616). While I have already rejected the proposition that plaintiff's
disability can be diagnosed solely on her scores outcome on tests without reference to the
manner in which she achieved those outcomes, see *supra*, Conclusions of Law, Section 1.B, I
also disagree with Dr. Flanagan that, to the extent that such tests scores are relevant, I should
equate "most people" with the average range on the bell curve. While the DOJ has not
specifically defined the term "most people," I find the EEOC's discussion of this term to be
instructive: "[a]n impairment is substantially limiting if it significantly restricts the duration,
manner or condition under which an individual can perform a particular major life activity as
compared to the average person in the general population's ability to perform that same major
life activity…It should be noted that the term "average person" is not intended to imply a precise
mathematical 'average.' 29 C.F.R. Pt. 1630, App. A §1630.2(j).

In <u>Yingling</u>, *supra*, the author (at 306) noted the views of the House Committee on

Education and Labor regarding the ADAAA.

It is critical to reject the assumption that an individual who performs well academically or
otherwise cannot be substantially limited in activities such as learning, reading, thinking, or
speaking.

Moreover, the Committee endorsed Bartlett's holding "that a determination of whether a

plaintiff is substantially limited should not take into consideration the plaintiff's ability to self-

accommodate." He further noted (at 307):

The courts can bring case law in step with the intentions of Congress and can also clarify
standards for examination boards by addressing future claims in a slightly different manner than
in the past. This article makes three primary recommendations for future decisions regarding
licensing exam accommodations for learning disabilities: (1) the courts should no longer

---

[5] See <u>Bartlett</u> at fn. 41.

foreclose the finding of a substantially limiting impairment in regard to the major life activity of reading due to an individual's academic success; (2) "working" should be recognized as an appropriate major life activity under which to evaluate claims for accommodations on the bar exam (and possible other licensing exams), with such evaluations involving a comparison to people having comparable training, skills, and ability; and (3) reading disabilities should be recognized not only by psychometric test that show a substantial limitation in comparison to most people, but also by test scores that indicate a significant discrepancy between an individual's intellectual capacity and actual reading ability. By following these recommendation, the courts will be able to evaluate with standards that reflect Congress' intention to provide a broad scope of protection under the ADA.

## DEFENDANT'S DENIAL OF ACCOMODATIONS

Defendant NBME based its decision to deny Plaintiff's accommodations request on the grounds that her performance on the 2014 MCAT and the 2018 Step 1 Exam, when compared to "most people in the general population," does not "demonstrate impaired functioning relative to most people or that standard test conditions are a barrier to your access to the USMLE." (Exhibit #1 at 2, ¶2). Plaintiff reiterates the argument above regarding the "most people in the general population" standard.

Plaintiff scored a 32 on the MCAT in June 2014. (Exhibit #2 at 47). That test was five years ago. Defendant's reliance on this test score to deny accommodations in 2019 is misplaced. In contrast, Plaintiff's professional evaluations are current and based on clinical observation in accordance with the accepted standard of clinical review of the DSM-V. It further assumes that Plaintiff could not have done better than a score of 32, given testing accommodations; that the question-answer format allowed her to show her aptitude and academic achievement level, as opposed to testing her disability. In fact, other than that there were no accommodations, Defendant has no information about the testing circumstances of her MCAT or how she interacted with the test format.

11

Further, Defendant overlooks that the statute provides that an individual may have an impairment that is episodic or in remission, and that it too is protected under the first prong of the disability definition. 28 C.F.R. §§ 35.108(d)(1)(iv); 36.105(d)(1)(iv).  In Manzzeo v. Color Resolution Int'l, L.L.C., 746 F.3d 1264 (11th Cir. 2014), the Court stated, "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active," citing 42 U.S.C. § 12102(4)(D).

In effect, Defendant's position on Plaintiff's MCAT score is that "Plaintiff has no disability requiring accommodations because she did well on that test." Plaintiff's good score on the MCAT is not a legitimate justification for denying her accommodations five years later on Step 2. Defendant also ignores the fact that plaintiff's medical school grades have significantly increased since Tulane granted her the same test-taking accommodations which she is requesting here. Defendant's argument is contradictory on its face and disregards the positive impact accommodations in medical school have had on Plaintiff's test results.

Plaintiff scored a 200 on the Step 1 test (for which Defendant had denied her first accommodations request). The minimum passing score on that test was 194. The mean was 228. Thus, Plaintiff scored just above passing and twenty-eight points below the mean. This was an underachievement by a student who has excelled academically throughout her career. It is also a remarkably poor performance for an individual with a Full-Scale IQ in the 96th percentile (Exhibit #9 at 5), who on all scales has scored consistently in the intellectually superior range. Plaintiff's low Step 1 score emphasizes that her impairment/learning disability shows a discrepancy between her age, measured intelligence, education, and her actual –versus– her expected achievement.

Contrary to Defendant's portrayal of Plaintiff's Step 1 score as being satisfactory compared to most people, it is the strongest evidence yet that her diagnosed disabilities are affecting her performance on a standardized test, specifically the Step Test format. Further, her low performance on Step 1 is evidence that Defendant's USMLE is doing exactly what the ADA statutorily is trying to avoid: testing Plaintiff's disability. This contravenes the ADA's plain language mandate that "the examination results accurately reflect the individual's aptitude or achievement level" and not her disability. 28 C.F.R. § 36.309(b)(1)(i). Bluntly put, just as her elementary school evaluations showed that Plaintiff's reading skills and test-taking skills were substantially below the level of performance one could reasonably expect from her overall intelligence level, her Step 1 score drives home the point that, without accommodations for her reading learning disability and ADHD, Plaintiff will perform at a very low level. Defendant uses Plaintiff's poor Step 1 results to justify denying accommodations on Step 2: since she didn't fail Step 1, Plaintiff has not demonstrated a need for accommodations on Step 2. This argument ignores the fact that her "barely passing score" virtually eliminated the possibility of Plaintiff securing any residency match – a requisite to Plaintiff being able to ultimately practice as a licensed doctor. It also puts her in the catch-22 of having barely passed Step 1, she was barred from retaking the test. The NBME only permits a retake if the student fails outright.

Third, Defendant has denied Plaintiff's request for accommodations (based on these two test results) without giving any weight to the psychiatric and psychological evaluations submitted clinically assessing her. Defendant's letter of denial makes an oblique, passing reference to these professional evaluations and their recommendations: "A diagnostic label, in and of itself, does not establish coverage under the ADA." (Exhibit #1 at 2, ¶1). Defendant cites no basis in the

record of Plaintiff's submissions as to why it discounted the findings of the professional evaluations. Nor did Defendant request additional information.

Fourth, Defendant has denied Plaintiff's accommodations request with out giving any weight to the extended time accommodations granted to her by Tulane for the past two years. Defendant merely states "nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings or circumstances." (Exhibit #1 at 2, ¶1). Astoundingly, Defendant makes this bald assertion without citing anything in the record in Plaintiff's psychiatric, psychological or academic submissions to show that Tulane's grant of accommodations was wrong, misplaced, or somehow irrelevant to Plaintiff's present request for accommodations.

Defendant's basis for denial of accommodations is even more startling when read in contrast to the ADA provisions stating that a disability or impairment "does not need to prevent, or significantly or severely restrict, an individual from performing a major life activity *in order to be substantially limiting.*" [Emphasis added] 28 C.F.R. 36.105(d)(1)(ii) This underscores the corrective nature of the ADA Amendments Act and its explicit rejection of the strict standards imposed under Toyota and its progeny. See Public Law 110-325, sec. 2(b)(4).

Defendant's denial of accommodations also contradicts the plain language of the statute that disability determinations "should not demand extensive analysis." See Public Law 110-325, sec. 2(b)(4)-(5). It defies reason that Defendant could reject Plaintiff's accommodation request when the statute itself contemplates that a disability need not "prevent" or "severely restrict" an individual from performing a major life activity; it need only substantially limit it to received protection under the ADA.

Plaintiff submits that the professional psychiatric and psychological evaluations she has submitted establish that she is covered by the ADA and that has satisfied the definition of "disability." The professionals who evaluated her have documented her need for particular testing accommodations as the best means to mitigate the effects of her disabilities. As such, she is entitled to testing accommodations under the ADA.

## DISABILITY DEFINITION PRONG (2)

The second part of the definition of "disability" is the "record of impairment" prong. An individual with a "record of an impairment" that substantially limits or limited a major life activity is an individual with a disability under the ADA. 42 U.S.C. § 12102. A "record" in this context is defined in 28 C.F.R. § 36.105 (e):

(1) An individual has a record of such an impairment if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities. [Emphasis added]

(2)Broad construction. Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to fall within this prong of the definition of "disability" if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment. In determining whether an impairment substantially limited a major life activity, the principles articulated in paragraph (d)(1) of this section apply.

(3)Reasonable modification. An individual with a record of a substantially limiting impairment may be entitled to a reasonable modification if needed and related to the past disability.

Plaintiff's record of disability dates back to 2003 documenting her learning disability and ADHD. (Exhibits #7, 8, 9, 10, & 11). Again, the Attorney General explained the context of this prong under the ADA Amendments Act, noting: "there are many types of records that could potentially contain this information, including but not limited to, education, medical, or

employment records. The Department notes that past history of an impairment need not be reflected in a specific document. Any evidence that an individual has a past history of an impairment that substantially limited a major life activity is all that is necessary to establish coverage under the second prong."[6]

Thus, plaintiff submits that by her sixteen-year documented record of a learning disability in regard to reading and her diagnosis as suffering ADHD, she has established she is covered under the ADA pursuant to the "record of impairment" prong of the disability definition. As such, she is entitled to testing accommodations on the Step 2 Exam.

ADA IS A REMEDIAL ACT TO RELIEVE THE STIGMA OF DISABILITY

The ADA "has been described as a 'milestone on the path to a more decent, tolerant, progressive society.'" P.G.A. Tour, Inc., v. Martin, 532 U.S. 671, 675 (2001).  It is the essence of remedial legislation. As such, it is entitled to great weight, if not controlling weight. United States v. Board of Trustees for the University of Alabama, 908 F. 2d 740 (11th Cir. 1990).

The late Judge Alvin Rubin explained "where the nature of an act is remedial, as here, it should be construed liberally in an attempt to provide the remedy, not avoid it. See Thomas v. Myers-Dickson Furniture Co., 479 F.2d 740 (5th Cir. 1973).  Compare Raetano v. Kelly Inc., 2009 WL 651808 (M.D. Fla. 2009) slip at 2, with Henrietta D. v. Bloomberg, 331 F. 3d 261, 279 (2d Cir. 2003), where the Court stated "[t]he Eleventh Circuit, quoting the Fifth Circuit, has explained that remedial statutes (and thus their supporting regulations) are to be construed liberally to effectuate their purpose." CFTC v. Hefferman, 245 F. Supp. 2d 1276, 1301 (S.D. Ga.

---

[6]  Office of the Attorney General, 28 CFR Parts 35 and 36, CRT Docket No. 24; AG Order No. RIN 1190-A59; Amendment of Americans with Disabilities Act Title II and Title III Regulations to Implement ADA Amendments Act of 2008. https://www.ada.gov/nprm_adaaa/nprm_adaaa.htm

2003); accord <u>National Engineering & Contracting Co. v. OSHA</u>, 928 F.2d 762, 767 (6th Cir.

1991), citing <u>Whirlpool Corp. v. Marshall</u>, 445 U.S. 1, 13 (1980).

### ADHD IS A DISABILITY UNDER THE ADA AMENDMENTS ACT OF 2008

As noted above, ADHD is a disability under the ADA Amendments. 28 C.F.R.

36.105(b)(1) The cases that hold otherwise were decided before the ADAAA became effective

date of the Act on January 1, 2009. See Weaving v. City of Hillsboro, 763 F.3d 1106 (9th Cir.

2014) (covering 2006-2009).

In <u>McCarthy v. Marple Tp. Ambulance Corps</u>., 869 F. Supp.2d 638, 648 (E.D.Pa. 2012),

the Court stated:

ADHA is an impairment within the meaning of the ADA, but it only qualifies as a disability
under the ADA it is "substantially limits one or more [of McCarthy's] major life activities." 42
U.S.C. §12102(1); see <u>Love v. Law Sch. Admission Council, Inc.</u> 513 F. Supp. 2d 206, 224
(E.D.Pa. 2007) (citing <u>Rothberg v. LSAC</u>, 300 F. Supp. 2d 1093 (D.Colo. 2004); <u>Bartlett v. N.Y.
State Bd. of Law Exam'rs</u>, 2001 WL 930792 (S.D. N.Y. Aug. 15, 2001); <u>Prince v. Nat'l Bd. of
Med. Exam'rs</u>, 966 F. Supp. 419 (S.D. W.Va. 1997). McCarthy asserts that the major life
activities affected by his ADHD are concentrating, thinking, and interacting with others. The
Third Circuit has already held that concentrating and thinking are major life activities. See
<u>Gagliardo v. Connaught Labs, Inc.</u> 31 F.3d 565, 569 (3rd Cir. 2002) (concentrating); <u>Taylor v.
Phoenixville Sch. Dist.</u>, 184 F.3d 296, 307 (thinking). [7]

According to her verified complaint, Plaintiff suffers from disabilities which substantially

affect her performance on standardized tests. She is substantially limited in the major life

activities of concentrating, reading, learning, and test-taking. See <u>Doe</u>, *supra* at 966, citing

<u>Bartlett v. N.Y. State Board of Law Examiners</u>, 970 F. Supp. 1094, 1117 (S.D.N.Y. 1997) affd.

in part and vacated in part on other grounds 527 U.S. 1031 (1999)[8]

---

[7] Rothberg was reversed on appeal of the preliminary relief. 102 Fed. Appx. 122 (10th Cir. 2004).
[8] <u>Bartlett</u> is cited a number of times in this brief. Plaintiff is referring however, to 2001 WL 930792 (S.D.N.Y. 2001).

It appears that the NBME refuses to accept that a reading learning disability or ADHD is a disability under the ADA; and refuses to accept either <u>Bartlett</u> or the EEOC regulations interpreting "substantially limits one or more major life activities compared to most people in the general population."[9] One might have thought that having entered into a settlement with the Department of Justice, (although concededly, it is now expired) that Defendant would have changed its practices.

PLAINTIFF IS ENTITLED TO A TRO

The standards for a temporary restraining order are the same as for a preliminary injunction. See <u>City of Eufaula v. Alabama DOT</u>, 2014 WL 7369783 (M.D. Ala. 2014); <u>O'Boyle v. Town of Gulf Stream</u>, 2013 WL 3147639 (S.D. Fla. 2013); <u>Florence v. Donald</u>, 207 WL 1033523 (S.D. Ga. 2007) citing <u>Bieros v. Nicola</u>, 857 F. Supp. 445, 446 (E.D. Pa. 1994); <u>Johnson v. Patterson</u>, 2012 WL 353238 (S.D. Ala. 2012) fn.1.

The appropriate standards are set out in Texas v. Seatrain International, 518 F2d 175, 179-180 (5th Cir. 1975):

As we said in <u>Canal Authority of State of Florida v. Callaway</u>, 489 F.2d 567 (5th Cir. 1974), it is an extraordinary and drastic remedy which should not be granted unless the movant has clearly carried the burden of persuasion concerning the existence and application of what we have recognized as the four prerequisites to such relief. These are: (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the party or parties opposed; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. <u>Canal Authority</u>, <i>supra</i>, 489 F.2d at 572; <u>DiGiorgio v. Causey</u>, 488 F.2d 527 (5th Cir. 1973); <u>Blackshear Residents Organization v. Romney</u>, 572 F2d 1197 (5th Cir. 1973); <u>Allison v. Froehle</u>, 470 F2d 1123 (5th Cir. 1972).

No matter how severe and irreparable an injury one seeking a preliminary injunction may suffer in its absence, the injunction should never issue if there is no chance that the movant will

---

[9] This is almost word for word what the NBME was doing to Mr. Rothberg and Ms. Whyte, see Paragraph 8 of the DOJ-NBME Agreement.

eventually prevail on the merits. Nor is there need to weigh the relative hardships which a preliminary injunction or the lack of one might cause the parties unless the movant can show some likelihood of ultimate success. Obviously, it is inequitable to temporarily enjoin a party from undertaking activity which he has a clear tight to pursue. However, one appealing to the conscience of the chancellor to maintain the status quo pending final decision, although he carries a burden, is not required to prove to a moral certainty that his is the only correct position. The prerequisite, as an absolute, is more negative than positive: one cannot obtain a preliminary injunction if he clearly will not prevail on the merits; however, that he is unable, in an abbreviated proceeding, to prove with certainty eventual success does not foreclose the possibility that temporary restraint may be appropriate. In its negative sense, the factor is critical; but viewed positively, the importance an nature of the requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of the interlocutory relief and the relative balance of the threatened hardship faced by each of the parties. <u>Canal Authority</u>, *supra*. This is so because, as we have noted, none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus, <u>Siff v. State Democratic Executive Committee</u>, 500 F. 2d 107 (5th Cir. 1974).
Plaintiff is Entitled to a TRO

It is true that there are a number of cases prior to the ADA Amendments of 2008 that denied a TRO, but as noted above, the 2008 Amendments have completely changed the legal landscape.[10]

Nevertheless, there was, and is a substantial body of case law granting such relief. See <u>Rush v. National Bd. of Medical Examiners</u>, 268 F. Supp. 2d 673 (N.D. Tex. 2003) (granting preliminary injunction); <u>Agranoff v. Law School Admissions Council, Inc.</u>, 97 F. Supp. 2d 86 (D. Mass, 1999); <u>Badgley v. Law School Admissions Council, Inc.</u>, WL 33224318 (N.D. Tex. 2000). See also <u>Bonnette v. District of Columbia Court of Appeal</u>, 796 F. Supp. 2d 164 (D.D.C. 2011), <u>Jones v. National Conference of Bar Examiners</u>, 801 F. Supp. 2d 270 (D. Vt. 2011).

Plaintiff Will Suffer Irreparable Injury which Outweighs the Possible Harm to Defendant

---

[10] See <u>Rothberg v. Law School Admissions Council</u>, 102 Fed. Appx. 122 (10th Cir. 2004) reversing 300 F. Supp.2d 1093 (D. Colo. 2004). Unlike <u>Rothberg</u>, Plaintiff can show harm. If she is not allowed to take the upcoming USMLE and pass, she will not be able to continue her medical education.

In <u>Alejandro v. Palm Beach State College</u>, 843 F. Supp. 2d 1263 (S.D. Fla. 2012), the

Court granted a temporary injunction requiring defendant to allow plaintiff to bring her

"psychiatric service dog to mitigate the symptoms of her mental disabilities." The court noted:

"Since attending class is an important aspect of obtaining a degree, this Court believes that
plaintiff will suffer irreparable harm if the requested injunctive relief is not granted."

Here, if plaintiff does not pass Step 2 of the USMLE, she will no longer be enrolled and

will not obtain a degree. The question, then, is whether plaintiff should be allowed her right to

try to pass that test on a level playing field.

In <u>Rush</u>, the Court stated:

The USMLE Step 1 examination involves and requires extensive reading, and scoring well
and/or passage of the exam requires extensive subject-matter knowledge. Plaintiff has shown a
sufficient causal connection between his reading impairment and his failures to score well, or as
well as he might, on time-limited examinations requiring extensive reading. Plaintiff has shown
that if he is accommodated, he will be effectively tested not on his disability but rather on his
subject-matter knowledge. Plaintiff has shown that his reading impairment seriously decreases
the rate at which he reads with comprehension. Plaintiff will suffer irreparable injury if the
required injunction is denied.

With the requested reasonable accommodation of double time to take the Step 1 exam, Plaintiff
will have time to either display his mastery of the subject matter, or show that he has not
sufficiently mastered the tested materials. In either event, granting the injunction will allow
Plaintiff to be tested on his medical and science knowledge and not his disability.
The threatened injury to Plaintiff outweighs any damage that granting the preliminary injunction
might cause at this time to the Defendant or to the public.
The injunction will not disserve the public interest but will further the public interest in
prohibiting discrimination by public entities, such as the National Board of Medical Examiners,
on the basis of disability by fulfilling the ADA's requirement that entities offering licensing
examinations provide reasonable accommodations to disabled individuals.

## PLAINTIFF HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS

Plaintiff has shown, as described above, that she has a disability as defined by the ADA

and that she is entitled to a reasonable accommodation. She has met her burden of showing

likelihood of success.

PLAINTIFF HAS DEMONSTRATED IRREPARABLE INJURY

Plaintiff has also shown, as described above, irreparable injury in that the result of her taking the test without accommodations will result in her not graduating from medical school, and/or not being able to practice as a medical doctor, or unnecessarily delaying her ability to do the same.

In Bonnette, *supra*, at 186-187, the Court explained the irreparable injury that necessarily results from denying accommodations to an individual with a disability who is taking a professional license test, as follows:

Bonnette contends that she will suffer irreparable injury in the absence of an injunction because she will either be forced to take the July 2011 MBE [Multistate Bar Exam] under discriminatory conditions or have to wait until at least the February 2012 administration while her claim is litigated. Because Bonnette can not practice law until she successfully passes the D.C. Bar Examination, any delay in taking the MBE deprives her of time to practice her chosen profession. The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation. See Enyart, 630 F.3d at 1166 (Affirming finding of irreparable harm based on plaintiff's inability to practice law without successfully passing the bar examination).

THE THREATENED INJURY TO PLAINTIFF OUTWEIGHS ANY POTENTIANL HARM TO DEFENDANT AS NBME WILL NOT SUFFER DAMAGE IF A TRO IS GRANTED

If the Court grants Plaintiff's application for a TRO, Defendant will not suffer damages. NBME will suffer no financial harm, or at most the hourly wage for one day of the proctor hired to administer the Step 2 Test to Plaintiff. Defendant will suffer no public stigma — in fact, the public will never even know that Plaintiff took the test with accommodations (whether she passes it or not). The TRO will not impact the fundamental structure or nature of the Step 2 test or what it purports to test; it will not jeopardize test security for this Step 2 Exam or any other given in future; it will not change the testing format, nor the time-based system as applied to student without a documented disability. If there are consequences to Defendant for a TRO, they are theoretical, at best.  To the contrary, the threatened injury to Plaintiff is grave and irreparable.

THE GRANT OF A TRO WOULD NOT BE ADVERSE TO THE PUBLIC INTERST

The grant of a TRO here is actuality required to advance the public interest embodied in

the ADA. For Plaintiff, the TRO affording testing accommodations will give life to the

legislative goal of the ADA Amendments Act: to provide Plaintiff a level playing field to show

what her mastery of the material, instead of showing the effects of her disability. It is not an

"automatic" pass for Plaintiff. The promise of the ADA is a level playing field for all Americans.

It is important to keep in perspective the reality of time accommodations actually means.

The NBME website gives the example of a section that lasts for an hour and has 40 questions on

it. That amounts to a student has 90 seconds to answer each question. NBME offers three

additional time categories: 25% time; 50% time; and 100% time. Plaintiff has requested the

middle accommodation. She's asking for 50% time. That means she would be afforded an extra

45 seconds to answer each question. That's all this litigation is about: approximately 45 seconds.

Here is a Step 2 sample question taken directly from the NBME website on July 18, 2019.

(https://www.usmle.org/pdfs/step-2-ck/Step2CK_SampleItems.pdf  at p. 10

7.   A 9-year-old boy is brought to the physician because of progressive weakness and a purple-red discoloration over his cheeks and upper eyelids over the past 8 weeks. His symptoms began shortly after a camping trip, and he now is unable to climb stairs, walk long distances, comb his hair, or dress himself. His mother says that she was careful to apply his sunscreen on the trip and can recall no tick bites or exposure to poisonous plants. His only medication is a topical corticosteroid for several dry, scaly patches of the skin. He appears weak and lethargic. He is at the 75th percentile for height and 25th percentile for weight; he has had no change in his weight since his last examination 9 months ago. His temperature is 37.7°C (99.8°F), blood pressure is 110/68 mm Hg, pulse is 105/min, and respirations are 28/min. Examination of the skin shows a purple-red discoloration over the cheeks and eyelids, periorbital edema, erythematous plaques and scales over the elbows and knees, and flat-topped red papules over all knuckles. There is generalized weakness and atrophy of the proximal muscles. Which of the following is the most likely diagnosis?

      (A)  Dermatomyositis
      (B)  Duchenne's muscular dystrophy
      (C)  Eczema
      (D)  Lyme disease
      (E)  Psoriasis
      (F)  Rocky Mountain spotted fever
      (G)  Seborrhea
      (H)  Systemic lupus erythematosus

**10**

That factual part of the question contains approximately 196 words (some are Arabic numerals or numeric expressions). There are eight choices to evaluate. The average student has 90 seconds to spend on each question in a one-hour block test. Test are given in one-hour blocks. Plaintiff's disability is the process of the written word. Simply put, she reads slowly and processes the meaning slowly. The accommodations requested is that she have an extra 45 seconds to account for her ADHD and dyslexia and reduced comprehension time.

It is also important to consider that the U.S. Department of Justice investigated Defendant in 2011. (Exhibit #12) A Yale medical student, Frederick Romberg, with diagnosed disabilities, applied for extra time accommodation on Step 1. The NBME twice refused his request, basing the denial on the grounds that he "did not demonstrate that he is currently substantially limited in a major life activity as compared to most people, so as to be disabled within the meaning of the ADA, as amended." (Exhibit #12 at 2, ¶8). This the exact basis for which NBME has denied Plaintiff's request for time accommodations due to a reading problem (along with ADHD). (Exhibit #1 at 2)

The DOJ investigation concluded Romberg had submitted sufficient documentation to demonstrate his disability under the ADA and was entitled to accommodations. The NBME disputed the findings, but entered the settlement anyway. It is noteworthy that Romberg, like Plaintiff here, had received accommodations in medical school for his disability. (Exhibit #7, Tulane University Accommodations Grant)

CONCLUSION

Defendant NBME can truthfully state that its Settlement Agreement with the DOJ has expired and is no longer binding. However, the ADA itself requires most if, not all, the provisions of the Agreement. NBME has violated the ADA:

1. Defendant has failed to carefully consider the recommendations of the qualified professionals who have evaluated Plaintiff, diagnosed her under the accepted standards of the DSM-V, and recommended that she receive the accommodations she requested. continue to give considerable weight to documentation of past accommodations, as Plaintiff here has presented that Tulane affords her test-time accommodations on all written exams.

2. Defendant has failed to give weight to the documented record of impairment of her disability, nor the test-time accommodation granted to her by Tulane University for written exams (time 1.5) since January 2, 2017.

3. Defendant has failed to apply the ADA Amendments Act as written and in the context of the Congressional instruction to give it a liberal interpretation to broadly afford coverage under the Act. Had Defendant followed the Congressional findings and applied the "Rules of construction" as contained in the Code of Federal Regulations, Plaintiff would not be standing before this Honorable Court today.

For the reasons outlined above, Plaintiff respectfully requests that a TRO be issued.

Respectfully submitted,

WILLIAM MARTIN MCGOEY, Esq., LSBA #14205
1828 Rose Street
Arabi, Louisiana 70032
Telephone: 504-250-3293
bmcgolaw@yahoo.com

FRANCES M. OLIVIER, ESQ. LSBA No. 17895
2341 Metairie Road
Metairie, Louisiana 70001
Telephone: 504-483-6334; Fax: 504-483-6344
folivier@olivierlawfim.com

**Attorneys for Plaintiff Meaghan Doherty**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above has been forwarded to all parties of record via the Electronic E-mail, U.S. Mail, and or/or the Court's ECF system when not under protective seal, on July 22, 2019.

WILLIAM M. MCGOEY