**FILED UNDER SEAL**

CONFIDENTIAL
for professional use only



**Jefferson Speech
& Language Center**

Since 1972
Specializing in
Speaking • Reading • Writing

517 N. Causeway Blvd.
Suite A
Metairie, LA 70001
(504) 835-5550
Fax (504) 835-5510

NAME: Meaghan Doherty

ADDRESS: 6415 West End Blvd.
New Orleans, LA 70124

PARENTS: Fran and Mark

TELEPHONE: (504) 482-2720
568-7381

SCHOOL: St Francis Xavier School

EXAMINER: Denise Nagim, M.C.D., CCC/SLP

REFERRAL SOURCE: Sharon Henry, BCSW

DATE OF EVALUATION: 08/18/2003

DATE OF BIRTH: 08/17/93

CHRONOLOGICAL AGE:
10 years

GRADE: 5.0

**EXHIBIT 11**

## SUMMARY OF EVALUATION RESULTS

SIGNIFICANT HISTORY:

Meaghan Doherty, a ten-year-old female was seen at the Center for a Complete Language-Based Psycho/Educational Evaluation on August 8 and 18, 2003. The purpose of the evaluation is to ascertain Meaghan's learning style related to difficulty linking sounds together quickly in reading. Meaghan is diagnosed as gifted and she attended the French immersion program at Audubon Elementary School in New Orleans from kindergarten to third grade. Mrs. Doherty noticed that Meaghan experienced difficulty developing phonology to enhance reading fluency during kindergarten through third grade. She presents as a highly motivated, bright student who demonstrates excellent communication skills.

Psycho/Educational testing indicates a profile of a superior student who presents a grand discrepancy in sound blending, word attack, spelling of sounds and phonological awareness. Cognitive Cluster scores are in the superior to average range; however, Auditory Processing, her weakest cluster score on the W/J-III Test of Cognitive Abilities, yields 44 percent. Although this is an average score, it is significantly below Meaghan's ability level (GIA, 91%). Further discrepancy is noted when comparing Academic Fluency (90%) with Basic Reading Skills (41%) and Phono/Grapheme Knowledge (31%). The Comprehensive Test of Phonological Processing (CTOPP) concurs with the W/J-III indicating that Meaghan has difficulty in Phonological Awareness (35%), the ability to hear sounds as a single unit. In depth

Denise Nagim, M.C.D., C.C.C.
Director

Kathleen Fohs, M.C.D., C.C.C.
Natalie Gandy, M.C.D./CF
Anne T. Prat, S.L.P./Asst.

Speech-Language Pathologists
Learning Specialists

1

reading testing using the Gray Oral Reading Test-4 (GORT-4) additionally concurs with test findings indicating a discrepancy in Reading Accuracy (37%); when compared to Reading Rate (75%) and Comprehension (75%). Therefore, Meaghan is a gifted student who presents a grand discrepancy in reading due to a Phonological Awareness weakness and Auditory Processing difficulty. Research (Torgesen, Wagner and Roshotte, 1997; Torgesen et al., in press) indicates that Phonological Awareness, is a necessary component in developing fluency in reading.

Prenatal and birth history indicates complications. Meaghan was born full term with a normal birth weight of 9 pounds, 4 ounces. She was born post-term at nine and half months with Aspirated Meconium and was placed in the Neonatal unit for one week. Developmental milestones were achieved within chronological age norms, as well as, speech and language development.

Medical history is not reported to be significant. Behavioral, social and emotional development indicates that Meaghan is a well-adjusted youngster, who enjoys school, her friends and her family. She demonstrated excellent work ethics and conformity in life, at school and during the evaluation.

Education history indicates that Meaghan is a bright young lady who maintains an A average in the academic arena. Both Mr. and Mrs. Doherty are concerned about Meaghan's prevailing difficulty in blending sounds together quickly for fluent reading. They describe Meaghan's reading as slow and choppy. Meaghan began school in a French immersion program where she was taught both French and English to develop reading, writing and speaking skills. Meaghan's parents feel that the basic phonic and reading skills were not drilled and rehearsed; therefore, Meaghan did not develop phonic skills easily for fluent reading. As the volume of reading has increased in learning, they feel "something" is lacking in her ability to read fluently. She is diagnosed as a gifted student; however, Mr. and Mrs. Doherty recently had her tested by Sylvan Learning Center who determined that oral reading skills are below grade-level expectations. Sylvan Learning Center recommended several hours of tutoring to assist Meaghan in developing reading skills. Mr. and Mrs. Doherty's observations of Meaghan's reading skills are astute. Psycho/Educational test results depict a profile of a student who is deficient in Phonological Awareness affecting Meaghan's ability to develop phonological skills, the ability to place sounds with graphemes (letters) for fluent reading and spelling. Observations made over time related to Meaghan's reading discrepancy are: omits words in writing sentences, has difficulty copying at near and far point, has difficulty maintaining the spacing between words in spontaneous writing, and spells phonetically; lacking visual recall for non-phonetic words. Meaghan occasionally does poorly on reading related tests even though information has been mastered. She suffers with headaches and performs worse on standardized tests as she progresses in school.

EVALUATION:

In order to assess cognition and language processing abilities related to information processing, long-term retrieval, processing speed, short-term memory, visual processing, spatial thinking, auditory processing, vocabulary/comprehension, and fluid reasoning, the Woodcock-Johnson-III Tests of Cognitive Ability (W/J-III) were administered. To assess the areas of reading, writing and math in depth the Woodcock-Johnson-III Tests of Achievement (W/JTA-III), the Test of Written Language- 3 (TOWL-3) and the Gray Oral Reading Test (GORT-4) were utilized.

In order to coordinate cognitive/achievement testing, cognitive cluster scores will be discussed as how cognitive clusters relate to academic areas of reading, writing, math and fluency speed. Test norms indicate that standard scores between 85 and 115 are in the average range while a score of 70 is

2

indicative of a learning disability. Variability of 22 points within test scores indicates that a 1.5 standard deviation is present and will affect learning in some specific way.

Overall Psycho/Educational testing yields a profile of a superior student with difficulty in Phonological Awareness affecting skills in reading orally. Cognitive difficulties underlying problems in reproduction are identified in Sound Blending and Auditory Processing (W/J III) which are significantly below Meaghan's GIA of 120. Cognitive Performance Clusters yield; Verbal Ability (90%) Thinking Ability (86%), and Cognitive Efficiency (80%). A grand discrepancy in the average range occurs in Auditory Processing when scores are closely analyzed (44%). Oral Language skills are excellent. Meaghan achieves above average ability (91%). Overall Academic Skills indicate a decrease in functioning, (57%). Meaghan's psycho/educational profile demonstrates that she has excellent executive processing skills, which allow her to view her behaviors, assess its appropriateness and make changes if required. She is a verbal learner, but utilizes visual cues to enhance fluency in cognition. Auditory processing difficulties and phonological awareness problems affect rapid linking of sounds for fluent reading, spelling and writing. Errors in reading and in spelling are dyslexic-like in nature, and may affect note taking in school and foreign language reading and writing.

## VERBAL ABILITY:

Verbal Ability is a measurement of language development that includes the comprehension of individual words, the comprehension of relationships among words (antonyms and synonyms), aspects of lexical knowledge and the ability to reason using lexical (language) knowledge. It indicates almost superior ability (90%). Verbal Ability predicts how a student will function in reading and reading yields efficient skills. The Oral Language Cluster of the Achievement Battery yields commensurate skills. Oral Language involves tests that identify the receptive and expressive language skills of an individual. In Story Recall, a test measuring language development, listening and meaningful memory, Meaghan achieves almost superior ability (90%). On the test Understanding Directions, which measures listening ability as an aspect of comprehension/knowledge, memory and attention, she receives above average ability (80%). Meaghan's strong verbal comprehension and language processing skills allow her to trigger information from listening and reading. It should be noted that Meaghan hears, reads or gathers information through listening.

## THINKING ABILITY:

Thinking Ability represents a sampling of the different thinking processes that may be invoked when information in the short-term memory cannot be processed automatically. It represents an aggregate of abilities that allow an individual to process information placed in short-term memory but cannot be processed quickly and fluently. This Performance Cluster includes one test from each of the four thinking abilities: long-term retrieval, visual-spatial thinking, auditory processing and fluid reasoning. These abilities are probably the core of what many professionals mean by "intelligence"; Meaghan scores in the above average range (86%).

Long-Term Retrieval: Long-Term Retrieval indicates skills ranging in the above average to superior range. Skills measuring long-term retrieval for automatic learning and storing yield above average ability (86%). Meaghan presents efficiency in her ability to store and recall learned information when information is taught using both a visual and verbal cue simultaneously. The ability to access language information stored in the brain yields superior ability (93%). The ability to put together information seen with information heard is similar to the process of learning to read, write and remember math operations efficiently over time (storing information and retrieval while additional

0003

learning occurs). However, Academic Skills present a discrepancy (57%) when compared to Long-Term Retrieval (92%).

**Visual-Spatial Thinking**: Visual-Spatial Thinking, the ability to store and recall visual representations, to analyze, synthesize and to think with visual patterns, indicates above average performance (76%). Meaghan presents superior ability in retrieving math operations and procedures learned over time. She integrates and remembers visual representations. Visual patterns and operations of numbers necessary to perform math operations indicate fluent ability in math (Calculation, 87% and Math Fluency, 91%). In contrast, patterns related to sounds, indicate a substantial difference as noted in Spelling of Sounds, (32%) and in single word Spelling, (35%).

**Phonemic Awareness/Auditory Processing**: The ability to detect the finer differences in sounds to understand speech and to develop phonology in reading indicates average but weaker ability when compared to IQ patterns of a gifted intelligence student (44%). Sound Blending, the ability to hear single sounds and identify the word that these sounds form, yields a further decrease, (32%). In Basic Reading Skills from the WJ-III Achievement Test, Meghan's scores are commensurate with her grand discrepancy in hearing sounds as a single unit. She scores 32 percent in Word Attack, the academic assessment of a student's ability to link sounds together fluently. Concurrent results are identified in Reading Accuracy on the (GORT-4). In Auditory Attention, Meaghan achieves average skills (62%). Auditory Attention allows a student to listen for understanding of sounds and the ability to listen to verbal information in noise. However, ability decreases in Phonological Awareness (35%) according to the CTOPP; and in Spelling of Sounds (32%) according to the WJ-III.

**Fluid Reasoning**: Fluid Reasoning involves the broad ability to reason, form concepts, and solve problems using unfamiliar or novel procedures. In Concept Formation, a measure of categorical reasoning based upon logic and an aspect of Executive Processes, one is required to shift mental tasks frequently; this process requires flexibility in thinking. On this test, Meghan's score indicates superior ability (94%). It should be noted that this particular measure of executive functioning involves non-verbal language sequencing and categorization.

COGNITIVE EFFICIENCY:

Cognitive Efficiency, which represents the capacity of the cognitive system to process information automatically, indicates skills to be in the above average range. Cognitive Efficiency involves a sampling of two different factors of automatic cognitive processing: processing speed and short-term memory. Meaghan achieves above average ability (80%).

**Processing Speed**: Processing speed is the ability to perform cognitive tasks particularly when under pressure to maintain focused attention. Visual Matching, a perceptual speed task measuring attention, concentration and efficiency of problem solving, yields superior ability (95%). Decision Speed, another measurement of mental processing speed that assesses the association of simple concepts and the ability to make quick rapid decisions, Meaghan achieves commensurate ability, (98%). Pair Cancellation, a test measuring sustained attention and the ability to perform a simple cognitive task under time constraints, indicates above average skills (78%). Thus, reinforcing that Meaghan is able to shift mental tasks easily.

**Short-Term Memory**: Short-Term Memory, the ability to hold information in immediate awareness, is efficient for learning; results indicate average ability (63%). This ability allows Meaghan to "hold and perform" mental operations, as well as, waiting to the last minute to study. Information not utilized in short-term memory is pushed to working memory to perform mental operations of information immediately received. Auditory Working Memory yields superior skills (93%); further allowing

4

Meaghan to listen and understand information quickly. Information is then stored in long-term memory. Memory is vital to learning, since learning involves a student's ability to use old information while learning new information.

## EXECUTIVE PROCESSES:

Tests involved in Executive Processes measure a student's ability to plan, control interference, and use mental flexibility. These processes have been discussed throughout cognitive interpretation of Meaghan's test results. Scores in executive processing yield superior ability and Meghan demonstrates ease and speed when attempting to access her knowledge. Meaghan presents excellent ability in monitoring her performance, blocking-out interference and in using mental flexibility to solve executive problems.

## BROAD ATTENTION:

The Broad Attention Cluster is multi-faceted and includes four areas of testing attention: focused or selective attention, vigilant or sustained attention, divided attention and attentional capacity or working attention. In Numbers Reversed, measuring attention capacity, Meaghan scores 63 percent, which indicates efficient immediate recall of information in the academic arena. In the ability to divide attention between information that has been placed in short-term memory into distinct sequences necessary for comprehension she receives 93 percent in Auditory Working Memory, which is very efficient for learning. In Auditory Attention, measuring Meaghan's ability to attend selectively to discriminate speech sounds amid the effects of noise, indicates average ability (62%). Pair Cancellation, also part of both executive functioning and processing speed, has been previously discussed indicating that as Meaghan is required to block-out interference while focusing on one task, she is efficient.

## ACADEMIC ASSESSMENT:

Academic assessment was measured using the following tools: the Woodcock-Johnson III Tests of Achievement (W-JTA-III), the Gray Oral Reading Test (GORT-4), and the Test of Written Language-3 (TOWL-3).

**Reading:** To assess reading related to basic phonology skills, sight-word reading, reading fluency and passage comprehension in a cloze sentence reading format the (W/J-III) was utilized. In low volume untimed reading, Meaghan's score indicates average ability (51%) in single word reading (Letter-Word Identification) and her scores decrease to (32%) in the ability to blend nonsense words. Spelling of Sounds also measuring Meaghan's ability to link sounds together rapidly and reproduce information on paper yields concurrent ability (32%). Further evidence of Meaghan reading problem related to hearing sounds and linking sounds together for fluent reading is identified Phonological Awareness, (35%), and in Reading Accuracy of the GORT-4 (37%). Although skills related to Oral reading particularly associating sounds with graphemes are in the average range a grand discrepancy is present when comparing oral reading skills related to sounds with other academic skills and with cognition. Reading Fluency related to the ability to read simple sentences and answer yes/no questions correctly in a timed format indicates 88 percent. Comprehension, reading sentences or short paragraphs using a cloze sentence format, yields average ability (61%) in Passage Comprehension, a low volume measure of reading comprehension using the W/J-III. On the GORT-4, a high volume, timed reading assessment of passage reading and comprehension in a multiple-choice format, indicates (75%) in both Reading Rate

5

and Reading Comprehension. Meaghan is diagnosed with an oral reading problem, which has intermittent characteristics of dyslexia.

**Math:** Math skill assessment, utilizing the Calculation and Applied Problem Tests indicates skills fluctuating in the above average to superior ability. She achieves 87 percent in Calculation. On the Applied Problems Test, Meaghan's skills are superior (96%). In Math Fluency, measuring the ability to recall basic math facts within time constraints yields above average skills (91%).

**Written Language:** Written language was measured using the TOWL-3. Spontaneous writing measuring the ability to integrate spelling patterns, apply rules governing grammar and use a variety of sentences and parts of speech, indicates efficient ability in integration of language sequencing and usage of grammatical forms. However, spontaneous spelling when asked to transfer language information from brain to paper to create an interactive story about a given picture confirms difficulty in linking sounds together rapidly (16%). Sentence structure yields the ability to use simple/compound sentences, difficulty in the mechanics of writing related to letter formation, spacing, and unfinished letters, as well as, misuse of the lines and margins which affects organization on paper and indicates some effort in using writing as a communication tool. Single word spelling indicates average skills (35%) and Writing Fluency, the ability to formulate ideas when words are given, as well as, thinking quickly yields above average ability, (85%). Characteristics of dysgraphia are identified in handwriting as mentioned above.

## SUMMARY:

Based upon Meaghan's evaluation results, review of classroom performance, review of report card grades, review of case history information and standardized test scores, she presents a cognitive/achievement profile of an above average student with a grand discrepancy, although average, in auditory processing related to phonological awareness, or the ability to hear single units of sounds and manipulate sounds quickly in blending and in writing. She has difficulty translating handwriting skills for output to paper. Characteristics of dyslexia are identified in reading and in handwriting related to spelling. Overall cognitive ability yields 91 percent, and achievement skills yield 57 percent. This is a substantial difference; however, math skills are in the above average to superior range but oral reading and spelling skills are inefficient and are considered the contributing factors to the discrepancy between cognitive versus achievement performance. Phon/Graph Knowledge, or the ability to use sounds along with graphemes/letters yields Meaghan lowest score (31%). Symptoms of dysgraphia are identified in writing and affect written expression. Meaghan is unable to reach potential as evidenced by her Spontaneous Writing score of 10 percent according to the TOWL-3.

6

## RECOMMENDATIONS

The following recommendations are prescribed for Meaghan:

1. Enroll Meaghan in a multi-sensory program to build phonological awareness, phonology, reading and writing fluency.

2. As Meaghan becomes proficient in computer keyboarding, she should use computer programming to assist written expression.

SUMMARY OF TEST SCORES
The Woodcock-Johnson-III Tests of Cognitive Ability-Revised

| | Standard Score | Percentile Rank | Rating Equivalent |
|---|---|---|---|
| GIA | 120 | 91 | Above Average |
| VERBAL ABILITY | 119 | 90 | Above Average |
| Verbal Comprehension | 119 | 90 | Above Average |
| THINKING ABILITY | 116 | 86 | Above Average |
| Visual-Auditory Learning | 116 | 86 | Above Average |
| Spatial Relations | 111 | 76 | Above Average |
| Sound Blending | 93 | 32 | Average |
| Concept Formation | 123 | 94 | Superior |
| Retrieval Fluency | 122 | 93 | Superior |
| COGNITIVE EFFICIENCY | 113 | 80 | Above Average |
| Visual Matching | 117 | 87 | Above Average |
| Numbers Reversed | 105 | 63 | Average |
| Decision Speed | 129 | 98 | Superior |
| LONG-TERM RETRIEVAL | 121 | 92 | Superior |
| Visual-Auditory Learning | 116 | 86 | Above Average |
| Retrieval Fluency | 122 | 93 | Superior |
| AUDITORY PROCESSING | 98 | 44 | Average |
| Sound Blending | 93 | 32 | Average |
| Auditory Attention | 104 | 62 | Average |
| PROCESSING SPEED | 125 | 95 | Superior |
| Visual Matching | 117 | 87 | Above Average |
| Decision Speed | 129 | 98 | Superior |
| PHON/GRAPH KNOWLEDGE | 92 | 31 | Average |
| SHORT-TERM MEMORY | | | |
| Numbers Reversed | 105 | 63 | Average |
| WORKING MEMORY | 115 | 84 | Above Average |
| Auditory Working Memory | 122 | 93 | Superior |
| Numbers Reversed | 105 | 63 | Average |
| BROAD ATTENTION | 117 | 87 | Above Average |
| Numbers Reversed | 105 | 63 | Average |
| Auditory Attention | 104 | 62 | Average |
| Auditory Working Memory | 122 | 93 | Superior |
| Pair Cancellation | 112 | 78 | Above Average |
| EXECUTIVE PROCESSES | 124 | 94 | Superior |
| Concept Formation | 123 | 94 | Superior |
| Pair Cancellation | 112 | 78 | Above Average |
| Planning | 122 | 93 | Superior |

8

| | ACHIEVEMENT Standard Score/ Scaled Score | Percentile Rank | Grade & Rating Equivalent | |
|---|---|---|---|---|
| (W/J III) | 103 | 57 | 5.3 | Average |
| ACADEMIC SKILLS | 120 | 90 | 8.0 | Above Average |
| ACADEMIC FLUENCY | | | | |
| ORAL LANGUAGE: | 120 | 91 | 12.4 | Above Average |
| Story Recall | 119 | 90 | >18.0 | Above Average |
| Understanding Directions | 113 | 81 | 10.4 | Above Average |
| READING: | | | | |
| (W/J III) | 101 | 51 | 5.1 | Average |
| Letter-Word Identification | 117 | 88 | 8.4 | Above Average |
| Reading Fluency | 104 | 61 | 5.8 | Average |
| Passage Comprehension | 93 | 32 | 3.1 | Average |
| Word Attack | 93 | 32 | 3.3 | Average |
| Spelling of Sounds | 106 | 65 | 7.3 | Average |
| Sound Awareness | 111 | 77 | 6.8 | Above Average |
| BROAD READING ABILITY | | | | |
| (GORT-4) | 12 | 75 | 6.0 | Average |
| Rate | 9 | 37 | 4.7 | Average |
| Accuracy | 11 | 63 | 5.7 | Average |
| Passage Reading | 12 | 75 | 7.2 | Average |
| Comprehension | 109 | 73 | | Average |
| ORAL READING QUOTIENT | | | | |
| MATHEMATICS: | | | | |
| (W/J-III) | 117 | 87 | 7.3 | Above Average |
| Calculation | 126 | 96 | 11.4 | Superior |
| Applied Problems | 120 | 91 | 7.9 | Above Average |
| Math Fluency | 128 | 97 | 8.7 | Superior |
| BROAD MATH ABILITY | | | | |
| WRITTEN LANGUAGE: | | | | |
| (W/J-III) | 94 | 35 | 4.1 | Average |
| Spelling | 115 | 85 | 7.1 | Above Average |
| Writing Fluency | | | | |
| (TOWL-3) | 7 | 16 | | Below Average |
| Contextual Conventions | 7 | 16 | | Below Average |
| Contextual Language | 7 | 16 | | Below Average |
| Story Construction | 81 | 10 | | Below Average |
| SPONTANEOUS WRITING QUOTIENT | | | | |

9

## COMPREHENSIVE TEST OF PHONOLOGICAL PROCESSING
### (CTOPP)

|  | Standard Score | Percentile Rank | Rating Equivalent |
|---|---|---|---|
| PHONOLOGICAL AWARENESS | 94 | 35 | Average |
| Elision | 9 | 37 | Average |
| Blending Words | 9 | 37 | Average |
| PHONOLOGICAL MEMORY | 94 | 35 | Average |
| Memory for Digits | 12 | 75 | Average |
| Nonword Repetition | 8 | 25 | Average |
| RAPID NAMING | 112 | 79 | Above Average |
| Rapid Digit Naming | 12 | 75 | Average |
| Rapid Letter Naming | 12 | 75 | Average |

Denise Nagim, M.C.D., CCC/SLP
Language Learning Specialist
LaBIDA Board Member
LA Lic. No. 603

10

## SETTLEMENT AGR   FILED UNDER SEAL

## BETWEEN

## UNITED STATES OF AMERICA

EXHIBIT 12

## AND

## NATIONAL BOARD OF MEDICAL EXAMINERS

### DJ# 202-16-181

Press Release

This Agreement is entered into by and between the United States of America, acting through the United States Department of Justice, Civil Rights Division, Disability Rights Section (the "United States"), and the National Board of Medical Examiners ("NBME").

## BACKGROUND AND APPLICABLE LAW

1. NBME is a private, non-profit organization. Its offices and principal place of business are located in Philadelphia, Pennsylvania.

2. Together with the Federation of State Medical Boards, NBME sponsors the United States Medical Licensing Examination ("USMLE"), an examination related to licensing for professional purposes. NBME administers the USMLE. Thus, NBME is subject to the requirements of Section 309 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12189, and the implementing regulations, 28 C.F.R. § 36.309.

3. The USMLE is a standardized examination used to evaluate applicants' competence for purposes of medical licensure in the U.S. and its territories. The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care. The USMLE is administered at locations around the world to individuals who are attending, or have attended, medical schools in the United States and abroad. State medical boards rely upon successful completion of the three USMLE component exams, or "Steps," as an important element in the process for licensing physicians.

4. The United States Department of Justice (the "Department") is the federal agency responsible for administering and enforcing Title III of the ADA, 42 U.S.C. §§ 12181-12189.

5. Pursuant to Title III of the ADA, private entities that administer examinations related to professional licensing must offer the examinations in a place and manner accessible to persons with disabilities. 42 U.S.C. §12189 and 28 C.F.R. § 36.309.

6. Pursuant to 28 C.F.R. § 36.309, private entities that administer such examinations are required to provide reasonable modifications to the examination and appropriate auxiliary aids and services (i.e., testing accommodations) for persons with disabilities. The purpose of testing accommodations is to ensure, in a reasonable manner, that the "examination results accurately

reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual or speaking skills (except where those skills are the factors that the examination purports to measure)." 28 C.F.R. § 36.309(b)(1)(i). "Required modifications to an examination may include changes in the length of time permitted for completion of the examination." 28 C.F.R. § 36.309 (b)(2).

7. The auxiliary aid requirement is a flexible one. A testing entity can choose among various alternatives as long as the result is effective communication. Use of the most advanced technology is not required so long as effective communication is ensured. *See* 28 C.F.R. Part 36, App. B, at 727-728 (2010).

8. Pursuant to the Attorney General's authority under 42 U.S.C. § 12188(b)(1)(A)(i) to conduct investigations of alleged violations of Title III of the ADA, the Department investigated a complaint from [redacted], alleging that the NBME had failed to grant him reasonable testing accommodations on the basis of a disability (dyslexia) for administrations of the USMLE Step 1 examination in 2008 and 2010. Among other things, the NBME had found that the supporting documentation submitted to NBME by [redacted] did not demonstrate that he is currently substantially limited in a major life activity as compared to most people , so as to be disabled within the meaning of the ADA, as amended.

9. The Department concluded that [redacted] had submitted sufficient documentation to demonstrate that he is a person with a disability within the meaning of the ADA, and that he was entitled to reasonable testing accommodations to take the USMLE. NBME disputes the Department's conclusions and denies that it has violated the ADA in any way in its handling of Mr. [redacted]'s request for accommodations.

10. [redacted] has recently provided additional documentation to the NBME in support of his request for accommodations on the USMLE Step 1 examination relating to accommodations he received in undergraduate school, graduate school, and medical school.

11. NBME and the Department have reached agreement that it is in the parties' best interests, and the Department believes it is in the public interest, to resolve this matter on mutually agreeable terms and have, therefore, agreed to enter into this Agreement.

WHEREFORE, the Department and NBME hereby agree and stipulate as follows:

## **AGREEMENT TERMS**

### A.   **General Obligations**

12. NBME shall provide reasonable testing accommodations to persons with disabilities who seek to take the USMLE, in accordance with the requirements of 42 U.S.C. § 12189 and the implementing regulations, 28 C.F.R. § 36.309.

13. NBME's requests for documentation shall be reasonable and limited to documentation that establishes (a) the existence of a physical or mental impairment; (b) whether the applicant's impairment substantially limits one or more major life activities within the meaning of the

ADA; and (c) whether and how the impairment limits the applicant's ability to take the USMLE under standard conditions. *See* 28 C.F.R. Part 36, App. B, at 737 (2010).

14. NBME will carefully consider the recommendation of qualified professionals who have personally observed the applicant in a clinical setting and have determined -- in their clinical judgment and in accordance with generally accepted diagnostic criteria, as supported by reasonable documentation -- that the individual is substantially limited in one or more major life activities within the meaning of the ADA and needs the requested test accommodations in order to demonstrate his or her ability and achievement level.

15. NBME will carefully consider all evidence indicating whether an individual's ability to read is substantially limited within the meaning of the ADA, including the extent to which it is restricted as to the conditions, manner, or duration as compared to the reading ability of most people.

16. In determining whether to grant a request for testing modifications or accommodations for an individual who did not receive a diagnosis of a reading disability until later in his or her life, NBME shall consider bona fide, reasonably supported reasons for the late diagnosis as well as academic records and other objective evidence relating to the individual's reading ability.

17. NBME has a right to make a timely request for supplemental information if the information submitted by an applicant does not clearly establish the nature of the disability or the need for reasonable testing accommodations, and the request is consistent with the requirements of Paragraph 13. NBME also has the right to have the information submitted by or on behalf of an applicant reviewed by one or more qualified professionals of NBME's choosing at NBME's request and expense. NBME is not required to defer to the conclusions or recommendations of an applicant's supporting professional but it must provide an explanation for declining to accept those conclusions or recommendations.

18. NBME is not required to provide testing accommodations that would fundamentally alter what the USMLE is intended to test, jeopardize exam security, or in the case of auxiliary aids and services, result in an undue burden.

19. If it is not doing so already, NBME will comply with the following requirements of the implementing regulations set forth at 28 C.F.R. § 36.309(b)(1) once they become effective on March 15, 2011:

> (iv) Any request for documentation, if such documentation is required, [will be] reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested.

> (v) When considering requests for modifications, accommodations, or auxiliary aids or services, the entity [will] give[] considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations, as well as such modifications, accommodations, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act or a plan describing services provided pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred as a Section 504 Plan).

(vi)   The entity [will] respond[] in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities.

## B.   Testing Accommodations for [redacted]

20.   NBME will grant [redacted] the accommodation of double the standard testing time and a separate testing area when he takes the Step 1 and Step 2 CK examinations. The testing for Step 1 and Step 2 CK shall be accomplished in accordance with a reasonable schedule. Actual testing time shall not exceed eight (8) hours per day.

21.   [redacted] will be subject to all standard requirements for registering to take the Step 1 and Step 2 CK examinations and scheduling his examinations.

22.   Except for the accommodations provided herein, the USMLE Step 1 and Step 2 CK examinations will be administered to [redacted] under the same conditions as those afforded examinees who do not receive accommodations. [redacted]'s scores on the Step 1 and Step 2 CK examinations will be reported in the same manner as are scores of other examinees who receive accommodations on the USMLE.

## C.   Miscellaneous

23.   Compliance Review and Enforcement. Throughout the term of this Agreement the Department may, at any time, review compliance with Paragraphs 20-22 of this Agreement by, among other things, arranging for meetings and discussions with NBME personnel, requesting copies of any documents related to compliance with this Agreement, or both. The United States may enforce this Agreement. If the Department believes that this Agreement or any portion of it has been violated, it will raise its concern(s) with the NBME and will attempt to resolve the concerns(s) in good faith. The Department will give the NBME thirty calendar days from the date it notifies the NBME of any breach of this Agreement to cure that breach, prior to instituting any court action.

24.   Disputes. If the Department and NBME are unable to reach a resolution of any issues covered by this Agreement, the Department may seek appropriate relief. Failure by the Department to enforce any provision or deadline of this Agreement shall not be construed as a waiver of its right to enforce other provisions or deadlines of this Agreement.

25.   Entire Agreement. This Agreement constitutes the entire Agreement between the Department and NBME on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by the Department or NBME or their agents, that is not contained in this written Agreement shall be enforceable regarding the matters raised herein.

26.   Agreement Binding on NBME. This Agreement shall be binding on the NBME, as well as the NBME's officers, agents, and employees, and their successors in interest. The NBME shall have a duty to so notify all such successors in interest of the existence and terms of this Agreement.

27.   No Admission. This Agreement is not an admission by NBME of any violation of the ADA or its implementing regulations.

28. <u>Term of the Agreement</u>. This Agreement shall remain in effect for three years from the effective date.

29. <u>Severability</u>. If any term of this Agreement is determined by any court to be unenforceable, the other terms of this Agreement shall nonetheless remain in full force and effect.

30. <u>Public Document</u>. This Agreement is a public document. A copy of this document, or any information contained herein, may be made available to any person. The Department and NBME shall provide a copy of this Agreement to any person or entity upon request.

31. <u>Release</u>. The Department will obtain a Release from [redacted] in the form attached as Exhibit A to this Agreement.

32. <u>No Retaliation</u>. The NBME agrees that it will not discriminate or retaliate against any person within the meaning of the requirements of 28 C.F.R. § 36.206.

33. <u>Authorization of Signatories</u>. The individuals signing this Agreement represent that they are authorized to bind the Department and NBME to this Agreement.

34. <u>Effective Date</u>. This Agreement shall be effective on the date it is signed by the last signatory.

FOR NBME:                          FOR THE UNITED STATES OF AMERICA:

By:                                By:

_____            _____

Dated: _____             THOMAS E. PEREZ
                                   Assistant Attorney General
                                   SAMUEL R. BAGENSTOS
                                   Principal Deputy Assistant Attorney General
                                   JOHN L. WODATCH
                                   Deputy Assistant Attorney General

                                   _____
                                   RENEE M. WOHLENHAUS, Acting Chief
                                   KATHLEEN P. WOLFE, Acting Special Legal Counsel
                                   SHEILA K. DELANEY, Trial Attorney
                                   Disability Rights Section – NYAV
                                   Civil Rights Division
                                   U.S. Department of Justice
                                   950 Pennsylvania Avenue, NW
                                   Washington, D.C. 20530
                                   Telephone:   (202) 307-6309
                                   Facsimile:   (202) 305-9775

                                   Dated: _____ 02/23/2011 _____

Cases & Matters by ADA Title Coverage | Legal Documents by Type & Date | ADA Home Page

February 23, 2011

## JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                       Tuesday, February 22, 2011

### Justice Department Settles with National Board of Medical Examiners Over Refusalto Provide Testing Accommodations to Yale Medical School Student

WASHINGTON - The Justice Department today announced a settlement under the Americans with Disabilities Act (ADA) with the National Board of Medical Examiners (NBME), a private, non-profit organization that administers the U.S. Medical Licensing Examination (USMLE), a standardized examination related to medical licensing. Under the terms of the settlement agreement, NBME is committed to providing reasonable testing accommodations to persons with disabilities who seek to take the USMLE, in accordance with the requirements of the ADA. In addition, it will grant Frederick Romberg, a Yale Medical School student, the accommodations of double the standard testing time and a separate testing area to take the USMLE.

"In the past, demands for unnecessary or redundant documentation, burdensome and expensive repeated professional evaluations, or irrelevant evaluative testing unrelated to the ability to demonstrate one's knowledge or skills on an examination prevented individuals with appropriately documented disabilities from pursuing their chosen professions." said Thomas E. Perez, Assistant Attorney General for the Civil Rights Division. "By entering into this agreement, NBME is doing its part to ensure that people with a reading disability like Mr. Romberg will have the opportunity to take the USMLE with the reasonable testing accommodations they need to demonstrate their knowledge and ability."

Under the agreement, the NBME will:

·      Only request documentation about (a) the existence of a physical or mental impairment; (b) whether the applicant's impairment substantially limits one or more major life activities within the meaning of the ADA; and (c) whether and how the impairment limits the applicant's ability to take the USMLE under standard conditions;

·      Carefully consider the recommendations of qualified professionals who have personally observed the applicant in a clinical setting and recommended accommodations based upon their clinical judgment that the individual is substantially limited in one or more major life activities within the meaning of the ADA and needs the requested test accommodations in order to demonstrate his or her ability and achievement level; such recommendations are to be based on generally accepted diagnostic criteria and supported by reasonable documentation.

·      Carefully consider all evidence indicating whether an individual's ability to read is substantially limited within the meaning of the ADA, including the extent to which it is restricted as to the conditions, manner or duration as compared to the reading ability of most people.

The Justice Department opened an investigation in response to a complaint from Mr. Romberg who alleged that the NBME had twice denied him reasonable testing accommodations to take the USMLE because of his disability, dyslexia, in violation of the ADA. Subsequently, the department and the NBME sought to resolve the investigation by reaching a settlement agreement.

The settlement was reached under Title III of the ADA which prohibits discrimination against individuals with disabilities by private testing entities that administer examinations related to professional licensing. More information about the Civil Rights Division and the laws it enforces is available at the website www.justice.gov/crt . More information about the settlement with NBME can be found at www.ada.gov or by calling the toll-free ADA Information Line at 800-514-0301 or 800-514-0383 (TTY).

**Component(s):**
Civil Rights Division
Civil Rights - Disability Rights Section

**Press Release Number:**
11-220

*Updated August 10, 2015*

# Step 2 CK Eligibility Period-PLEASE RESPOND
# ref:_00D46pfBg._5004A1axgHD:ref

**EXHIBIT 13**

disabilityservices@nbme.org

Mon 7/15/2019 2:27 PM

To Doherty, Meaghan O <mdoherty@tulane.edu>;

External Sender. Be aware of links, attachments and requests.

Dear Ms. Doherty,

A decision in regard to your request for accommodations for Step 2 CK has been reached.  Please let me know if you would like for me to update your eligibility period to the July 1 - September 30th window or the August 1 - October 31st window.  Please note that once I have released the hold on your permit, it will take approximately 5-7 business days for you to receive an electronic notification that your permit is available.  I cannot finalize your request and release your permit until we have your preferred eligibility period.

Once I have heard from your regarding your eligibility period, I will e-mail a PDF copy of your decision letter to you.

If you have any additional questions once you have received and read over your decision letter, please feel free to email me at disabilityservices@nbme.org or call us at 215-590-9700.

Sincerely,

Elisea Hewitson
Disability Services Specialist
National Board of Medical Examiners
3750 Market Street

Philadelphia, PA 19104-3102
TEL: 215-590-9700
FAX: 215-590-9422
Email: disabilityservices@nbme.org

This email message and any attachments may contain privileged and/or confidential business information and are for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please notify the sender immediately by reply email and destroy all copies of the original message and any attachments.

# Status of USMLE Application EL21520

## USMLEReg@nbme.org

Mon 7/15/2019 5:02 PM

To:Doherty, Meaghan O <mdoherty@tulane.edu>;

External Sender. Be aware of links, attachments and requests.

Name: Doherty, Meaghan Olivier
Reference ID: EL21520
USMLE ID: 53976700

Your USMLE Step 2 CK registration status is complete.

Your eligibility period is Jul 1 - Sep 30, 2019.

YOU MUST RECEIVE YOUR SCHEDULING PERMIT BEFORE YOU CAN SCHEDULE A TESTING
APPOINTMENT.  Your scheduling permit is on hold because you indicated on your application that you
are requesting test accommodations.

Your permit will be issued as soon as Disability Services processes your request for test accommodations.
If you have questions about the status of your request for test accommodations, contact Disability Services
at disabilityservices@nbme.org.

*If you requested test accommodations in error, reply to this email and include a note confirming that you
do not want test accommodations and would like your permit to be released.

You will be notified by email when your permit is available for you to access/print online.

To check the status of your registration on the NBME Licensing Examination Services Website, go to
https://nam03.safelinks.protection.outlook.com/?url=http%3A%2F%2Fexaminee.nbme.org%
2Finteractive&amp;data=02%7C01%7Cmdoherty%40tulane.edu%
7C19bca6a415384e2e982f08d709702904%7C9de9818325d94b139fc34de5489c1f3b%7C0%7C0%
7C636988249644974914&amp;sdata=WGNqKStShiscKf%2B1uNnMYqjAjH9elC%2Bq0oyUnT%2BbU6s%
3D&amp;reserved=0. NOTE: Be sure to keep your contact information up to date. NBME will use this
information to contact you about your registration and score report. You may update your contact
information at any time on NLES by selecting the "Change Contact Information" option from the Account
menu.

If you have any questions about your registration, please reply to this email or call the NBME Registration
Department at 215-590-9700.

0003
7/18/2019

# Step 2 CK Status Update ref:_00D46pfBg._5004A1axgHD:ref

### disabilityservices@nbme.org

Tue 7/16/2019 8:11 AM

Inbox

To:Doherty, Meaghan O <mdoherty@tulane.edu>;

1 attachments (264 KB)

DohertySTEP2Dec20190710145615.pdf;

External Sender. Be aware of links, attachments and requests.

Dear Ms. Doherty,

A decision in regard to your request for Step 2 CK has been reached.  Attached, please find a PDF copy of your decision letter.

We have updated your eligibility period to the July 1 - September 30th window to allow time for scheduling and we have released the hold on your scheduling permit. You will receive an email notification in several business days once your permit becomes available.  Once you have your permit, you may schedule your exam at any time.

If you have any additional questions, please feel free to contact us.

Sincerely,

Elisea Hewitson
Disability Services Specialist
National Board of Medical Examiners
3750 Market Street

Philadelphia, PA 19104-3102
TEL: 215-590-9700
FAX: 215-590-9422
Email: disabilityservices@nbme.org

This email message and any attachments may contain privileged and/or confidential business information and are for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please notify the sender immediately by reply email and destroy all copies of the original message and any attachments.

# USMLE Step 2 CK Scheduling Permit

## USMLEReg@nbme.org

Thu 7/18/2019 1:04 AM

To:Doherty, Meaghan O <mdoherty@tulane.edu>;

1 attachments (5 KB)

permit.pdf;

External Sender. Be aware of links, attachments and requests.

Name: Doherty, Meaghan Olivier
Reference ID: EL21520
USMLE ID: 53976700

Your USMLE Step 2 CK scheduling permit is now available on NLES. A copy is attached for your convenience.

To access your permit on NLES, go to https://nam03.safelinks.protection.outlook.com/?url=http%3A%2F%2Fexaminee.nbme.org%2Finteractive&amp;data=02%7C01%7Cmdoherty%40tulane.edu%7C6d36bc13f90443b4b8bc08d70b458664%7C9de9818325d94b139fc34de5489c1f3b%7C0%7C0%7C636990266525909532&amp;sdata=FMjuwsD7KaDPeqVXekoo8xz9inSRlR%2BQlnG1q1PpaNU%3D&amp;reserved=0, log in, and select the "Print Permit" link.

We strongly encourage you to print your scheduling permit at least several days in advance of your scheduled test date to avoid any problems accessing or printing your permit on test day. You may print your permit or present it electronically (e.g., via Smartphone). If, on the day of your exam, you are unable to access the permit electronically for any reason, you must present a paper copy.

Refer to the instructions on the scheduling permit to schedule your test date. Please be aware that appointments are first-come, first-served and test centers fill up quickly; therefore, you are advised to schedule a test date as soon as possible.

If you have any questions about your scheduling permit, please reply to this email or call the NBME Registration Department at 215-590-9700.

Follow USMLE on Facebook - facebook.com/usmle

This email message and any attachments may contain privileged and/or confidential business information and are for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please notify the sender immediately by reply email and destroy all copies of the original message and any attachments.

**United States Medical Licensing Examination®**
## Step 2 CK SCHEDULING PERMIT
### IMPORTANT DOCUMENT - TAKE TO TEST CENTER

| | |
|---|---|
| **Name:** Meaghan Olivier Doherty | **Eligibility Begins:** July 01, 2019 |
| **USMLE#:** 5-397-670-0 | **Eligibility Ends:** September 30, 2019 |
| **Program:** STEP2 | **# Test Days:** 1 |
| **Exam:** STEP2 | **CIN (Candidate ID #):** KPHN821XDMC |
| **Scheduling #:** 038666500 | **(for use on test date only to access your exam)** |
| **(for appointment scheduling)** | |
| **Testing Region:** United States and Canada | |

This Scheduling Permit authorizes you to sit for Step 2 CK during the period noted above. **You must bring this permit to the test center in order to take your exam.** You may print this permit or present it electronically (e.g. via Smartphone). If, on the day of your exam, you are unable to access the permit electronically for any reason, you must present a paper copy. Review the *USMLE ® Bulletin of Information* at www.usmle.org for specific procedures.

1.  **SCHEDULE A TEST DATE:** Using the information above, schedule a test date via the Prometric website at www.prometric.com/USMLE or call 1-800-MED-EXAM (1-800-633-3926) located in Baltimore, MD, USA, available M-F 8AM-8PM (local time). Provide a valid telephone number and email address when scheduling so Prometric can email you a Confirmation Notice and contact you in the event that your appointment must be rescheduled. The Confirmation Notice contains a Prometric Confirmation Number -- You need this number to **confirm or change** your appointment.

2.  **CONFIRM OR CHANGE APPOINTMENT:** Confirm your appointment using your Prometric Confirmation Number one week before your appointment at www.prometric.com/USMLE or by calling the telephone number above. You may change (e.g., reschedule, cancel, change test center location) your appointment within the eligibility period noted above. **To avoid an appointment change fee, you must change your appointment 31 or more days before (but not including) the first day of your scheduled test date.** All deadlines are calculated using local time in Baltimore, MD, USA. If you reschedule your appointment or change your test center location within 30 days, you must pay a fee to Prometric at the time you make the change. If you cancel your appointment within 30 days or do not test as scheduled, before you can schedule a new appointment, you must **call** Prometric at 1-800-853-6769 to pay a fee to reinstate your eligibility record. Refer to your Confirmation Notice for specific fee information.

3.  **ELIGIBILITY PERIOD EXTENSION:** If you are unable to test within your eligibility period, contact NBME to inquire about a one-time, contiguous three-month eligibility period extension. A fee is charged for this service. Visit NBME's website for more information. If you do not take the test within your original or extended eligibility period and wish to take it in the future, you must reapply by submitting a new application and fee(s).

4.  **PRACTICE SESSION:** To take a Practice Session at a Prometric Test Center for a fee payable to Prometric, register on the USMLE website, www.usmle.org, using the Scheduling # and CIN from this permit. You will be issued a Practice Session Scheduling Permit within seven business days of registering. Upon receipt of your permit, you may contact Prometric to pay the fee and schedule an appointment.

5.  **ADMISSION TO THE TEST CENTER:** You must bring this Scheduling Permit and an unexpired, government-issued form of ID (such as a driver's license or passport) that includes both your recent photograph and signature. **The name on your ID must match the name on this permit exactly.** The only acceptable differences are variations in capitalization; the presence of a middle name, middle initial or suffix on one document and its absence on the other; or the presence of a middle name on one and middle initial on the other. The name on your ID must appear in the Latin alphabet, i.e., in "English language letters." If the names on your ID and permit differ, contact NBME immediately. **You cannot make a name change or correction within seven business days of your scheduled test date.** If you are required to carry a Permanent Residency Card, be sure to bring it with you along with the other required form of ID as noted above.

6.  **TEST DAY:**
    *   **ARRIVAL:** Report to the test center 30 minutes before your scheduled appointment. You must sign in and your photograph will be taken. If you arrive later than your scheduled appointment, you **may not** be admitted. If you arrive **more than 30 minutes after your scheduled appointment, you will not** be admitted to the testing center.
    *   **PERSONAL ITEM STORAGE: You must place all of your personal items, including cell phones, pagers, watches, wallets, food, and beverages in a small locker.** Pagers and cell phones must be turned off.
    *   **TESTING:** The Test Center Administrator (TCA) will instruct you to write your name and CIN listed above on a laminated writing surface provided for making notes. You will enter your CIN into the computer at your workstation to initiate your exam and to resume testing after breaks. **Do not erase your name and CIN from the laminated writing surface until the end of your test day.**

7.  **END OF TEST DAY:** The TCA will provide you with a printout that confirms you appeared for that day's testing session. Once you leave the test center, Prometric cannot reproduce the printout.

# Appointment Confirmation

## donotreply@prometric.com

Thu 7/18/2019 6:32 AM

To:Doherty, Meaghan O <mdoherty@tulane.edu>;

External Sender. Be aware of links, attachments and requests.

To:    Meaghan Olivier Doherty

| North America |
| --- |

Date:  18 Jul 2019

Subject: Confirmation of computer-based **Step 2 - United States Medical Licensing Examination,#0000000091461304**

---

Your appointment for the computer-based **Step 2 - United States Medical Licensing Examination** is confirmed. Please find the confirmation details that follow:

| | |
| --- | --- |
| Confirmation: **0000000091461304** | Prometric Test Center: **# 0061** |
| Program:    **STEP2** | **New Orleans - Metairie** |
| Exam Code:   **STEP2** | **2424 EDENBORN AVE.** |
|                **Step 2 - United States Medical Licensing Examination** | **METAIRIE CTR, STE 190** |
| Exam Date:   **06 Aug 2019** | **METAIRIE LOUISIANA 70001** |
| Exam Time:   **08:00** | **UNITED STATES** |

### GLOBAL TEST CENTER SECURITY PROCEDURES

Prometric takes our role of providing a secure test environment seriously. During the check-in process, we inspect any and all eyeglasses, jewelry and other accessories to look for camera devices that could be used to capture exam content.

- You will be required to remove your eyeglasses for close visual inspection. These inspections will take a few seconds and will be done at check-in and again upon return from breaks before you enter the testing room to ensure you do not violate any security protocol.
- Jewelry outside of wedding and engagement rings is prohibited. Please do not wear other jewelry to the test center. Hair accessories, ties and bowties are subject to inspection. Please refrain from using ornate clips, combs, barrettes, headbands, tie clips, cuff links and other accessories as you may be prohibited from wearing them in to the testing room and asked to store them in your locker. Violation of security protocol may result in the confiscation of prohibited devices and termination of your exam.

### IDENTIFICATION POLICY

You must bring your Scheduling Permit and proper identification with you to be admitted to the exam. Review your Scheduling Permit for complete details. ✦This email is NOT your Scheduling Permit.

You may access your Scheduling Permit from your account on your registration entity's (NBME, ECFMG, or FSMB) website. We strongly encourage you to print your Scheduling Permit at least several days in advance of your scheduled test date to avoid any problems accessing or printing your permit on test day.
You may print your Scheduling Permit or present it electronically (e.g., via Smartphone). If, on the day of your exam, you are unable to access the permit electronically for any reason, you must present a paper copy.

### RESCHEDULE / CANCEL POLICY

If you need to change (e.g., reschedule, cancel, change test center location) your appointment, you must go to www.prometric.com/USMLE or call the Prometric Regional Registration Center (RRC) noted on your Scheduling Permit. If you reschedule, your rescheduled test date(s) must fall within your assigned eligibility period. If you are unable to take the test within your eligibility period, contact your registration entity to inquire about a one-time eligibility period extension. A fee is charged for this service, and some restrictions may apply.

The date that you change your appointment, using local time of the RRC, will determine whether you pay an appointment change fee and the amount of this fee:

- If you change your appointment 31 or more days before (but not including) the first day of your scheduled test date, there is no fee.
- If you change your appointment fewer than 31 days but more than 5 days before (but not including) the first day of yo ur scheduled test date, the fee is $50 US Dollars (USD).
- If you change your appointment 5 or fewer days before (but not including) the first day of your scheduled test date, the fee is $128.00 USD for domestic U.S.A. and Canada, $311.00 USD for International Zone 1, $353.00 USD for International Zone 2, or $569.00 USD for International Zone 3.

SPECIAL NOTE ABOUT CANCELLED OR MISSED APPOINTMENTS: If you cancel your appointment within 30 days or do not appear on your scheduled test date, you must call the RRC as directed on your Scheduling Permit and pay the appropriate fee to reinstate your eligibility record before you can schedule a new appointment. You will not be able to perform any transactions via the web.

If you do not take the test within your original or extended eligibility period and wish to take it in the future, you must reapply by submitting a new application and fee.

If you fail or do not complete your exam and want to retake it, you m ust reapply by submitting a new application and fee. Retest policies are available in the USMLE Bulletin of Information at www.usmle.org.

## DRIVING DIRECTIONS

Our center is located at the corner of the South I-10 Service Road and Edenborn in the Metairie Centre.
From the North: Take Causeway Blvd south crossing over I-10. Turn right at 1st stop light onto South I-10 Service Road. Follow South I-10 Service Road to Edenborn. Turn left onto Edenborn. Park in the parking garage located behind the Metairie Centre.
From the South: Take Causeway Blvd. north. After crossing West Napoleon, get into the left turn lane. Turn left at stop light onto the South I-10 Service Road. Follow South I-10 Service Road to Edenborn. Turn left onto Edenborn. Park in the parking garage located behind the Metairie Centre.
From the West: Follow I-10 east toward New Orleans. Take the Causeway Blvd. exit south (exit 228). Turn right at 1st stop light onto the South I-10 Service Road. Follow South I-10 Service Road to Edenborn. Turn left onto Edenborn. Park in the parking garage located behind the Metairie Centre.
F rom the East: Follow I-10 west toward Baton Rouge. Take the Causeway Blvd. exit south (exit 228). Turn right at 1st stop light onto the South I-10 Service Road. Follow the South I-10 Service Road to Edenborn. Turn left onto Edenborn. Park in the parking garage located behind the Metairie Centre.

## ADDITIONAL INFORMATION

- TEST DAY ARRIVAL: Report to the test center 30 minutes before your scheduled appointment for check-in procedures. If you arrive later than your scheduled appointment, you may not be admitted. If you arrive more than 30 minutes after your scheduled appointment, you will not be admitted to the testing center.

- BIOMETRIC CHECK-IN: The USMLE exams include biometrics as part of the testing experience. In many locations, examinees will provide their fingerprint during check-in, breaks, and check-out for identification purposes. To learn more about biometrics, please visit the USMLE website at http://www.usmle.org/frequently-asked-questions/#becs.

- EARPLUGS: Though the test center provides noise reducing headphones, you are encouraged to bring your own soft-foam earplugs (subject to inspection).

- TEST CENTER REGULATIONS: For a full listing of Prometric Testing Center Regulations and other FAQ's, please visit the Prometric website at http://www.prometric.com/TestTakers/FAQs/default.htm.

- TEST CENTER AVAILABILITY: In the event that the test center becomes unavailable on your scheduled test date, we will attempt to notify you in advance and schedule you for a different time and/or center. However, on occasion, we may need to reschedule your appointment at the last minute. We encourage you to check your voicemail and email prior to leaving for your appointment on test day, particularly during inclement weather. You may also call the test center to check for weather-related closings.

## PERSONAL DATA COLLECTION & PROCESSING

You have consented to the collection and processing of your Personal Data, and biometrics, where required by your Test Sponsor.

Sincerely,

**North America**
Prometric
www.prometric.com

**FILED UNDER SEAL**



Cleveland State University
**EngagedScholarship@CSU**

**Cleveland-Marshall**
College of Law Library

Cleveland State Law Review

Law Journals

2011

**EXHIBIT 14**

# Learning Disabilities and the ADA: Licensing Exam Accommodations in the Wake of the ADA Amendments Act of 2008

M. Patrick Yingling

Follow this and additional works at: https://engagedscholarship.csuohio.edu/clevstlrev

Part of the Civil Rights and Discrimination Commons

**How does access to this work benefit you? Let us know!**

Recommended Citation

M. Patrick Yingling, *Learning Disabilities and the ADA: Licensing Exam Accommodations in the Wake of the ADA Amendments Act of 2008*, 59 Clev. St. L. Rev. 291 (2011)
*available at* https://engagedscholarship.csuohio.edu/clevstlrev/vol59/iss3/3

This Article is brought to you for free and open access by the Law Journals at EngagedScholarship@CSU. It has been accepted for inclusion in Cleveland State Law Review by an authorized editor of EngagedScholarship@CSU. For more information, please contact library.es@csuohio.edu.

# HEINONLINE

Citation: 59 Clev. St. L. Rev. 291 2011

Content downloaded/printed from
HeinOnline (http://heinonline.org)
Tue Jun  4 18:28:49 2013

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

Published by EngagedScholarship@CSU, 2011

# LEARNING DISABILITIES AND THE ADA: LICENSING EXAM ACCOMMODATIONS IN THE WAKE OF THE ADA AMENDMENTS ACT OF 2008

M. PATRICK YINGLING[*]

I.   PROTECTION FOR INDIVIDUALS WITH LEARNING
     DISABILITIES UNDER THE ADA .......................................... 292
II.  THE ADA'S APPLICABILITY TO LICENSING EXAMS ............. 294
III. CASE LAW DEVELOPMENTS ............................................... 296
     A.   *The Early Years (1991-1999)* ...................................... 296
     B.   *The Sutton Impact (1999-2008)* .................................. 297
IV.  THE ADA AMENDMENTS ACT OF 2008 ............................... 304
V.   RECOMMENDATIONS .......................................................... 307
     A.   *Academic Success* ...................................................... 307
     B.   *The Major Life Activity of Working* ............................. 308
     C.   *Finding a Substantial Limitation in the Major
          Life Activity of Reading* .............................................. 311
VI.  CONCLUSION ..................................................................... 313

"That's the real problem with kids who struggle with learning . . . Some kids feel like they're stupid. I want them to know that they're not. They just learn differently. Once they understand that and have the tools to learn in their individual way, then they can feel good about themselves."[1]   This quote from Charles Schwab, the financial pioneer who discovered that he had dyslexia at the age of 40, embodies the importance of having federal statutes, such as the Individuals with Disabilities Education Act[2] and Section 504 the Rehabilitation Act,[3] that guarantee special education programs and reasonable accommodations to eligible students with learning disabilities. However, learning disabilities are not exclusive to the formal education process. In fact, learning disabilities often remain with individuals long after their experiences as students. Unfortunately, until the enactment of the Americans with Disabilities Act of 1990 ("ADA"),[4] individuals with learning

---

[*] Associate, Reed Smith LLP, Pittsburgh, Pennsylvania; Visiting Lecturer, Moi University School of Law, Eldoret, Kenya; Juris Doctor, University of Pittsburgh School of Law; Bachelor of Science, Bucknell University.  Thanks to Ben Bratman, Judith Teeter, and Michael Waterstone for their helpful advice.  Special thanks to Michael and Georgiana Yingling for their endless support.

[1] Charles   Schwab,   *GoodLearners.net*,   Sept.   12,   2011,   http://www.good learners.net/behaviordisorders.html.

[2] Individuals with Disabilities Education Act, 20 U.S.C. § 1400 (2006).

[3] Rehabilitation Act of 1973, 29 U.S.C. § 701 (2006).

[4] Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (2006).

disabilities often faced a roadblock when seeking to make the transition from student to professional. The roadblock came in the form of a state licensing exam.

The ADA was the first piece of federal legislation to guarantee accommodations on state licensing exams for individuals with learning disabilities.[5] The ADA had the purpose of assuring "equality of opportunity" and the "elimination of discrimination" in regard to all individuals with disabilities.[6] However, over the course of two decades, the courts steadily narrowed the ADA's scope of protection.[7] Individuals with learning disabilities who sought accommodations on licensing exams experienced the negative effects of such judicial interpretations. As a result, Congress took action to restore a "broad scope of protection" under the ADA by enacting the ADA Amendments Act of 2008 ("ADAAA").[8]

This Article argues that the courts must be cognizant of Congress' intention to broaden the scope of the ADA, especially in regard to reading impaired individuals who request reasonable accommodations on licensing exams. Part I examines the ADA's protections for individuals with learning disabilities. Part II discusses the applicability of the ADA to licensing exams, including state bar exams. Part III examines case law over the past twenty years pertaining to learning impaired individuals who have requested accommodations on licensing exams. Part IV analyzes the ADAAA and focuses on its potential to change the status quo for learning impaired individuals who request accommodations on licensing exams. Finally, Part V puts forth recommendations for the courts to provide appropriate standards for individuals requesting accommodations on licensing exams under the amended ADA. Specifically, this Article suggests that: (1) courts should no longer foreclose the finding of a substantially limiting impairment in regard to the major life activity of reading due to an individual's academic success; (2) "working" should be recognized as an appropriate major life activity under which to evaluate claims for accommodations on the bar exam (and possibly other licensing exams), with such evaluations involving a comparison to most people having comparable training, skills, and abilities; and (3) reading disabilities should be recognized not only by psychometric tests that show a substantial limitation in comparison to most people, but also by test scores that indicate a significant discrepancy between an individual's intellectual capacity and actual reading ability. By following these recommendations, the courts will be able to evaluate future claims for accommodations on licensing exams with standards that reflect Congress' intention to provide a broad scope of protection under the ADA.

## I. PROTECTION FOR INDIVIDUALS WITH LEARNING DISABILITIES UNDER THE ADA

Traditionally, proving the existence of a disability is the primary obstacle that an individual must overcome in order to qualify for protections under the ADA. The ADA defines disability to mean "a physical or mental impairment that substantially

---

[5] *See* 28 C.F.R. § 36.309(a) (2011).

[6] Americans with Disabilities Act, 42 U.S.C. §§ 12101(a)(8), 12101(b) (2006).

[7] *See, e.g.,* Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002); Sutton v. United Air Lines, *(Sutton II)* 527 U.S. 471 (1999).

[8] ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(1) (2008).

limits one or more of the major life activities of such individual."[9]  The language does not clearly indicate whether individuals with learning disabilities are entitled to protections under the ADA.  Fortunately, the ADA's implementing regulations clarify that learning disabilities fall under the ADA's umbrella of protection.  The Department of Justice ("DOJ") regulations explicitly define the phrase "physical or mental impairment" to include "specific learning disabilities."[10]  The regulations also define "major life activities" to include "learning."[11]

The term "learning disability" has failed to acquire a commonly accepted meaning, and the ADA does not explicitly attempt to define it.[12]  In general, learning disabilities include a wide range of cognitive disorders, the most common of which is dyslexia, a reading impairment.[13]  The ambiguity surrounding learning disabilities makes it difficult for experts to diagnose them.  Experts often employ psychometric tests in order to diagnose specific learning disabilities.  For example, a psychometric test intended to identify dyslexia would measure an individual's reading ability.[14]  In practice, some experts use a combination of psychometric tests and clinical observations to diagnose these disabilities.[15]  Still, others rely on psychometric tests alone.[16]   Specific learning disabilities can also be diagnosed by proving a discrepancy between an individual's inherent capacity and actual performance.  However, courts have not always accepted such a discrepancy as indicative of a disability, especially in cases of individuals requesting accommodations on professional licensing exams.[17]   Individuals requesting accommodations on

---

[9]  Americans with Disabilities Act, 42 U.S.C. § 12102 (2006) ("The term disability means, with respect to an individual ... (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment").

[10]  28 C.F.R. § 35.104 (2011); 28 C.F.R. § 36.104 (2011).

[11]  *Id.*

[12]  Samuel S. Heywood, *Without Lowering the Bar: Eligibility for Reasonable Accommodations on the Bar Exam for Learning Disabled Individuals Under the Americans with Disabilities Act*, 33 GA. L. REV. 603, 609 (1999) (referencing Patricia Dunn, LEARNING RE-ABLED: THE LEARNING DISABILITY CONTROVERSY AND COMPOSITION STUDIES, 15-20 (Peter R. Stillman et. al. 1995)).

[13]  *Id.* at 609 (referencing Frank A. Vellutino, *Documenting the Existence of Dyslexia: Rationale for the Criteria Recommended to the New York State Board of Law Examiners for Documenting the Existence of a Learning Disability ("Dyslexia") as the Basis for Special Accommodations on the New York State Bar Exam*, 63 B. EXAM'R 6, 6-7 (1994)).

[14]  Vellutino, *supra* note 13, at 9.

[15]  Heywood, *supra* note 12, at 610-11 (citing Pazer v. N.Y. State Bd. of Law Exam'rs, 849 F. Supp. 284 (S.D.N.Y. 1994) (ruling that the plaintiff did not have a learning disability based on psychometric test score along with other observations)).

[16]  *Id.* at 611 (citing Argen v. N.Y. State Bd. of Law Exam'rs, 860 F. Supp. 84, 91 (W.D.N.Y. 1994) (finding exclusive reliance on psychometric test scores preferable to a qualitative evaluation)).

[17]  *See, e.g.*, Price v. Nat'l Bd. of Med. Exam'rs, 966 F. Supp. 419, 426-27 (S.D. W.Va. 1997) (holding that any reference to a disparity between capacity for achievement and actual achievement was inadmissible because it would undermine the "comparison to most people"

professional licensing exams often have a history of academic success, which has caused courts to question whether such individuals could possibly have an impairment that substantially limits a major life activity.[18]

When the ADA was signed into law on July 26, 1990, President George H.W. Bush declared that "every man, woman, and child with a disability can now pass though once closed doors into a bright, new era of equality, independence, and freedom."[19] However, due to narrow judicial interpretations of the ADA, many have questioned whether such "closed doors" have actually been opened. The narrowed scope of protection under the ADA contributed to the 110th Congress' desire to enact the ADAAA, and "carry out the ADA's objectives . . . by reinstating a broad scope of protection to be available under the ADA."[20] Although the text of ADAAA does not explicitly address learning disabilities, the House Committee on Education and Labor specifically expressed its rejection of case law that unjustly limited access to reasonable accommodations for individuals with learning disabilities.[21]

## II. THE ADA'S APPLICABILITY TO LICENSING EXAMS

The ADA was the first piece of federal civil rights legislation to pertain to state licensing exams.[22] Prior to the ADA, there were no federal grounds to challenge the fairness of bar exams or medical licensing tests.[23] Although the Rehabilitation Act of 1973 mandated that institutions receiving federal funding not discriminate against handicapped individuals, it was not guaranteed that state bar examiners would be covered under this Act due to their lack of federal assistance.[24] It has been argued that Title VII of the Civil Rights Act of 1964 applies to state licensing exams.[25] However, this argument has generally faced rejection.[26] The apparent reason for

---

approach as set forth in the Department of Justice regulations implementing Titles II and III of the ADA).

[18] *See, e.g., id.*; Gonzales v. Nat. Bd. of Med. Exam'rs, 225 F.3d 620, 630 (6th Cir. 2000); Wong v. Regents of Univ. of Cal., 410 F.3d 1052, 1067 (9th Cir. 2004).

[19] George H.W. Bush, U.S. President, Signing Ceremony for the Americans with Disabilities Act (July 26, 1990), http://www.eeoc.gov/eeoc/history/35th/videos/ada_signing_text.html.

[20] ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(1) (2008).

[21] H.R. Rep. No. 110-730, pt. 1, at 10 (2008) (rejecting the findings in *Price*, 966 F. Supp. 419; *Gonzales*, 225 F.3d 620; *Wong*, 410 F.3d 1097).

[22] *See* 28 C.F.R. § 36.309(a) (2011).

[23] W. Sherman Rogers, *The ADA, Title VII, and the Bar Examination: The Nature and Extent of the ADA's Coverage of Bar Examinations and an Analysis of the Applicability of Title VII to Such Tests*, 36 HOW. L. J. 1, 2 (1993).

[24] *See* Rehabilitation Act of 1973, 29 U.S.C. § 701 (2006). *But see* Bartlett v. N.Y. State Bd. of Law Exam'rs, 156 F.3d 321, 329-30 (2d Cir. 1998) (*Bartlett III*) (finding the Board to be bound by the Rehabilitation Act, even though the Board did not receive direct federal funding, because two state entities received federal funding and extended assistance to the Board), *judgment vacated on other grounds*, 527 U.S. 1031 (1999).

[25] *See generally* Rogers, *supra* note 23, at 2-15.

[26] *See, e.g.*, Washington v. Davis, 426 U.S. 229, 248 (1976).

such rejection is the fear that Title VII would perpetually require the invalidation of many state licensing exams, including all bar exams.[27] In contrast to Title VII, the application of the ADA to state licensing exams has not required the invalidation of such exams. The ADA's implementing regulations imply that the sole remedy available to disabled test takers is a modification in the way that the exam is administered.[28]

The ADA provides comprehensive protection to individuals with disabilities in several areas, and contains titles pertaining to employment ("Title I"), public services ("Title II"), public accommodations and services operated by private entities ("Title III"), telecommunications ("Title IV"), and miscellaneous matters ("Title V").[29] Title II and Title III are particularly relevant to licensing exam situations. Title II defines a public entity as being "any State or local government" or "any department, agency . . . or other instrumentality of a State or States or local government."[30] Since licensing examination boards serve as instrumentalities of state governments, these boards are considered public entities within the scope of Title II.[31]

However, Title II, unlike Title III, contains no specific standard for determining whether the selection or administration of a licensing exam is performed in a nondiscriminatory manner.[32]    The DOJ, which was given the explicit task of implementing regulations pertaining to Titles II and III,[33] addressed this matter in 1992 by issuing an *amicus curiae* memorandum in the case of *Rosenthal v. New York State Board of Law Examiners* explaining that although the regulation implementing Section 309 of Title III applied to "private entities,"[34] the detailed testing standards set forth in the regulations "are useful as a guide for determining what constitutes discriminatory conduct by a public entity in testing situations under both Titles II and III."[35] This view, however, does not undermine the significance of

---

[27] *Id.* (alluding to the concern that any application of Title VII would invalidate many state licensing statutes).

[28] *See* Rogers, *supra* note 23, at 2.

[29] *See* Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (2006).

[30] Americans with Disabilities Act, 42 U.S.C. § 12131(1)(A)-(B) (2006).

[31] *See* Rogers, *supra* note 23, at 8 (referencing Nat'l Conference of Bar Exam'rs, Bar Exam'rs Handbook 95-97 (1980)).

[32] *See* Americans with Disabilities Act, 42 U.S.C. § 12189 (2006) ("Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.").

[33] *See* Americans with Disabilities Act, 42 U.S.C. § 12134 (2006) ("Not later than 1 year after July 26, 1990, the Attorney General shall promulgate regulations in an accessible format that implement this part.").

[34] *See* 28 C.F.R. § 36.309(a) (2011).

[35] *See* Michael K. McKinney, *The Impact of the Americans with Disabilities Act on the Bar Examination Process: The Applicability of Title II and Title III to the Learning Disabled*, 26 Cumb. L. Rev. 669, 677 (1995-1996) (quoting Amicus Curiae Mem. of the United States, Rosenthal v. N.Y. State Bd. of Law Exam'rs, No. 92 Civ. 1100 (S.D.N.Y. 1992) (unreported decision)).

*CLEVELAND STATE LAW REVIEW* [Vol. 59:291

Title II to other aspects of the state licensing process. Title II still applies to certain aspects of the licensing process such as the investigation of the applicant's character and fitness. Title II, for example, would be the only appropriate basis for challenging such an aspect of the licensing process since Title III is limited to the selection and administration of licensing exams.[36]

### III. CASE LAW DEVELOPMENTS

#### A. The Early Years (1991-1999)

A significant portion of the case law pertaining to requests for accommodations on licensing exams has involved questions of how to interpret the ADA's ambiguous terms. Although many individuals suffer from what is commonly known as a "learning disability," the ADA's scope of protection for an individual with a "learning disability" is restricted to those whose situation is covered by the Act's definition of disability, which requires an impairment to "substantially limit[] one or more ... major life activities."[37] The DOJ elaborated upon this definition by declaring that "[a] person is considered an individual with a disability ... when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people."[38] This standard was the controversial subject of a few important cases in the ADA's early history.

*Pazer v. New York State Board of Law Examiners* was one of the earliest ADA cases involving a request for licensing exam accommodations due to a learning disability.[39] In *Pazer*, a bar examination applicant was twice denied accommodations by the New York State Board of Law Examiners for his alleged visual processing disability. After instituting an administrative appeal that was eventually denied, Pazer commenced a court action pursuant to Titles II and III of the ADA to compel the board to provide him with reasonable accommodations to take the bar exam over a period of four days rather than two, and use of a computer.[40] The court issued an opinion that focused primarily on whether Pazer was "substantially limited" in a major life activity.

The court specifically noted the importance of the DOJ regulations pertaining to Title III's language on examinations. Section 36.309 of the DOJ regulations requires examinations to be administered so that the results "accurately reflect the individual's aptitude or achievement level . . . rather than reflecting the individual's impaired sensory, manual, or speaking skills."[41] In noting the importance of this regulation, the court found some merit to the argument that a discrepancy between inherent capacity and performance permits the inference of a substantially limiting impairment, even if the individual's actual performance has met the standard of the

---

[36] *See* Rogers, *supra* note 23, at 7.

[37] Americans with Disabilities Act, 42 U.S.C. § 12102 (2006).

[38] 28 C.F.R. § 35.104 App. B. (2011) (defining a substantial limitation of a major life activity).

[39] Pazer v. N.Y. State Bd. of Law Exam'rs, 849 F. Supp. 284 (S.D.N.Y. 1994).

[40] *Id.* at 285-86.

[41] *Id.* at 286 (citing 28 C.F.R. § 36.309 (1992)).

ordinary person.[42]    In other words, the court implied that it might grant accommodations to an applicant who was found to possess above-average intellectual capabilities but had nonetheless performed in the average range on psychometric tests or in school.[43]

However, the *Pazer* court was ultimately not persuaded that such a discrepancy could compel the finding of a disability as a matter of law. In fact, Pazer's timed reading comprehension score, which put him in the 64th percentile, provided enough evidence for the court to declare that Pazer was not substantially limited in the major life activity of reading, despite the fact that he scored in the 84th percentile on a similar reading comprehension test that was conducted without time limits.[44]

*Price v. National Board of Medical Examiners* also involved individuals requesting accommodations on a licensing exam.[45] In *Price*, the plaintiffs, medical students who had completed the equivalent of two years of study, requested additional time and private rooms when taking Step 1 of the United States Medical Licensing Examination because of their Attention Deficit Hyperactivity Disorder, Reading Disorder, and Disorder of Written Expression.[46] After being denied such accommodations by the board, the plaintiffs sought injunctive relief in the Southern District of West Virginia.

The court found that none of the plaintiffs had exhibited a history of substantial academic difficulties.[47] In response, the plaintiffs cited *Pazer* to support their position that average performance does not necessarily preclude an individual from qualifying as a person with a disability under the ADA.[48] However, the *Price* court rejected the reasoning of *Pazer*. The court further held that Section 36.309 of the DOJ regulations, which requires examinations to reflect the applicant's aptitude rather than the applicant's impairment, did not outweigh the principle that an impairment must limit a person in comparison to "most people" in order to be considered a disability worthy of accommodations.[49] The court went on to cite the plaintiffs' history of significant scholastic achievement as reflecting a complete absence of any impairment that could be said to limit the plaintiffs in comparison to "most people."[50]

### B. The Sutton *Impact (1999-2008)*

One of the most contentious issues in the first decade of ADA case law was whether courts should consider an individual's use of mitigating measures when determining the existence of an impairment that substantially limits a major life

---

[42] *Id.* at 287.

[43] *See* Heywood, *supra* note 12, at 616.

[44] *Pazer*, 849 F. Supp. at 287.

[45] Price v. Nat'l Bd. of Med. Exam'rs, 966 F. Supp. 419 (S.D. W. Va. 1997).

[46] *Id.* at 422.

[47] *Id.* at 423-24.

[48] *Id.* at 436 (*Pazer*, 849 F. Supp. 287).

[49] *Id.* at 426 (citing 28 C.F.R. § 36.309 (1996)).

[50] *Id.* at 427.

activity.[51] Mitigating measures are corrective actions that ameliorate the effects of an impairment without actually eliminating the impairment itself. In June 1999, the Supreme Court addressed the issue of mitigating measures and decided a series of cases that significantly narrowed ADA protections. With its decisions in *Sutton v. United Air Lines, Inc.*,[52] *Albertson's, Inc. v. Kirkingburg*,[53] and *Murphy v. United Parcel Service, Inc.*,[54] the Supreme Court held that ameliorative effects of mitigating measures were to be considered in determining whether an individual was substantially limited in a major life activity.[55] *Sutton v. United Air Lines, Inc.* has become the most commonly cited case for this point. In turn, it has also become the primary focus of legislative reform in the area of disability rights.[56]

*Sutton* involved twin sisters, both of whom had severe visual problems without corrective lenses, and could see at a level no better than 20/200. However, with corrective lenses, they were able to function identically to individuals without a similar impairment.[57] When the sisters applied for employment as commercial airline pilots, they were denied the positions because they did not meet the airline's minimum vision requirement of 20/100 or better.[58] When the sisters filed a charge of disability discrimination under the ADA in the United States District Court for the District of Colorado, the court held that they were not substantially limited in any major life activity, and thus had not stated a claim that they were disabled within the meaning of the ADA.[59] The Tenth Circuit affirmed the District Court's judgment, and the Supreme Court granted a writ of certiorari.[60]

In affirming the Tenth Circuit, the Supreme Court concluded that although the Equal Employment Opportunity Commission ("EEOC") and DOJ guidelines directed that a disability determination be made without reference to mitigating measures, such an interpretation would be impermissible under the ADA.[61] The Court first asserted that the EEOC and DOJ regulations could not be given

---

[51] *See* Sutton v. United Air Lines, Inc., 130 F.3d 893, 902 (10th Cir. 1997) (holding that mitigating measures should be referenced when determining the existence of a disability). *Contra* Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 629-30 (7th Cir. 1998) (holding that disabilities should be determined without reference to mitigating measures); Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 937-38 (3d Cir. 1997) (holding the same); Arnold v. United Parcel Service, Inc., 136 F.3d 854, 859-66 (1st Cir. 1998) (holding the same).

[52] Sutton v. United Air Lines, Inc. (*Sutton II*), 527 U.S. 471 (1999).

[53] Albertson's, Inc. v. Kirkingburg, 527 U.S. 555 (1999).

[54] Murphy v. United Parcel Serv. Inc., 527 U.S. 516 (1999).

[55] *See, e.g., Sutton II*, 527 U.S. at 475.

[56] *See, e.g.*, ADA Amendments Act of 2008, Pub. L. No. 110-325 (2008).

[57] *Sutton II*, 527 U.S. at 475.

[58] *Id.* at 476.

[59] *Id.*

[60] *Id.* at 477.

[61] *Id.* at 481-82 (addressing 29 C.F.R. pt. 1630, App. § 1630.2(j) (1998); 28 C.F.R. pt. 35, App. A, § 35.104 (1998); 28 C.F.R. pt. 36, App. B, § 36.104 (1998)).

substantial deference because neither the EEOC nor the DOJ had been given authority to issue regulations implementing the "generally applicable" provisions of the ADA, which governed the definition of "disability."[62]

The Court then pointed to three provisions of the ADA that, when read in concert, contradicted the approach adopted by the EEOC and the DOJ.[63] First, the Court reasoned that because the phrase "substantially limits" appears in the Act in the present indicative verb form, the language is properly read as requiring a person to be presently limited, not hypothetically limited.[64] Second, since a disability determination is an "individualized inquiry," the agency approach was inappropriate because it required the courts to make a disability determination based on general information about how an uncorrected impairment "usually" affects individuals rather than on the individual's actual condition.[65] Finally, the Court found Congress' declaration that "some 43,000,000 Americans have one or more physical or mental disabilities" to be indicative of the fact that Congress did not intend to protect all individuals whose unmitigated conditions amounted to disabilities.[66] In order to draw such an inference, the Court pointed out that "the number of people with vision impairments alone is 100 million."[67] Therefore, the Court held that Congress could not have intended to include all persons with corrected impairments, or else it would have cited a much higher number of disabled persons in its findings.[68]

Lower courts applied the Supreme Court's holding in *Sutton* to many actions under the ADA, including those involving requests for accommodations on licensing exams due to alleged learning disabilities. One of the first and most prominent post-*Sutton* cases involving learning disabilities was *Gonzales v. National Board of Medical Examiners.*[69]  *Gonzales* involved a medical student who was seeking extended time on Step 1 of the United States Medical Licensing Exam because of an alleged learning disability.[70] The Sixth Circuit Court of Appeals recognized *Pazer*'s conclusion that there is "some merit to the argument that a disparity between inherent capacity and performance on a test may, in some circumstances, permit the inference that an individual's performance has met the standard of an ordinary person."[71] However, the Sixth Circuit ultimately affirmed the district court's holding that the plaintiff did not exhibit any kind of disparity that could be said to be a

---

[62] *Id.* at 479.

[63] *Id.* at 482.

[64] *Id.* at 482 (citing Americans with Disabilities Act, 42 U.S.C. § 12102(2)(A) (1998)).

[65] *Id.* at 483 (citing 42 U.S.C. § 12102(2) ("The term disability means, with respect to an *individual* . . . a physical or mental impairment that substantially limits one or more of the major life activities of such *individual*.") (emphasis added)).

[66] *Id.* at 484 (quoting Americans with Disabilities Act, 42 U.S.C. § 12101(a)(1) (1998)).

[67] *Id.* at 487 (referencing NAT'L ADVISORY EYE COUNCIL, U.S. DEP'T OF HEALTH & HUM. SERVS., VISION RESEARCH—A NATIONAL PLAN: 1999-2003, 7 (1998)).

[68] *Id.* at 487.

[69] 225 F.3d 620 (6th Cir. 2000).

[70] *Id.* at 622.

[71] *Id.* at 629 (quoting Pazer v. New York State Board of Law Exam'rs, 849 F. Supp. 284, 287 (1994)).

https://engagedscholarship.csuohio.edu/clevstlrev/vol59/iss3/3

HeinOnline -- 59 Clev. St. L. Rev. 299 2011

0011

disability.[72] In reaching that conclusion, the Sixth Circuit cited Gonzales' history of academic success.[73] The court further cited the Supreme Court's holding in *Sutton*, and concluded that even if Gonzales' academic successes were due to self-accommodations, he could not be considered disabled under the ADA.[74]

In addition to its application of *Sutton*, the Sixth Circuit made a ruling in regard to Gonzales' claim of being substantially limited in the major life activity of working that would prove to be controversial. Gonzales claimed that he was substantially limited in the major life activity of working, and that he was restricted in his ability to perform a class of jobs due to his difficulties in passing the licensing exam. Gonzales advocated for the court to apply the EEOC's Title I definition of "substantially limits" as it related to the major life activity of working, which stated, "the term substantially limits means significantly restricted . . . as compared to the *average person having comparable training, skills, and abilities*."[75] This definition differed from the definition of "substantially limits" provided by the EEOC and the DOJ for every other relevant major life activity, which required an individual to be "restricted in comparison to the *average person in the population, or to most people*."[76] The DOJ regulations pertaining to Titles II and III of the ADA were, and continue to be, silent as to whether the major life activity of working deserves a different standard than the other major life activities.

The Sixth Circuit declined to transplant the EEOC's definition of "substantially limits" in regard to the major life activity of working for a claim governed by Title III of the ADA. The Sixth Circuit gave three primary reasons for its decision. First, the court presumed that if the DOJ wanted to modify its definition of "substantially limits" regarding the major life activity of working, then it would have expressly done so, just as the EEOC had done with Title I.[77] Second, the court noted that the plaintiff's claimed disability in the major life activity of working was itself problematic because the Supreme Court had recently questioned whether working could even be a major life activity under the ADA.[78] Finally, the Sixth Circuit found that the ADA's legislative history lent no support to Gonzales' argument, and that such history suggested that Congress intended "substantially limits" to be interpreted

---

[72] *Id.* at 629.

[73] *Id.* at 630.

[74] *Id.* at 630 (citing Sutton v. United Air Lines, Inc. (*Sutton II*), 527 U.S. 471, 482 (1999)).

[75] *Id.* (quoting 29 C.F.R. § 1630(j)(3)(i) (1999)).

[76] 29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added); 28 C.F.R. pt. 36, App. B (1999) (emphasis added).

[77] *Gonzales*, 225 F.3d at 631.

[78] *Id.* at 631 (citing *Sutton II*, 527 U.S. at 492) ("We note . . . that there may be some conceptual difficulty in defining 'major life activities' to include work, for it seems 'to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] . . . then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap.'") (quoting Transcript of Oral Argument at 15, School Bd. of Nassau County v. Arline, 475 U.S. 1118 (1986) (No. 85-1277) (argument of Solicitor General)).

as "significantly restricted in a major life activity in relation to the average person within the population," no matter what major life activity was being considered.[79]

Another case dealing with accommodations on licensing exams under the ADA decided post-*Sutton* was *Bartlett v. New York State Board of Law Examiners*.[80] *Bartlett* is probably the most prominent case in this area due to its procedural journey from the Southern District of New York to the United States Supreme Court, and its subsequent remand back through the circuit to the district court.[81] Marilyn J. Bartlett had a history of academic success. She had successfully attained a Ph.D. from New York University in 1981 and a law degree from Vermont Law School in 1991. Bartlett first received accommodations for her learning disability while studying at New York University. Although she did not receive accommodations on her Law School Admissions Test, she did receive accommodations while at Vermont Law School.[82] Bartlett attempted to pass the New York State Bar Examination in July 1991, February 1992, and February 1993. She failed all three attempts. Bartlett was not granted accommodations for these attempts. Pursuant to a stipulation ordered by the district court, Bartlett was granted accommodations on her fourth attempt to pass the bar exam. Despite the accommodations, she failed the bar exam once again. Still, Bartlett claimed that the accommodations were inadequate, and the litigation continued.[83]

After both the Southern District of New York and the Second Circuit Court of Appeals decided in favor of Bartlett, the United States Supreme Court granted certiorari, and remanded the case to the Second Circuit so that it could be decided in light of the Supreme Court's recent decision in *Sutton*.[84] On remand, the Second Circuit affirmed that "reading" and "working" were major life activities.[85] The court then addressed the question of whether Bartlett's impairment "substantially limited" her with respect to the major life activities of "reading" and "working" in light of the Supreme Court's decision in *Sutton*.[86] In evaluating the reading claim, the Second Circuit recognized that Bartlett's self-accommodations accounted for her academic

---

[79] *Id.* at 631-32 (citing S. Rep. No. 101-116, at 23 (1989)).

[80] 226 F.3d 69 (2nd Cir. 2000) (remanded to the Southern District of New York, No. 93 CIV. 4986 (SS), 2001 WL 930792 (S.D.N.Y. 2001)).

[81] 970 F. Supp. 1094 (S.D.N.Y. 1997) (*Bartlett I*); 2 F. Supp. 2d 388 (S.D.N.Y.) (motion for reconsideration denied) (*Bartlett II*); 156 F.3d 321 (2nd Cir. 1998) (*Bartlett III*); 527 U.S. 1031 (1999) (*Bartlett IV*); 226 F.3d 69 (2nd Cir. 2000) (*Bartlett V*); 2001 WL 930792 (S.D.N.Y. 2001) (*Bartlett VI*).

[82] 970 F. Supp. at 1101 ("The law school accommodations included time-and-a-half to take examinations, the use of a yellow legal pad with a red left margin instead of the traditional 'blue book,' and permission to circle the answers on multiple choice examinations instead of filling in a computer-scored answer sheet.").

[83] *Id.* at 1102-04.

[84] *Bartlett IV*, 527 U.S. 1031 (1999) ("Judgment vacated, and case remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of Sutton v. United Air Lines, Inc., (Sutton II) 527 U.S. 471 (1999).").

[85] 226 F.3d at 80 (citing *Bartlett III*, 156 F.3d at 328 n.3; EEOC v. R.J. Gallagher Co., 181 F.3d 645, 654-55 (5th Cir. 1999)).

[86] *Id.* at 80-85.

https://engagedscholarship.csuohio.edu/clevstlrev/vol59/iss3/3

HeinOnline -- 59 Clev. St. L. Rev. 301 2011

12

0013

success.[87]  The court also affirmed the trial court's original finding that Bartlett "reads slowly, haltingly, and laboriously."[88]  Still, the court members were not prepared to hold that Bartlett was substantially limited in the major life activity of reading.  Instead, this issue was remanded so that the district court could make a factual determination as to whether Bartlett's slow reading rate amounted to a substantial limitation in comparison to most people or only a "mere difference."[89]

The Second Circuit also addressed the question of whether Bartlett was substantially limited in the major life activity of working.  The court held that the trial court did not err in relying on the EEOC regulations to define "substantially limits" with respect to "working" because such regulations were not inconsistent with the DOJ regulations pertaining to Title III of the ADA.[90]  This holding was in direct contradiction to that of the Sixth Circuit Court of Appeals in *Gonzales*.[91]  In the end, however, the court could not affirm the original district court conclusion that Bartlett was substantially limited in the major life activity of working.  According to the Second Circuit, Bartlett failed to show that her inability to practice law resulted from her reading impairment, rather than other factors that may have prevented her from passing the bar exam.  Therefore, this issue was also remanded so that the district court could make a factual finding as to whether Bartlett's impairment, rather than factors such as her education, experience, or innate ability, "substantially limited" her ability to work.[92]

Following remand by the Second Circuit, Judge Sonia Sotomayor issued the decision for the Southern District of New York.[93]  Judge Sotomayor first addressed the major life activity of reading, and how the Supreme Court's holding in *Sutton* related to Bartlett's alleged substantial limitation.  The court concluded that the ameliorative effects of mitigating measures should only be referenced if they affect the individual's ability to perform the major life activity in question.[94]  The court cited opinions from a number of other courts that had considered the issue post-*Sutton*, and had come to similar conclusions.[95]  Judge Sotomayor applied this

---

[87] *Id.* at 80.

[88] *Id.* at 81 (citing *Bartlett I*, 970 F. Supp. at 1099).

[89] *Id.* at 81-82 (citing Albertson's v. Kirkingburg, 527 U.S. 555, 565 (1999)).

[90] *Id.* at 83 (referencing the Department of Justice's *amicus curiae* brief; and Auer v. Robbins, 519 U.S. 452 (1997) (holding agency's interpretation of its own regulation to be "controlling unless plainly erroneous or inconsistent with the regulation")).

[91] *See Gonzales*, 225 F.3d at 631-32.

[92] *Bartlett V*, 226 F.3d at 85.

[93] Sonia Sotomayor is currently an Associate Justice of the Supreme Court of the United States.  President Barack Obama nominated Judge Sonia Sotomayor to the Supreme Court on May 26, 2009, and she was confirmed by the United States Senate on August 6, 2009.

[94] Bartlett v. N.Y. State Bd. of Law Exam'rs, No. 93 CIV. 4986 (SS), 2001 WL 930792, at *31 (*Bartlett VI*).

[95] *Id.* at 31-34 (citing Finical v. Collections Unlimited, Inc., 65 F. Supp. 2d 1032, 1039 (D. Ariz. 1999) (finding that measures that merely helped the plaintiff to communicate, but did not improve her ability to hear, should not be referenced in regard to whether she was substantially limited in the major life activity of hearing); Root v. Ga. State Bd. of Veterinary

conclusion to Bartlett's situation and found that while Bartlett used coping strategies, like study groups and dictation, to assist her with reading, such methods "merely help[ed] plaintiff function . . . [and did] not affect her ability to read."[96] The court therefore found such coping measures to be irrelevant to any determination of whether Bartlett was substantially limited in the major life activity of reading.

In addition, Judge Sotomayor held that Bartlett's real world achievements were "not inconsistent with" the court finding her to be substantially limited in the major life activity of reading.[97] The court specifically held that Bartlett's success was the result of her "creativity in finding methods around reading . . . and [is] further evidence that she is substantially limited in reading when compared to 'most people.'"[98] In making the actual finding that Bartlett was indeed substantially limited in comparison to most people, the court refused to base its decision purely on psychometric tests and a percentile cut-off mark, as was recommended by the New York State Board of Law Examiners. The court held that "such a standard must take into consideration an applicant's evaluation report *in toto*, rather than focusing exclusively on psychometric test scores."[99]

Although Judge Sotomayor had found Bartlett to be substantially limited in reading, she went on to address the Second Circuit's question in regard to the major life activity of working — whether the denial of accommodations was a substantial factor in preventing her from passing the bar exam.[100] Because the bar examination involves extensive reading and writing, and Bartlett had proven that her reading impairment seriously decreased her rate of reading, the court found a sufficient causal connection between her reading impairment and her failure to pass the bar exam. Judge Sotomayor then confirmed that when compared to persons of comparable training, skills, and abilities, in accordance with EEOC regulations, Bartlett's reading skills were well below normal.[101] Thus, the court found that Bartlett was substantially limited in the major life activity of working.[102]

In 2005, the Ninth Circuit Court of Appeals, in *Wong v. Regents of the University of California*, provided a more narrow interpretation of the ADA that highlighted the disparity amongst the circuit courts in terms of finding a substantial limitation in regard to the major life activities of learning, reading, and working.[103] *Wong* involved a plaintiff medical student with a history of academic success and a limited

---

Med., 114 F. Supp. 2d 1324, 1333 (N.D. Ga. 2000), *rev'd in part, vacated in part on other grounds* 252 F.3d 443 (11th Cir. 2001)).

[96] *Bartlett VI*, 2001 WL 930792, at *35.

[97] *Id.* at *40; *contra Price*, 966 F. Supp at 427 ("[E]ach of the students has a history of significant scholastic achievement reflecting a complete absence of any substantial limitation on learning ability."); *Gonzales*, 225 F.3d at 630.

[98] *Bartlett VI*, 2001 WL 930792, at *40.

[99] *Id.* at *41.

[100] *Id.* at *44-46.

[101] *Id.*

[102] *Id.*

[103] 410 F.3d 1052 (9th Cir. 2005).

HeinOnline -- 59 Clev. St. L. Rev. 303 2011

history of having any learning or reading impairments.[104]  Wong performed well without accommodations during the first two years of medical school, but "[w]hen his program moved to the clinical clerkships in the third year . . . [his] performance deteriorated substantially . . . . He was diagnosed by the University Disability Resource Center as having an impairment that limited his ability to process and communicate information."[105]  Wong eventually requested an eight-week reading period before his next clerkship, and was denied.  He was later dismissed from the medical school after the school committees concluded that he was not qualified to meet the school's academic standards.[106]  Wong subsequently brought suit in the Eastern District of California, and the court granted summary judgment to the defendant university on the grounds that there was no genuine issue of material fact as to whether Wong was substantially limited in the major life activities of learning, reading, or working.[107]

The Ninth Circuit Court of Appeals affirmed the district court's holding, and relied on *Price* to conclude that Wong's academic success was fatally inconsistent with his claim to be disabled.[108]  In doing so, the court declared that although Wong's academic achievement was not directly inconsistent with the contention that he is substantially limited in "reading," as it was in regard to the major life activity of "learning," "the relationship between reading and academic success is sufficiently close to make that argument a difficult one to maintain."[109]  The Ninth Circuit also held that Wong had not shown that he was substantially limited in the major life activity of working because it had not been shown that his failure to pass the clerkships would foreclose him from a broad range of jobs.  In doing so, the Ninth Circuit affirmed the district court's finding that Wong "will only be precluded from jobs that require very specific and detailed deductive reasoning . . . ."[110]  *Wong*'s holding contradicted many of the legal conclusions reached in *Bartlett*.  These disagreements fueled the flames of the already burning fire in the movement for Congress to restore broad protections under the ADA.

## IV. THE ADA AMENDMENTS ACT OF 2008

President George W. Bush signed the ADAAA into law on September 25, 2008.  The Act's purpose was clear – "to carry out the ADA's objectives of providing 'a clear and comprehensive national mandate for the elimination of discrimination' . . . by reinstating a broad scope of protection to be available under the ADA."[111]  The

---

[104]  "In kindergarten, Wong was identified as suffering from a learning impairment, but in grammar school he was certified as a gifted student . . . . In high school and college, he regularly requested extra time on assignments and essay examinations."  Wong v. Regents of the Univ. of Cal., 410 F.3d, 1052, 1056 (9th Cir. 2005).

[105]  *Id.* at 1057.

[106]  *Id.* at 1057-58.

[107]  *Id.* at 1059.

[108]  *Id.* at 1059 (citing *Price*, 966 F. Supp. 419).

[109]  *Id.* at 1067; *contra Bartlett VI*, 2001 WL 930792 at *37-40.

[110]  *Id.* at 1059, 1067.

[111]  ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(1) (2008).

amendment had been a long time coming. After much discussion about the ADA's narrowing scope of protection, the National Council on Disability issued a report entitled "Righting the ADA" in 2002.[112] The report paved the way for a number of policy briefs that discussed, among other things, the Supreme Court's misinterpretation of ADA findings and the Court's conclusion that a disability determination should reference the ameliorative effects of mitigating measures.[113] In February 2008, a coalition of advocates from the disability and business communities came together to compromise on an appropriate amendment for the ADA.[114] The negotiating group reached a final agreement in May 2008, and this agreement formed the basis for a corresponding Congressional agreement – the ADAAA. The ADAAA passed both branches with strong support, and was signed into law before the end of the year.[115]

The ADAAA explicitly rejected the holdings of two Supreme Court cases – *Sutton v. United Air Lines*[116] and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams.*[117] *Toyota* was rejected for its strict interpretation of the phrase "substantially limits."[118] *Sutton* was rejected for a number of reasons, including its holding that a disability is to be determined with reference to the ameliorative effects of mitigating measures.[119] Also, due to the Supreme Court's reasoning for denying coverage in *Sutton*, Congress removed from its findings the statement that "some

---

[112] NATIONAL COUNCIL ON DISABILITY, *Policy Brief Series: Righting the ADA* (2002), *available at* www.ncd.gov/publications/2002 and www.ncd.gov/publications/2003.

[113] *Id.*, Brief No. 6, *Defining "Disability" in a Civil Rights Context: The Court's Focus on Extent of Limitations as Opposed to Fair Treatment and Equal Opportunity*, text at n. 29, *available at* http://www.ncd.gov/publications/2003/Feb242003.

[114] MEMORANDUM FROM JEFFREY C. MCGUINESS, *HR Policy–Supported "ADA Amendments Act" Offers Balanced Approach to Revising the ADA*, n.85 (September 25, 2008) (*available at* www.hrpolicy.org). (Disability community representatives included American Association of People with Disabilities; Bazelon Center for Mental Health Law; Epilepsy Foundation; National Council on Independent Living; and National Disability Rights Network. Business representatives included the HR Policy Association; National Association of Manufacturers; Society for Human Resource Management; and United States Chamber of Commerce.).

[115] The House of Representatives passed an initial version of the bill with a vote of 402 Ayes, 17 Nays, and 15 Present/Not Voting. *See* http://www.govtrack.us/congress/bill.xpd?bill=h110-3195. The Senate passed its bill with unanimous consent, and the House approved on a voice vote. *See* http://www.govtrack.us/congress/bill.xpd?bill=s110-3406.

[116] Sutton v. United Air Lines (*Sutton II*), 527 U.S. 471 (1999).

[117] Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184 (2002). The ADAAA rejected the holding of this case because it interpreted the term "substantially limits" to require a greater degree of limitation than was intended by Congress. *See* ADA Amendments Act of 2008, Public Law 110-325 (2008), § 2(a)(7).

[118] *See* ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(4) (2008); § 2(b)(5) (2008).

[119] *See* ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(2) (2008).

43,000,000 Americans have one or more physical or mental disabilities."[120] Congress also produced a non-exhaustive list of major life activities that explicitly included "learning," "reading," and "working."[121]    Interestingly, other than confirming the existence of such major life activities, the actual language of the ADAAA does not speak to the specific controversies surrounding learning disabilities and corresponding case law. Fortunately, the ADAAA has plenty of legislative history that speaks to the plight of individuals with learning disabilities.[122]

The House Committee on Education and Labor for the 110th Congress issued a Report of the Committee's views on June 23, 2008 in anticipation of the bill's enactment. In its discussion on how to interpret "substantially limits" under the ADAAA, the Committee weighed in on the term's significance in regard to specific learning disabilities. The Committee stated,

> When considering the condition, manner or duration in which an individual with a specific learning disability performs a major life activity, it is critical to reject the assumption that an individual who performs well academically or otherwise cannot be substantially limited in activities such as learning, reading, writing, thinking, or speaking. As such, the Committee rejects the findings in *Price v. National Board of Medical Examiners, Gonzales v. National Board of Medical Examiners,* and *Wong v. Regents of University of California.*[123]

Further, in addressing the issue of mitigating measures and the rejection of *Sutton,* the Committee explicitly endorsed the holding of *Bartlett v. New York State Board of Law Examiners,* in which the court held that a determination of whether a plaintiff is substantially limited should not take into consideration the plaintiff's ability to self-accommodate.[124]    In support of such endorsement, the Committee expressed its belief that someone should not be penalized simply because they have "managed their own adaptive strategies or received informal or undocumented accommodations that have the effect of lessening the deleterious impacts of their disability."[125] In essence, the Committee endorsed *Bartlett* in many of the ways that it differed from *Price, Gonzales,* and *Wong.* What is yet to be seen is the extent to which the courts will incorporate and acknowledge the ADAAA's legislative history with respect to the rights of individuals with learning disabilities.

---

[120] *Compare* ADA Amendments Act of 2008, Public Law 110-325 § 2 (2008) *with* 42 U.S.C. § 12101(a)(1) (1990) (amended 2008).

[121] ADA Amendments Act of 2008, Pub. L. No. 110-325 § 4(a) (2008) ("[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communication, and working.").

[122] *See* H.R. Rep. No. 110-730, pt. 1 (2008).

[123] *Id.* at 11.

[124] *Id.* at 16 (referencing Bartlett v. New York State Bd. of Law Exam'rs, 226 F.3d 69 (2d Cir. 1998)).

[125] *Id.*

HeinOnline -- 59 Clev. St. L. Rev. 306 2011

## V. RECOMMENDATIONS

The courts can bring case law in step with the intentions of Congress and also clarify standards for examination boards by addressing future claims in a slightly different manner than in the past.    This Article makes three primary recommendations for future decisions regarding licensing exam accommodations for learning disabilities:  (1) the courts should no longer foreclose the finding of a substantially limiting impairment in regard to the major life activity of reading due to an individual's academic success; (2) "working" should be recognized as an appropriate major life activity under which to evaluate claims for accommodations on the bar exam (and possibly other licensing exams), with such evaluations involving a comparison to people having comparable training, skills, and abilities; and (3) reading disabilities should be recognized not only by psychometric tests that show a substantial limitation in comparison to most people, but also by test scores that indicate a significant discrepancy between an individual's intellectual capacity and actual reading ability.  By following these recommendations, the courts will be able to evaluate future claims for accommodations on licensing exams with standards that reflect Congress' intention to provide a broad scope of protection under the ADA.

### A. Academic Success

There are a number of reasons why academic success should not foreclose the courts from finding an individual's reading impairment to be substantially limiting. First, due to Judge Sotomayor's treatment of the issue in *Bartlett VI*, there exists strong persuasive precedent for not allowing academic success to derail an individual's claim.[126]  Second, the legislative history of the ADAAA clearly rejects the holdings of *Price, Gonzales*, and *Wong*, in which courts held that academic success foreclosed the plaintiff's disability claim.[127]  The House Committee on Education and Labor specifically stated that "it is critical to reject the assumption that an individual who performs well academically or otherwise cannot be substantially limited."[128]    Referencing legislative history in this manner is appropriate.  The language of the ADAAA does not specifically refer to the issue, and the views of the Committee do not in any way contradict of the Act's language. In fact, the Committee's views fit perfectly with the ADAAA's purpose of "reinstating a broad scope of protection to be available under the ADA."[129]  Third, the EEOC, in its most recent promulgation of regulations governing Title I of the ADA, specifically states that "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population."[130]

---

[126] Bartlett v. New York State Bd. of Law Exam'rs, No. 93 CIV. 4986 (SS), 2001 WL 930792 at 37-40 (S.D.N.Y. Aug. 15, 2001).

[127] H.R. Rep. No. 110-730, pt. 1, at 11 (2008).

[128] *Id.*

[129] ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(1), 122 Stat. 3553, 3554 (2008).

[130] 29 C.F.R. § 1630.2(j)(4)(iii) (2011).

In addition, common sense tells us that academic success should not foreclose an individual from being disabled due to a reading impairment. To hold otherwise would be to penalize individuals who use hard work and creativity to find ways around their impairments in order to achieve success. This point is especially relevant in regard to accommodations on licensing exams. Students who sit for licensing exams almost always have a history of academic success. If they did not, they would not be in a position to sit for the licensing exam in the first place. Therefore, if academic success always forecloses a court from finding a substantially limiting reading impairment, then no impaired individual would ever be eligible for licensing exam accommodations. By referencing the Act's legislative history, the EEOC's implementing regulations, and pure common sense, the courts will be able to effectively recognize the ADAAA's purpose of restoring broad protections under the ADA.

### B. The Major Life Activity of Working

The ADAAA should be used as a basis for clarifying various contradictory rulings in regard to the major life activity of working. In *Gonzales*, the Sixth Circuit questioned whether working was even a major life activity.[131] In doing so, the Sixth Circuit cited language from *Sutton*, in which the Court referenced the EEOC's suggestion that "working be viewed as a residual life activity, considered, as a last resort, only if an individual is not substantially limited with respect to any other major life activity."[132] It is true that working is to be considered only when an individual is not substantially limited with respect to another major life activity.[133] However, Congress dispelled the Supreme Court's concerns that working was not meant to be a major life activity by explicitly listing "working" as a major life activity within the language of the ADAAA.[134]

When working has been considered as a legitimate major life activity, there have been diverging conclusions on what regulations should be used to determine whether an individual has a substantially limiting impairment under Titles II and III.[135] As noted earlier, individuals requesting accommodations under the ADAAA for state licensing exams must do so under Title II (public services) and Title III (public accommodations and services provided by private entities). Unlike the EEOC regulations and interpretative guidance pertaining to Title I (employment), the DOJ regulations pertaining to Titles II and III do not explicitly define what it means to be substantially limited in the major life activity of working. Therefore, some courts have held that a disability determination under Titles II and III cannot involve a

---

[131] Gonzales v. Nat'l Bd. of Med. Exam'rs, 225 F.3d 620 at 631 (6th Cir. 2000).

[132] *Id.* (citing *Sutton II*, 527 U.S. at 492).

[133] *See* 29 C.F.R. § 1630.2 App. (2011).

[134] *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, § 4(a), 122 Stat. 3553, 3553 (2008).

[135] *See* Bartlett v. New York State Bd. of Law Exam'rs, 2 F. Supp. 2d 388, 389-91 (S.D.N.Y. 1997) ("[T]he EEOC's interpretation of substantial limitation in the context of the major life activity of working is both a part of, and consistent with, the Department of Justice's regulations and the purpose of the ADA."). *Contra Gonzales*, 225 F.3d at 631 ("We decline to transplant this definition from the Title I regulations into the Title III regulations.").

comparison to a person "having comparable training, skills, and abilities,"[136] as stated by the EEOC, but instead that such a determination must be made in comparison to "most people" in the general population.[137] In the future, the DOJ may also define a different comparison group in regard to the major life activity of working, but until that time comes, the courts should be willing to use the EEOC standard to evaluate claims involving the major life activity of working under Titles II and III.

In its original section by section analysis of the regulations pertaining to Title II, the DOJ specifically stated: "Title II . . . incorporates those provisions of Title I and III of the ADA that are not inconsistent with the regulations implementing Section 504 [of the Rehabilitation Act]. Therefore, this part also includes appropriate provisions derived from the regulations implementing those titles."[138] From this, it is evident that the DOJ anticipated regulations from different titles being used in order to lend meaning to concepts absent from its own regulations.[139] The courts have never seriously questioned the consistency of the EEOC regulations in regard to the major life activity of working and the regulations implementing Section 504 of the Rehabilitation Act. The EEOC and the DOJ promulgated the regulations pertaining to the ADA in a cooperative spirit so that the regulations would not be inconsistent with Section 504 of the Rehabilitation Act. In fact, Section 107(b) of the ADA mandated consistency.[140]

As further proof that the Title I regulations do not apply lesser standards than those of the Rehabilitation Act, the Rehabilitation Act now specifically points to the standards established by Title I of the ADA and its regulations.[141] Section 793(d) of the Rehabilitation Act provides that "[t]he standards used to determine whether this section has been violated . . . shall be the standards applied under Title I of the Americans with Disabilities Act."[142] In the end, the EEOC's regulations pertaining to Title I of the ADA are entirely consistent with the Rehabilitation Act, Title II of the ADA, and the remedial character of the ADA as a whole. Thus, courts evaluating claims under Titles II and III should decide whether an individual is

---

[136] *See* 29 C.F.R. § 1630 App. (2011) (describing the standard for being substantially limited in the major life activity of working).

[137] *See* 28 C.F.R. § 35.104, App. A (2011).

[138] 28 C.F.R. § 35.103, App. A (2011) (The original section by section analysis remains relevant to the extent it is not contradicted by the amendments to the rules or it provides guidance on provisions of the rules unchanged by the revised 2010 ADA regulations).

[139] *See Bartlett*, 2 F. Supp. 2d at 391.

[140] Americans with Disabilities Act, 42 U.S.C. § 12117 (2006) ("The agencies with enforcement authority for actions which allege employment discrimination under this title and under the Rehabilitation Act of 1973 shall develop procedures to ensure that administrative complaints filed under this title and under the Rehabilitation Act of 1973 are dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards for the same requirements under this title and the Rehabilitation Act of 1973.").

[141] *See Bartlett*, 2 F. Supp. 2d at 390.

[142] 29 U.S.C. § 793(d) (2006).

substantially limited in the major life activity of working by comparing that individual to "most people having comparable training, skills, and abilities."[143]

In addition to a comparison to "most people having comparable training, skills, and abilities," the EEOC definition of "substantially limits" for the major life activity of working provides that a plaintiff must show that the impairment substantially limits his or her "ability to perform a class of jobs or a broad range of jobs in various classes."[144] Specifically, in regard to state bar exams (and possibly other licensing exams), the courts would be wise to recognize that if an individual attempting to pass the bar exam is substantially limited in comparison to most people having comparable training, skills, and abilities, then that individual's disability has implicated the major life activity of working. The major point here is that an individual's attempt to pass the bar exam implicates an ability or inability "to perform a class of jobs or a broad range of jobs in various classes."[145] Numerous courts have held that the proper scope of inquiry in determining whether a disability implicates an ability or inability to perform a class of jobs is the relevant employment at issue, and not employment generally.[146] Therefore, for a law school graduate attempting to pass the bar exam, the appropriate legal inquiry would focus on jobs in the legal profession, rather than every job in the national economy.

In addition, in a previous version of the EEOC's Interpretative Guidance, it is written that "an individual is not substantially limited in working just because he or she is unable to perform a particular job for one employer, or because he or she is unable to perform a specialized job or profession requiring extraordinary skill, prowess, and talent."[147] In order to give an example of such a specialized profession, the EEOC pointed to the pursuits of a professional athlete.[148] The question then becomes whether practicing law is specialized in the same way as professional athletics. Reason tells us that it is not. If it were, then every profession would have to be classified as a specialized profession, because each profession contains its own "extraordinary skill, prowess, and talent."[149] As such, many disabled Americans could be excluded from professions such as medicine and accounting. Thus, it is apparent that this provision is not meant for individuals whose impairments prevent them from entering such professions. Instead, this provision is meant to address individuals whose impairment prevents them from obtaining a highly specialized job, such as that of a professional athlete.[150] Therefore, because failure to pass the

---

[143] *See* 29 C.F.R. § 1630 App. (2011).

[144] *Id.*

[145] *Id.*

[146] Bartlett v. New York State Bd. Of Law Exam'rs, 970 F. Supp. 1094 (*Bartlett I*) (citing Cook v. State of Rhode Island, Dep't of Mental Health, Retardation, and Hosps., 10 F.3d 17, 25 (1st Cir. 1993); Welsh v. City of Tulsa, 977 F.2d 1415, 1419 (10th Cir. 1992); Taylor v. United States Parcel Serv., 946 F.2d 1214, 1217 (6th Cir. 1991); and Forrisi v. Bowen, 794 F.2d 931, 934 (4th Cir. 1986)).

[147] 29 C.F.R. § 1630.2(j) App. (1992).

[148] *Id.*

[149] *See Bartlett I*, 970 F.Supp. at 1123.

[150] *Id.* at 1123-24.

HeinOnline -- 59 Clev. St. L. Rev. 310 2011

bar exam effectively excludes an individual from performing "a class of jobs,"[151] an individual whose impairment substantially limits him or her from passing the bar exam in comparison to "most people having comparable training, skills, and abilities"[152] is substantially limited in the major life activity of working.

### C. Finding a Substantial Limitation in the Major Life Activity of Reading

In determining what methods are appropriate to evaluate an individual's potential reading disability, many interests need to be considered, including those of Congress, licensing examiners, reading impaired individuals, and the public at large. Standards that reflect the ADA's "broad scope of protection" are appropriate in order to accommodate the interests of Congress, along with many reading impaired individuals.[153]   Therefore, in addition to recognizing a disability when an individual's psychometric test scores show a substantial limitation in comparison to "most people,"[154] a disability should be recognized when test scores indicate a significant discrepancy between an individual's intellectual capacity and actual reading ability.[155]  Further, clear and precise standards are appropriate in order to accommodate the interests of licensing examiners.  Bright-line cut-offs should exist for both of the aforementioned ways to determine a substantially limiting reading impairment.  With such bright-line cut-offs, the licensing examiners and the courts will be less likely to make inconsistent judgments about whether an individual is deserving of accommodations.

Section 36.309 of the DOJ regulations pertaining to Title III requires examinations to be administered so that the results "accurately reflect the individual's aptitude or achievement level ... rather than reflecting the individual's impaired sensory, manual, or speaking skills."[156]  This provision provided the basis for *Pazer*'s conclusion that a discrepancy between inherent capacity and performance permits the inference of a substantially limiting impairment, even if the individual's actual performance has met the standard of the ordinary person.[157]  This acknowledgment of the "discrepancy theory" was later rebuffed in *Price* when the court concluded that Section 36.309 of the DOJ regulations did not outweigh the principle that an impairment must limit a person in comparison to "most people" in order to be considered a disability worthy of accommodations.[158]

Congress' desire to provide increased protection under the ADA should give the courts reason to reject *Price*.  A reading impaired individual with a very high

---

[151]  29 C.F.R. § 1630 App. (2011).

[152]  *Id.*

[153]  ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(1), 122 Stat. 3553.

[154]  28 C.F.R. § 35.104 App. B. (2011) (defining a substantial limitation of a major life activity).

[155]  *See* 28 C.F.R. § 36.309(b)(1)(i) (2011).

[156]  *Id.*

[157]  *See* Pazer v. New York State Bd. of Law Exam'rs, 849 F. Supp. 284, 287 (citing 28 C.F.R. § 36.309 (1992)).

[158]  *See* Price v. Nat'l Bd. of Med. Exam'rs, 966 F. Supp. 419, 426 (citing 28 C.F.R. § 36.309; 28 C.F.R. Pt. 36, App. B (1996)).

aptitude, whose reading impairment is not necessarily substantially limiting in comparison to most people, should not be denied accommodations if there is a significant discrepancy between the individual's aptitude and actual reading ability. To hold otherwise would be contrary to Section 36.309's requirement that examinations be administered so that the results accurately reflect the individual's aptitude.    Such a holding would also be contrary to the new EEOC Title I regulations, which state that a disability can be shown "where an impairment, such as a learning disability, is clinically diagnosed based in part on a disparity between an individual's aptitude and that individual's actual versus expected achievement."[159]   Law schools have granted reasonable accommodations in the past when such discrepancies have been shown.    For instance, the University of California Hastings College of Law and the University of Houston Law Center have previously looked to whether a student's cognitive test score is 1.5 standard deviations[160] or more below the level corresponding to the student's IQ in deciding whether accommodations are warranted.[161]

While this Article does not speculate as to whether the 1.5 standard deviation cut-off reflects the ADA's "broad scope of protection,"[162] it is clear that the DOJ regulations require accommodations to be granted on licensing exams when a significant discrepancy exists between the scores of such cognitive and IQ tests.  In choosing an adequate cut-off, the courts must ensure that they do not require a level of discrepancy that indirectly prevents all individuals whose impairments are not substantially limiting in comparison to most people from receiving accommodations. Otherwise, the point of testing for discrepancies would become moot.

The courts would be wise to give the cut-off point a bright-line effect so that licensing examiners can objectively grant and deny accommodations with certainty. A bright-line cut-off point for psychometric reading tests is also appropriate when determining whether an individual is impaired in comparison to "most people."[163] Dr. Frank R. Vellutino, who assisted the New York State Board of Law Examiners in screening applicants who requested special accommodations on the basis of claims that they suffered from dyslexia or reading disability, suggests a cut-off at the 30th percentile in terms of psychometric test results.[164]  Dr. Vellutino reasons that because conservative estimates of the incidence of reading disabilities is approximately 20 percent, a cut-off at the 30th percentile would be justifiable.[165] This reasoning was rejected by Judge Sotomayor in *Bartlett I* on the basis of

---

[159] 29 C.F.R. § 1630.2(j)(1)(v) App. (2011).

[160] A standard deviation is a parameter that indicates the way in which a probability function or a probability density function is centered around its mean and that is equal to the square root of the moment in which the deviation from the mean is squared. *Standard Deviation Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/standard%20deviation (last visited September 12, 2011).

[161] Bartlett v. New York State Bd. of Law Exam'rs (*Bartlett VI*), No. 93 CIV. 4986 (SS), 2001 WL 930792 at 43.

[162] ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(1), 122 Stat. 3553.

[163] 28 C.F.R. § 35.104 App. B. (2011).

[164] Vellutino, *supra* note 13, at 10.

[165] *Id.*

Published by EngagedScholarship@CSU, 2011

HeinOnline -- 59 Clev. St. L. Rev. 312 2011

0024
23

alternative evidence suggesting that many adult dyslexics were capable of scoring above the 30th percentile.[166]

This Article does not necessarily recommend Dr. Vellutino's specific cut-off, but it would not be unreasonable to suggest that a cut-off at the 30th percentile is appropriate for licensing exam situations, even under ADA's "broad scope of protection."[167] This can be said because the ADA, when interpreted according to the intentions of Congress, does not foreclose an individual from being granted accommodations on a licensing exam merely because the individual is not substantially limited in comparison to "most people."[168] If an individual satisfies the requirements of the discrepancy theory, then he or she would also be eligible for accommodations. In addition, licensing exams, such as the bar exam, invoke the major life activity of working, which requires an individual to be substantially limited in comparison to "most people having comparable training, skills, and abilities."[169] If the 30th percentile is used as a bright-line cut-off for determining whether an individual is substantially limited in comparison to "most people," then surely a significantly higher cut-off would be required for determining whether a reading impaired professional school graduate is substantially limited in comparison to "most people having comparable training, skills, and abilities."[170] Thus, it would be unlikely that an individual with dyslexia could legitimately be denied reasonable accommodations on a licensing exam.

## VI. CONCLUSION

The ADA was the first piece of federal civil rights legislation to pertain to state licensing exams. As such, individuals who had "learning disabilities" that substantially limited a major life activity were entitled to reasonable accommodations on licensing exams under the ADA. Due to the courts' increasingly narrow interpretation of the ADA, Congress passed the ADAAA in 2008. One of the primary purposes of the ADAAA was to restore a "broad scope of protection" under the ADA.[171] In order to adhere to the intentions of Congress, the courts must address claims for accommodations on licensing exams differently than they have in the past. This includes granting accommodations to substantially limited individuals even if they have a history of academic success, recognizing the appropriateness of the major life activity of working, and recognizing the discrepancy theory for evaluating a substantial limitation in the major life activity of reading. By following these recommendations, the courts will be able to evaluate future claims for accommodations on licensing exams with standards that reflect Congress' intention to provide a "broad scope of protection" under the ADA.[172]

---

[166] Bartlett v. New York State Bd. of Law Exam'rs (*Bartlett I*), 970 F. Supp. 1094, 1114 (S.D.N.Y. 1997).

[167] *See* ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(1) (2008).

[168] 28 C.F.R. § 35.104 App. B.

[169] 29 C.F.R. § 1630 App. (2011).

[170] *See* 28 C.F.R. § 35.104 App. B (2011); 29 C.F.R. § 1630 App. (2011).

[171] *See* Pub. L. No. 110-325 § 2(b)(1).

[172] *Id.*