UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2019 AUG -2 P 12: 27

| | | |
|---|---|---|
| MEAGHAN DOHERTY | * | CIVIL ACTION NO. |
| VERSUS | * | JUDGE: GGG  Section "T" |
| NATIONAL BOARD OF MEDICAL EXAMINERS | * | MAGISTRATE: |

* * * * * * * * * * * * * * * * *

## UNDER SEAL

### PLAINTIFF'S POST-HEARING BRIEF

**MAY IT PLEASE THE COURT:**

Plaintiff, Meaghan Doherty, respectfully presents this Post-Hearing Brief in support of her request for a Preliminary Injunction against the National Board of Medical Examiners (NBME) to mandate Defendant cease discriminating against her and to provide her with test-taking accommodations on the Step 2 CK Exam pursuant to the ADA, for reasons more fully explained below.

### PLAINTIFF MEETS THE STANDARD FOR A PRELIMINARY INJUNCTION

In <u>Benisek v. Lamone</u>, 585 U.S. ___, 138 S.Ct. 1942 at 1944, 201 L.Ed.2d 398 (2018), the U.S. Supreme Court stated "a preliminary injunction is an extraordinary remedy never awarded as of right (quoting <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), explaining it is a matter of equitable discretion." "A court must also consider whether the movant has shown 'that he is likely to suffer irreparable

1

harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

The U.S. Court of Appeals for the Fifth Circuit articulated the standard for a preliminary injunction <u>Byrum v. Landreth</u>, 566 F.3d 442, 445 (5th Cir. 2009), stating a plaintiff must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury, if the injunction is denied, outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." <u>Garcia v. Jones</u>, 910 F.3d 188 at 190 (5th Cir. 2018); <u>Janvey v. Alguire</u>, 647 F.3d 585, 595-596 (5th Cir. 2011).

(1) <u>Substantial Likelihood of Success on the Merits</u>

To show a likelihood of success, a plaintiff must present a *prima facie* case, but need not prove that he is entitled to summary judgment. <u>Janvey</u>, 647 F.3d at 595-596; <u>Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.</u>, 710 F.3d 579 (5th Cir. 2013).

Plaintiff submits she has established a *prima facie* case under the ADA.

(1) The ADA definition of disability (42 U.S.C. 12102(2) requires a showing that the individual has a "physical or mental impairment that substantially limits one or more of the major life activities of the individual." 28 C.F.R. 36.105(a)(1). A "physical or mental impairment" includes a "specific learning disability" and "Attention Deficit Hyperactivity Disorder." 28 C.F.R. 36.105(b)(2). A "major life activity" includes "learning, reading, concentrating, thinking, writing." 42 U.S.C. 12102(2) & 28 C.F.R. 36105(c)(1)(i).

(2) Dr. Patricia Brockman diagnosed Meaghan with a Learning Disorder with impairment in Reading: rate (DSM-V 315.00 ICD-10 F81.0) (Rec. Doc. 1-5 at 31; Exhibit #9); Dr. James

2

Barbee diagnosed her with Attention Deficit/Hyperactivity Disorder-Combined Type (DSM-V F-90.1) (Rec. Doc. 1-5 at 14; Exhibit #8) and Generalized Anxiety Disorder (DSM-V 300.02 ICD-10 F41.1) (Rec. Doc. 1-5 at 32; Exhibit #9).

(3) Dr. Brockman's testing established that Meaghan's reading speed is slower than 90% of students her age and that her reading "decoding" speed was slower than 75% of students against the general population. On the timed Nelson Denny subtest, Meaghan's Reading Speed fell in the borderline or slow learner range at the 6th Percentile of all readers. (Rec. Doc. 1-5 at 32; Exhibit #9). In closing arguments, Defendant NBME argued that the Nelson Denny Test is "only" a one-minute reading test. This is the same argument Defendant made in its denial of Plaintiff's request for accommodations on the Step 1 Exam in 2018 (Rec. Doc. 1-5 at 6; Exhibit #4), on which she scored 28 point *below* the mean. Dr. Brockman refuted Defendant's view in her "Addendum of April 19, 2019" stating

"the claim that 'experts' do not consider the NDRT [Nelson Denny Reading Test] 'to be a reliable measure of reading efficiency' because it is based on a one-minute reading sample is false. The NDRT is one of the most widely administered reading test in the nation and is used by many medical schools to gauge reading ability." (Rec. Doc. 1-5 at 40). (Rec. Doc. 1-5 at 32; Exhibit #9)

Defendant asserts that Meaghan is not disabled under the ADA standards is simply wrong and unsupported by the statute or case law. The ADA regulations plainly state "When considering requests for modifications, accommodations, or auxiliary aids or services" the entity (Defendant) must "give <u>considerable weight to documentation of past modifications, accommodations</u>, or auxiliary aids or services received <u>in similar testing situations</u>." (Emphasis added) 28 C.F.R. 36.309(b)(1)(v). Plaintiff has documented the past and present accommodations granted to her by Tulane University for the exact same accommodation under the same testing situations.

3

(4) Based on the exact same evidence, Tulane University School of Medicine has provided Meaghan test-taking accommodations of extended time on written tests since January 2017. (Rec. Doc. 1-5 at 13; Exhibit #7). As a result of that accommodation, Plaintiff's test scores have gone up 20% across the board on written tests using NBME-style questions/vignettes. It is significant to note that her test scores went up *only* on tests in which the questions were NBME-style; her scores were already, and remained average to high, on tests that did *not* use the NBME-style vignettes. This is strong evidence that she needs extra test time only on the NBME Step 2 CK exam (vignette-style questions). As Meaghan testified at the hearing, she did not request accommodations on the Step 2 Clinical Exam because it does *not* include NBME vignette style questions.

Plaintiff submits that there is an objective standard embodied in the ADA for determination of accommodations. Despite Defendant's assertion in closing arguments, not "anyone" can ask for accommodations. An individual must medically prove that a diagnosed disability, by a licensed professional psychiatrist or psychologist, pursuant to the criteria of the DSM-V, for which there is a statutory accommodation provided by the ADA. Plaintiff has met that objective standard with uncontroverted professional psychiatric and psychological diagnosed impairments which she submitted to the NBME and to this Honorable Court. The professionals who evaluated her have documented her need for test-taking accommodations as the best means to mitigate the effects of her disabilities. As such, she has met the objective criteria for a disability and a statutorily authorized accommodation. Under a "totality of the circumstances" test, Plaintiff submits she has established a *prima facie* case that she will prevail on the merits at trial.

(2) <u>Substantial Threat of Irreparable Injury if the Injunction is not Granted</u>.

Plaintiff has established a *prima facie* case as to the irreparable injury she will suffer here if she is not granted the protection of the ADA by means of a preliminary injunction:

(1) Plaintiff must pass the Step 2- CK Exam in order to graduate from medical school. She will not be allowed to complete medical school or to graduate with a medical degree without passing Step 2-CK. (Rec. Doc. 1-8 at 32; Exhibit #18) She must take Step 2-CK on August 6, 2019 if she is to remain in good standing and in hopes of competing –based on her achievement and knowledge – for a residency placement in September 2019. Earning a Residency placement is the requisite next step in the US Medical licensing requirements. (Rec. Doc. 1-8 at 36-37; Exhibit #19)

Obtaining a residency position is highly competitive. In 2018, 37,103 active applicants vied for the 30,232 first year and 2,935 second year residency position. (Rec. Doc. 1-8 at 41-55; Exhibit #22). Scores on USMLE Step2-CK are used by residency programs to decide admissions with the assumption that the test score is an indicator of the applicant's abilities. (Rec. Doc. 1-8 at 45; Exhibit #22)

Further, Plaintiff must take and pass Step 2-CK by September 15, 2019 to meet the ERAS (Electronic Residency Application System) application deadline for Residency Programs. Given her poor score on the Step 1 Exam (when she was denied accommodations) time is of the essence for Plaintiff. She simply can't afford to not submit her applications by the September 15 Residency Program deadline. An application submitted after that date will be date stamped and reviewed after the timely applications are submitted. Defendant NBME argued at the hearing that the worst Meaghan will suffer is that she will have to "wait a year" to compete in the 2020 residency placement period. That is exactly the irreparable injury Plaintiff seeks to avoid.

5

Irreparable injury is one for which there is no monetary damages will not repair the injury. Here, if the preliminary injunction is denied, Plaintiff will never get back the "year" she had to wait.

Further, if she fails Step 2-CK, plaintiff will then be competing with a new cohort of medical school seniors, it being readily apparent that she had to sit out a year due to failing Step 2, leaving her only two options: attempt to explain failure as an inaccurate reflection of her aptitude or achievement level because of her disability, which HIPAA otherwise protects, thus incurring the stigma of disability which the ADA was enacted to overcome and placing a permanent brand on her professional record; or to remain silent and the evaluators will process and rank her application for residency against non-disabled candidates, thereby allowing them to consider her low performance on Step as an accurate reflection of her aptitude or achievement level, or lack thereof. The whole point of ADA accommodations on licensing exams is that the test score should reflect her ability and knowledge, not her disability.

Plaintiff passed Step 1 (with no accommodations) by only a few points, scoring a 200 with a minimum passing score of 194. (Rec. Doc. 1-5 at 7; Exhibit #5) The score was so low that Plaintiff is not in any of the percentiles of individuals who received matches with any residency programs in their selected field based on data generated in 2018. (Rec. Doc. 1-8 at 49; Exhibit #22) Plaintiff is in the dilemma of having to overcome the abysmally low Step 1 score in order to be considered for any residency program. Without a preliminary injunction now, Plaintiff will suffer even greater negative consequences than she did as a result of the unaccommodated Step 1 test.

Defendant NBME argued that Plaintiff would still be eligible for residency placement in the "Scramble" in March, a scrum in which senior medical students who got no residency placements "scramble" with one another to find some placement whatsoever. That is not a plan

6

or an alternative for Plaintiff. That's not a reasonable plan. That's an emergency drill based on a hope with no guarantees whatsoever. Further, Defendant's assertion that Plaintiff can "just wait" is contradicted by the case law. Specifically, in <u>Bonnette v. District of Columbia Court of Appeal</u>, 796 F. Supp. 2d 164 (D.D.C. 2011), the Court explained the irreparable injury that necessarily results from denying accommodations to an individual with a disability who is taking a professional license test, as follows:

> Bonnette contends that she will suffer irreparable injury in the absence of an injunction because she will either be forced to take the July 2011 MBE [Multistate Bar Exam] under discriminatory conditions or have to wait until at least the February 2012 administration while her claim is litigated. Because Bonnette cannot practice law until she successfully passes the D.C. Bar Examination, any delay in taking the MBE deprives her of time to practice her chosen profession. The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation. See <u>Enyart</u>, 630 F.3d at 1166 (Affirming finding of irreparable harm based on plaintiff's inability to practice law without successfully passing the bar examination). <u>Bonnette</u> 796 F. Supp. at 186-187).

Defendant's admonition that Plaintiff "just wait a year" also ignores the basic facts of life of any student, namely, to plan a budget for school that includes tuition, housing, food, transportation, and unexpected expenses. Plaintiff planned financially for four years of medical school with no income. She did not plan financially for a "fifth" unpaid year before getting a job in her field. Defendant's "Pollyanna" approach to this practical real-life budget breaker, also ignores that student loans will continue to accrue, interest compounds, and she will not be in forbearance as she would be, as Defendant advised "on a leave of absence" from school. The scenario Defendant paints is so divorced from reality it borders on cognitive dissonance.

Plaintiff will suffer irreparable injury emotionally, knowing that all her plans for being a physician have struck the reef of the NBME's Step 2 Ck Exam, the professional injury of not beginning her professional career, the financial injury of a year's lost income from not earning a time-appropriate residency placement, and the stigma of disclosing to future residency placement

7

interviews that she has a learning disability, ADHA, and generalized anxiety in order to explain the empty year in which she achieved nothing in her medical education.

### (3) That the Threatened Injury (if the injunction is denied) Outweighs Any Harm that will result if the Injunction is Granted

If this Honorable Court grants Plaintiff's Preliminary Injunction, Defendant will not suffer damages whatsoever. Specifically, NBME will suffer no financial harm, or at most the hourly wage for one day of the proctor hired to administer the Step 2 Test to Plaintiff. Defendant will suffer no public stigma — in fact, the public will never even know that Plaintiff took the test with accommodations (whether she passes it or not), both based on the anonymity of the test and the fact that this proceeding is Sealed.

Despite Defendant's allusion to the "integrity of the test" a preliminary injunction have no impact the fundamental structure or nature of the Step 2 test or what it purports to test; it will not jeopardize test security for this Step 2 Exam or any other given in future; it will not change the testing format, nor the time-based system as applied to student without a documented disability. If there are consequences to Defendant from the granting of the preliminary injunction, it is theoretical, at best.

The best evidence of this is the Settlement Agreement which Defendant entered into with the U.S. Department of Justice over the issue of test-taking accommodations of extra time for a medical student on the Step 2 CK Exam. (Rec. Doc. 1-6 at 17-18; Exhibit #12) In that, a very public and national embarrassment to the NBME, in which even there, Defendant did not have to admit fault or liability, Defendant agreed to grant a Yale medical student (who had been granted test-taking accommodations of extended time by Yale Medical School, without suffering any

untoward consequences for the "integrity of the test." In closing arguments, Defendant stated that Plaintiff's case is one of the "most egregious" examples of someone requesting test-taking accommodations. This is an extraordinary assertion given the Settlement Agreement case. It also belies that NBME has not changed its negative view of granting accommodations since the Settlement. Yet, Defendant seems to have been able to sustain the Settlement Agreement black eye over denying ADA accommodations to medical students, without ill effect; thus, it defies imagination to know how Defendant would be injured by a preliminary injunction in this Sealed proceeding. To the contrary, the threatened injury to Plaintiff is grave and irreparable.

### (4) That the Grant of an Injunction Will Not Disserve the Public Interest."

Ironically, the grant of Plaintiff's preliminary injunction will substantially advance the public interest as it is codified in the ADA of 1990 and the ADA Amendments Act of 2008. For Plaintiff, testing accommodations will give life to the ADA's legislative goal: to provide Plaintiff a level playing field to show what her mastery of the material, instead of showing the effects of her disability. It is not an "automatic" pass for Plaintiff. The promise of the ADA is a level playing field for all Americans. Sadly, a preliminary injunction is the only way to protect Plaintiff from discrimination for her disabilities and provide her with a level playing field.

In Rush v. National Board of Medical Examiners, 268 F. Supp. 673 (N.D. Tex. 2003), the Court stated:

> The USMLE Step 1 examination involves and requires extensive reading, and scoring well and/or passage of the exam requires extensive subject-matter knowledge. Plaintiff has shown a sufficient causal connection between his reading impairment and his failures to score well, or as well as he might, on time-limited examinations requiring extensive reading. Plaintiff has shown that if he is accommodated, he will be effectively tested not on his disability but rather on his subject-matter knowledge. Plaintiff has shown that his reading impairment seriously decreases the rate at which he reads with comprehension. Plaintiff will suffer irreparable injury if the required injunction is denied.

9

With the requested reasonable accommodation of double time to take the Step 1 exam, Plaintiff will have time to either display his mastery of the subject matter, or show that he has not sufficiently mastered the tested materials. In either event, granting the injunction will allow Plaintiff to be tested on his medical and science knowledge and not his disability.
The threatened injury to Plaintiff outweighs any damage that granting the preliminary injunction might cause at this time to the Defendant or to the public.

The injunction will not disserve the public interest but will further the public interest in prohibiting discrimination by public entities, such as the National Board of Medical Examiners, on the basis of disability by fulfilling the ADA's requirement that entities offering licensing examinations provide reasonable accommodations to disabled individuals.

Despite Defendant's narrow reading of the ADA, and insistence both during cross-examination of Plaintiff and in closing arguments that if accommodations are accorded to Plaintiff, then she will be displacing another successful student from achieving a residency placement during the "Match" period. This is exactly the mindset the ADA was enacted to abolish. Defendant's closing arguments are contradicted by the statement issued by the U.S. Department of Justice upon promulgating its regulations about the legislative goals of the ADA Amendments Act: that the Act is to be interpreted and "shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."[1]

Defendant made its position clear today: because of Plaintiff's high school GPA, SAT, ACT, college GPA, and MCAT score, Plaintiff has no disability requiring ADA accommodations. Defendant could cite no provision of the ADA that makes prior request for or receipt of test-taking accommodations as a pre-requisite for receiving such accommodations on

---

[1] Office of the Attorney General, 28 CFR Parts 35 and 36, CRT Docket No. 24; AG Order No. RIN 1190-A59; Amendment of Americans with Disabilities Act Title II and Title III Regulations to Implement ADA Amendments Act of 2008. https://www.ada.gov/nprm_adaaa/nprm_adaaa.htm

Defendant's Step Exams. It doesn't exist. Such a rule would destroy the whole purpose of the ADA.[2]

Defendant also made clear today its view that the findings of licensed professional psychologists and psychiatrists who have clinically treated Plaintiff and determined under the DSM-V that she has specified impairments, carry little weight in their determination to grant or deny test-taking accommodations. This contradicts the ADA, the ADA Rules of Construction, and it contradicts the Settlement Agreement between the US DOJ and the NBME.

Defendant made the bald assertion in closing arguments that counsel, given extra time, would have done even better on the bar exam. This gives voice to the NBME's bias against licensing accommodations and the endemic discrimination Plaintiff faces here. As Dr. Brockman stated in her 2019 Addendum, "[i]n effect, the NBME is holding Meaghan's superior intelligence and hard work over the years to compensate for her attentional and learning disabilities against her." (Rec. Doc. 1-5 at 43; Exhibit #9). She added, "[c]ontrary to what one would expect, given her overall intelligence level, Meaghan did poorly on the Step 1 test, scoring just above passing. But that is not surprising given the fact that the NBME denied her accommodation request. In fact, her poor performance confirms the original evaluation findings" that Meaghan needed test-taking accommodations. (Rec. Doc. 1-5 at 44; Exhibit #9).

Defendant completely ignores the fact that plaintiff's medical school grades have significantly increased since Tulane granted her the same test-taking accommodations for those tests which mimic the NBME style tests. which she is requesting here. Defendant's argument is

---

[2] Though this argument conveniently ignores the fact that Tulane University School of Medicine provided the same test-taking accommodations Plaintiff requested of the NBME, and her scores improved.

contradictory on its face and disregards the positive impact accommodations in medical school have had on Plaintiff's test results.

Defendant's basis for denial of accommodations is even more startling when read in contrast to the ADA provisions stating that a disability or impairment "does not need to prevent, or significantly or severely restrict, an individual from performing a major life activity *in order to be substantially limiting*." [Emphasis added] 28 C.F.R. 36.105(d)(1)(ii) This underscores the corrective nature of the ADA Amendments Act and its explicit rejection of the strict standards imposed under Toyota and its progeny. It defies reason that Defendant could reject Plaintiff's accommodation request when the statute itself contemplates that a disability need not "prevent" or "severely restrict" an individual from performing a major life activity; it need only substantially limit it to receive protection under the ADA.

## CONCLUSION

Defendant NBME can truthfully state that its Settlement Agreement with the DOJ has expired and is no longer binding. However, the ADA itself requires most if, not all, the provisions of the Agreement. NBME has violated the ADA:

1. Defendant has failed to consider and accord the proper weight to the recommendations of Plaintiff's qualified treating professionals who have evaluated Plaintiff, diagnosed her under the accepted standards of the DSM-V, and recommended that she receive the accommodations she requested.  continue to give considerable weight to documentation of past accommodations, as Plaintiff here has presented that Tulane affords her test-time accommodations on all written exams.

2. Defendant has failed to give weight to the documented record of impairment of her disability, nor the test-time accommodation granted to her by Tulane University for written exams (time 1.5) since January 2, 2017.

3. Defendant has failed to apply the ADA Amendments Act as written and in the context of the Congressional instruction to give it a liberal interpretation to broadly afford coverage under the Act. Had Defendant followed the Congressional findings and applied the "Rules of construction" as contained in the Code of Federal Regulations, Plaintiff would not be standing before this Honorable Court today.

Plaintiff submits, that taken under a "totality of the circumstances" test, plaintiff has established a prima facie case for a disability under the ADA, the need for test-taking accommodations, the irreparable injury she faces herein and respectfully requests that this Honorable Court grant her request for a preliminary injunction.

Respectfully submitted,

*Frances M. Olivier*
FRANCES M. OLIVIER, ESQ. LSBA No. 17895
2341 Metairie Road
Metairie, Louisiana 70001
Telephone: 504-483-6334; Fax: 504-483-6344
folivier@olivierlawfim.com

WILLIAM MARTIN MCGOEY, Esq., LSBA #14205
1828 Rose Street
Arabi, Louisiana 70032
Telephone: 504-250-3293
bmcgolaw@yahoo.com

**Attorneys for Plaintiff Meaghan Doherty**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above has been forwarded to all parties of record via the Electronic E-mail, U.S. Mail, and or/or the Court's ECF system when not under protective seal, on August 2, 2019.

*Frances M. Olivier*
FRANCES M. OLIVIER