**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| MEAGHAN DOHERTY, | ) |
| | ) |
|     Plaintiff, | ) |
| | )   **Civil Action No. 19-11790** |
|     v. | ) |
| | )   **Judge:  The Hon. Greg G. Guidry** |
| NATIONAL BOARD OF MEDICAL | ) |
| EXAMINERS, | )   **UNDER SEAL** |
| | ) |
|     Defendant. | ) |
| | ) |

**NBME'S POST-HEARING BRIEF IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

This action was initiated on July 22, 2019, by the filing of a document captioned "Plaintiff's Application for Temporary Restraining Order with Equitable Relief and Order to Show Cause Why a Preliminary Injunction Should Not Issue." (ECF No. 1) ("Plaintiff's Application").[1]  Defendant National Board of Medical Examiners ("NBME") was served with a Summons and a copy of Plaintiff's Application on July 30, 2019. On July 26, 2019, the Court denied Plaintiff's request for Temporary Restraining, correctly stating in its Order that "plaintiff fails to fulfill the requirements for a temporary restraining order under Rule 65 of the Federal Rules of Civil Procedure." (ECF 6).

NBME respectfully urges the Court to reach the same conclusion regarding Ms. Doherty's request for a preliminary injunction under Rule 65.  It was clear from the hearing held yesterday that Ms. Doherty is an extremely smart, focused, and accomplished individual.  She

---

[1] Under Fed. R. Civ. P. 3, "[a] civil action is commenced by filing a complaint with the court."

will no doubt be an excellent physician.  But she is not entitled to extra testing time on her medical licensing exam because she is not disabled within the meaning of the Americans with Disabilities Act ("ADA").  The relevant provision of the ADA, Section 12189, was not intended to enable individuals such as Ms. Doherty to maximize their performance on licensing exams or other high stakes tests, thereby giving them an unwarranted advantage over other examinees who work just as hard and are just as interested in achieving their professional aspirations.  Providing accommodations when they are not warranted is unfair to all other examinees, including individuals who actually experience substantial functional limitations because of a physical or mental impairment.  Far from advancing the purposes of the ADA, granting the relief that is requested in this case would disserve the very population that the statute is intended to protect.

On a week's notice to NBME and based upon an urgency that does not in fact exist, Ms. Doherty seeks a *mandatory* preliminary injunction that would provide her with all the substantive relief to which she would otherwise be entitled only if she were to prevail on the merits.  She has not made the requisite showing for such extraordinary relief.

<u>**NATURE OF THE CASE**</u>

Plaintiff Meghan Doherty is in her fourth and final year of medical school.  She claims that she is entitled to extra testing time and other accommodations on Step 2 CK of the United States Medical Licensing Examination ("USMLE") because she has been diagnosed with a Learning Disability with Impairment in Reading, an Attention Deficit Hyperactivity Disorder ("ADHD"), and a Generalized Anxiety Disorder. Pl's App. at ¶ 8.  She relies primarily on the learning disability diagnosis, however, to support her alleged need for extra testing time.  *See* Cover Letter to NBME at 3 (1/1/18) (ECF No. 1-4 at 16).

NBME denies that Ms. Doherty is entitled to any accommodations on Step 2 CK of the USMLE. Reading disorders and ADHD are lifelong impairments with childhood onset. Ms. Doherty, however, has presented no objective evidence that she struggled with reading or learning during her formative years or at *any* point in her life prior to medical school. Medical school, of course, is difficult for everyone, and the fact that she found exams in medical school more challenging than exams taken earlier in her life cannot reasonably be viewed as evidence of a disability.

Ms. Doherty's counsel argued during yesterday's hearing that her improved performance on medical school exams after she started getting 50% extra time proves that she is disabled. That is of course not true. Everyone who is given extra time on challenging exams is likely to do better if given extra testing time, regardless of whether they are disabled. That is precisely why there is a virtual epidemic of highly accomplished individuals seeking extra testing time on high stakes and in college based upon diagnoses of learning disability or ADHD, many of which do not meet the applicable diagnostic criteria.

Ms. Doherty claims that her diagnosed impairments limit her ability to take the Step 2 CK examination under standard time conditions, relying primarily to a one-minute reading rate evaluation done by a psychologist who she went to see specifically for the purpose of obtaining a report that would support her "request accommodations for medical school," consisting of extra testing time. Brockman Evaluation Report at 1 (March 2017) (ECF 1-4 at 18). Her performance on that one-minute examination -- the so-called Nelson Denny test -- was a statistical outlier to her performance on *every* other assessment instrument whose results are reflected in the various evaluation reports that have been submitted to the Court. The reading rate reflected in her Nelson Denny reading rate evaluation is likewise squarely contradicted by her upper-echelon

performance on other highly competitive, timed, standardized tests without any accommodations. She is not substantially limited in any major life activity as compared to most people in the general population, and she does not need extra testing time or any other accommodations in order to access Step 2 CK of the USMLE.

## BACKGROUND

### I.     NBME and the USMLE

NBME is a non-profit organization. In conjunction with the Federation of State Medical Boards, another non-profit entity, NBME sponsors the USMLE program. Jurisdictions across the country rely upon the USMLE as part of their licensure process for ensuring the qualifications of prospective physicians.

The USMLE Step exams are standardized exams. With limited exceptions, all examinees take the USMLE exams under the same testing conditions, including standard testing time. The primary exception is for individuals who are disabled within the meaning of the ADA.

NBME conscientiously evaluates each accommodation request. It does so to ensure that "individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the ... examination." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004).

### II.     Ms. Doherty's Current Status in Medical School

Ms. Doherty is in her fourth year of medical school. Her school requires students to pass the Step 2 CK exam by April of their fourth year, but students can obtain a leave of absence for up to 24 months within which to pass Step 2 CK. Ms. Doherty thus has until April 2022 to pass the Step 2 CK exam. She is in no danger of being dismissed from medical school if she does not

- 4 -

take the Step 2 CK exam at any point in 2019, much less by the arbitrary August 6, 2019 date that she claims as the date by which she must take the test.

## III.   Ms. Doherty's Academic and Testing History

### A.   <u>Primary and Secondary School and the ACT and SAT</u>

Ms. Doherty's "grades were always excellent" in elementary school, middle school, and high school; she "always made honor roll;" and she was routinely told by her teachers that she was a "great student." Cover Letter to NBME (May 17, 2019) (ECF 1-4 at 9).   She acknowledged at yesterday's hearing that she performed at this exceptional level -- including her years at a high school that she characterized as academically rigorous -- without receiving extra testing time or any other accommodations, formal or informal.   *See also* Request for USMLE Accommodations at 5 (4/22/19) (ECF 1-4 at 7).

Ms. Doherty also performed *exceptionally* well on standardized tests, which she took without accommodations under standard testing conditions.   She was in the top 1% of all examinees across the country who took the ACT college admissions test, which includes English, Reading and Science subtests.   ACT Score Report (ECF 1-4 at 51).   Almost 1.6 million students took the ACT test in 2010,[2] the year Ms. Doherty tested, and she was in top 1%.

Ms. Doherty also achieved an excellent score on the SAT college admission test.   *See* SAT Score Report (ECF 1-4 at 50).   While she did not perform quite as well as she did on the ACT, her Critical Reading score of 620 placed her in the 84th percentile, or top 16%, of all students across the country who took the SAT that year.[3]

---

[2] *See* Summary of ACT Scores in Selected Years from 1995 through 2017, National Center for Education Statistics, available at <u>https://nces.ed.gov/fastfacts/display.asp?id=897</u>.

[3] *See* College Board Percentile Ranks for 2011 College-Bound Seniors, available at <u>https://secure-media.collegeboard.org/digitalServices/pdf/SAT-Percentile_Ranks_2011.pdf</u>.

Ms. Doherty also took Advanced Placement (or AP) exams in high school.  *See* Brockman Report at 3 (ECF 1-4 at 20) (noting that Ms. Doherty "earned 21 [college] credits by taking Advanced Placement classes in high school," where she did "exceptionally well" in her classes).  Although the subjects of those exams are not in the record, she acknowledged during the hearing that they were taken under standardized testing conditions, including time limits, and that she received no extra testing time or other accommodations.

**B.   College and The MCAT**

Ms. Doherty attended the University of Wisconsin.  She testified yesterday that she graduated with a grade point average of approximately 3.75, majoring in Biology and with two double majors.  She performed at that level without receiving extra time on tests or any other accommodations.

Ms. Doherty took the Medical College Admission Test ("MCAT") in 2014.  She only needed to take it once, because she achieved an excellent score.  Her total score of 32 put her in the 88th percentile, or top 12%, of all individuals who the MCAT between January 2012 and September 2014.  See MCAT Score Report (ECF 1-4).  Even more telling, her score on the Verbal Reasoning section of the MCAT placed her in the 95th percentile, to *top 5%*, of all MCAT examines who tested between 2012 and 2014. *See id.*

Ms. Doherty has suggested that her exceptional performance on the MCAT should be disregarding because that was five years ago.  Mem. In Supp. of Pl's App. at 12 (ECF 1-1).  However, learning disabilities and ADHD are lifelong conditions. Therefore, if her alleged functional limitations were not substantially limiting when she took the MCAT -- and they clearly were not -- they are not substantially limited today.

Ms. Doherty also suggested that her MCAT results because the MCAT is a very different exam, with questions that are much shorter.  Putting aside whether this reasoning has any validity in terms of the limitation that result from a learning disability, the MCAT is not a drastically different.  It is also a multiple-choice exam, administered on a computer; it also takes the better part of a day to take; and the questions on the MCAT call for extensive reading and concentration under fixed time limits -- just like the Step 2 CK exam.   A sample MCAT exam reflecting the subject areas and item format of the MCAT is attached hereto at Exhibit A.

## IV.    Ms. Doherty's Medical Evaluations

### A.    Nagim Evaluation

Denise Nagim, M.C.D., CCC/SLP, evaluated Ms. Doherty when she was ten years old. See Hagim Report (August 2003) (ECF 1-4 at 60). She administered the Woodcock-Johnson III Tests of Cognitive Ability and Achievement to Ms. Doherty, as well as the Comprehensive Test of Phonological Processing.  *See id.* at 9-10 (ECF 1-4 at 68-69).  Except for a single subtest on which she performed slightly below average, her scores were uniformly in the Average to Superior range, with most scores -- including Verbal Comprehension, Reading Fluency, and Broad Reading Ability -- either Above Average or Superior.  *Id.*

### B.    Ducey Evaluation

Ms. Doherty was evaluated in 2004 by Sarah Ducey, Ph.D., when she was in the 6th grade.  *See* Ducey Report (Nov. 2004) (ECF 1-4 at 52).   Dr. Ducey administered numerous assessments to Ms. Doherty, including the WISC-IV battery.   The results on that battery reflected verbal skills and visual-motor-spatial skills in the "Very Superior range, at the 98th percentile;" working memory skills in the "Average" range; and a Processing Speed Index "in the High Average Range."  *Id.* at 3 (ECF 1-4 at 54).  Her results on the Woodcock-Johnson III

indicated that "Meaghan's reading, math, and writing skills are in the High Average ranger overall, her ability to apply these skills is in the High Average range, and her fluency in using these skills is in the Superior range." *Id.* at 5 (ECF 1-4 at 56). "Regarding attention," Dr. Ducey reported that "Meaghan did not perform like a child with an attention problem on the individually administered tests of attention." Id. at 7 (ECF 1-4 at 58).

**C.    Brockman Evaluation**

Patricia Brockman, Ph.D., conducted a psychological evaluation of Ms. Doherty in August 2017, intended to support a "request for accommodations for medical school." Brockman Report at 1 (ECF 1-4 at 18). Ms. Brockman stated at the beginning of her report that Ms. Doherty "had been diagnosed with AD/HD as a young student" (no mention was made of a learning disability diagnosis), and that she "received accommodations throughout her elementary and high school years" (a statement that we now know was incorrect). *Id.*

Dr. Brockman administered numerous assessments to Ms. Doherty, ***all*** of which -- except one -- reflected average to superior skill levels in Ms. Doherty's reading ability. Her scores on "verbal comprehension," for example, were at the 99.6th percentile, her "processing speed" was average, her "word reading" was at the 77th percentile, her "reading comprehension" was at the 87th percentile, and her "oral reading fluency" and her "oral reading rate" were at the 61st percentile. *See id.* (ECF 1-4 at 36-41).

The only outlier was Ms. Doherty's performance on the Nelson Denny Reading Test. While her performance on the Comprehension section of that test was in the average range (54th percentile), her performance on the Reading Rate subtest was at the 6th percentile. *Id.* (ECF 1-4 at 41). Dr. Brockman relied heavily on that performance result in diagnosing Ms. Doherty with a learning disability that warrants extra testing time. *See id.* at 11, 12, 17 (ECF 1-4 at 28, 29, 34).

The Nelson Denny subtest relied upon by Dr. Brockman to support her recommendation that Ms. Doherty receive extra testing time in medical school is a "1-minute reading rate exam. *See* http://www.sjdm.org/dmidi/Nelson-Denny_Reading_Test.html. Dr Brockman prepared a supplemental letter in April 2019 defending her heavy reliance on this one-minute reading rate exam, asserting that NBME had no basis to question the reliability or utility of the exam and that its use in "in determining Meaghan's disability" is "supported by the literature."   Brockman Letter at 1 (April 19, 2019) (ECF 1-4 at 42).  It appears that the two articles she cites to support this assertion related to the Nelson Denny test as a whole, and not to the Nelson Denny Reading Rate subtest to which she ascribes so much significance.  That part of the Nelson Denny has, in fact, been extensively criticized "in the literature," as illustrated by a recent article in a peer-reviewed professional journal:

> Consistent with the conclusions of both Smith (1998) and Ward-Murray (1998), one should not employ the Reading Rate scores from the NDRT [(Nelson Denny Reading Test)] to determine impairment in global speed of reading.  Not only does this subtest have a low level of reliability, but it also a subjective measure that is face valid and therefore easy to feign if one is motivated to demonstrate the need for extra time accommodations.

A. Harrison and K. Harrison, "A Critical Analysis of the Nelson Denny Reading Test as a Method of Identifying Reading Impairments in Adults," 12 Psychological Injury and Law at 27 (Jan. 2019).[4]

Moreover, Dr. Brockman acknowledged that the Nelson Denny test is not normed on the "normal population" and instead reflects the "educational level of the individual being tested." Brockman Letter at 2 (ECF 1-4 at 43).  Thus, the fact that she performed at the 6th percentile on the Nelson Denny Reading Rate test does not mean, in any event, that her reading rate is that

---

[4] *See* Exhibit B hereto.

level compared to most people in the general population. *Cf. Bartlett v. N.Y. Bd. of Law Exam'rs*, 226 F.3d 69, 81-82 (2d Cir. 2000), (discounting the results of plaintiff's performance on the Nelson Denny Reading Test, which showed "a reading rate in the fourth percentile or below as compared to college freshman," saying that they "are of limited value, because the proper reference group is 'most people,' not college freshman.").

Finally, in arguing that Ms. Doherty meets the ADA standard of "disability," Dr. Brockman did not suggest that her reading is substantially limited compared to most people in the general population, implicitly conceding that she is not. Instead, she argued that Ms. Doherty should be compare with "other college educated students, not the general population," and more specifically, "she should be assessed in comparison to her fellow medical school students sitting for the USMLE Step 2 CK Test." Brockman Letter at 4 (ECF 104 at 45). As discussed below, this reflects a fundamental misunderstanding of how "substantial limitation" requirement is applied under the ADA.

## V.     The USMLE Step Exams

Ms. Doherty took the Step 1 exam under standard time conditions. She achieved a passing score of 200 the first time she tested (6 points above the minimum passing score of 194). Step 1 Score Report (ECF 1-5 at 7). She suggested during yesterday's hearing that this was not a very good score compared to how well she has done on other tests, and that the reason was her alleged reading impairment. However, her score report suggests that her score reflected lower performance on three specific subjects, not a shortage of time. *See id.* at 2 (ECF 1-5 at 8) (reflecting much lower performance in the areas of PC: Management, Histology & Cell Biology, and Muscoloskeletal, Skin, & Subcutaneous Tissue).

The Step 1 exam is a challenging multiple-choice exam, administered on computer over the course of a full day.  The Step 2 CK exam is also a challenging multiple-choice exam, administered on computer over the course of a full day.

## I.    PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is a "drastic" and "extraordinary" remedy that should not be granted unless a plaintiff shows that the four prerequisite factors all support the requested relief. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A plaintiff must make a "clear showing" that he is likely to succeed on the merits, that he is "likely" to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at 20, 22.  The claimed irreparable harm must be "actual and imminent" rather than "speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

The burden on Ms. Doherty is even higher here, because she seeks a mandatory preliminary injunction that would alter the status quo and award her all the substantive relief she seeks in this lawsuit.  Such relief is "'particularly disfavored and should not be issued unless the facts and law clearly favor the nonmoving party.'"  Milena Ship Mgmt. Co. v. Newcomb, 804 F. Supp. 846, 853 (E.D. La. 1992).

Ms. Doherty has not satisfied the demanding standard for issuance of a mandatory preliminary injunction.

II.   **MS. DOHERTY HAS NOT MADE A CLEAR SHOWING THAT SHE IS LIKELY TO SUFFER IRREPARABLE HARM**

It is difficult to know which preliminary injunction factor to address first, insofar as Ms. Doherty has not come close to meeting any of the four factors.  However, her facially untenable claim of threatened irreparable harm is a reasonable place to start.

According to Ms. Doherty, she will suffer irreparable harm if she is not allowed to take the Step 2 CK exam on August 6, 2019.  Pl's App. ¶ 20.  She says that she "must take Step 2 CK on August 6, 2019 if she is to remain in good standing and in hopes of competing ... for a residency in September 2019." *Id.*

As a factual matter, **neither of Ms. Doherty's assertions is true**.  She does not need to take the Step 2 CK exam on August 6, 2019 to "remain in good standing" at her medical school. The evidence is unrefuted that students at her medical school have until April of their senior year -- which, in Ms. Doherty's case, will be **April 2020** -- to pass the Step 2 CK exam on the ordinary schedule; and they can apparently obtain automatics leaves of absence of up to two additional years within which to pass the exam, if necessary -- which, in Ms. Doherty's case, would be April 2020.  *See* Tulane Univ. Medical Student Handbook at 12, ¶¶ 2, 3, and 6 (ECF 1-8 at 32).  Students remain in good standing throughout that period and will be dismissed from school only if they do not pass the exam at the end of that 24-month period.  *Id.* at ¶ 6.

Likewise, she does not need to test on August 6, 2019, to compete "for a residency in September 2019" and participate in the 2020 residency Match.  Her school "recommend[s]" that students take the Step 2 CK **before December 31 of their senior year to participate in the Match.**  *Id.* at ¶ 6 (original emphasis).   She has until November 30, 2019 to register to participate in the Match, and until February 26, 2020, to verify her credentials, which include

passing the Step 2 CK exam. *See* Match Calendar (ECF 1-8 at 36).   She testified yesterday that she will be disadvantaged if she cannot immediately register on September 15th and begin to seek interviews, but the only support she cited was what appeared to be a test preparation-type website.   The fact that her school recommends that students take Step 2 CK by December 31st suggests that students will not be unduly disadvantaged if they test by the date, and the NBME "regular" registration deadline of November 30th suggests that prospective Match participants will be submitting their applications for a period of roughly 2 and half months.

It is true that Ms. Doherty has scheduled a test administration on August 6, 2019. However, unlike state bar exams, which are administered only twice a year, the Step 2 CK exam is administered on almost a daily basis in testing centers located in Louisiana and around the country.   *See* https://www.usmle.org/apply/.   Thus, as noted on her scheduling permit, Ms. Doherty has been approved to take the Step 2 CK exam at any time within the three-month eligibility period of July 1, 2019 through **September 30, 2019**; she can change her current testing date to another date within that eligibility period at any time by simply contacting NBME's test delivery vendor (Prometric), and she can also contact NBME to request a "one-time, contiguous three-month eligibility period extension," which would extend her testing eligibility period to December 31, 2019 (which happens to coincide with the date by which her medical school recommends that she take the Step 2 CK exam).   *See* Step 2 CK Scheduling Permit (ECF 1-6 at 24).

This entire rushed proceeding has thus been based on a manufactured premise of urgency. Ms. Doherty does not need to test on August 6, 2019, even if one accepts the proposition that she needs to participate in the upcoming Match to avoid irreparable harm.   The Match occurs every year, of course, and Ms. Doherty could certainly participate in next year's Match without being

irreparably harmed (as many of her classmates and other medical school students across the country who are in their fourth year of medical school will do).

The harm asserted by Ms. Doherty -- a possible delay in graduating from medical school, a possible delay in starting the next phase of her graduate medical education (a residency program), possible school expenses for some additional period of time, and a delay in receiving the stipend that residents receive -- is both unduly speculative and does not constitute irreparable harm sufficient support preliminary injunctive relief in any event.

The claim of irreparable harm is also unduly speculative to the extent it assumes she will fail the Step 2 CK exam or not get as good a score as she wants unless she gets extra testing time. However, she passed the USMLE Step 1 exam on her first attempt with no extra time and her performance on the MCAT and other standardized tests without accommodations has also been exceptional. There is no basis for assuming that anything different would happen if he takes the Step 1 exam without accommodations. *See Rothberg v. Law Sch. Adm. Council*, 102 Fed. App'x 122, 125 (10th Cir. 2004) (finding, on the question of irreparable harm, that "the harm alleged by [plaintiff test-taker] is speculative") (overturning preliminary injunction); *Bach v. Law School Admission Council*, No. 1:13-cv-888, 2014 U.S. Dist. LEXIS 124632, at *5-6 (M.D.N.C. 2014) (noting that plaintiff's argument regarding his likely test results if he tested without accommodations was speculative, as he had had successfully taken other standardized tests without accommodations) (denying preliminary injunction); *Doe v. Ohio State Univ.*, No. 2:15-cv-2830, 2016 WL 692547, *10-11 (S.D. Feb. 22, 2016) (denying medical student's motion for a preliminary injunction reinstating him as a student in good standing, where student "offered only his own testimony that residencies are more likely to be obtained by someone who is a student in good standing" based upon his understanding of "the 'match' and 'scramble' procedures by

which medical students are offered residencies," and it was not clear whether plaintiff would be able to obtain a residency even if he was not "reinstated prior to March 14, 2016," or whether any residency he obtained "would be of lesser value" than another residency he might obtain: "Certainly, Mr. Doe's medical education pathway has been disrupted by his dismissal from Ohio State.  But it is far from clear that, absent an injunction at this point, he will be unable to complete his education or to pursue his chosen profession."), *objections overruled, report aff'd*, 2016 WL 1578750 (S.D. Ohio April 20, 2016); *Kelly v. W. Va. Bd. of Law Exam'rs*, No. 2:08-933, 2008 U.S. Dist. LEXIS 56840, at *6 (S.D.W. Va. 2008) (no irreparable harm where plaintiff successfully completed other examinations without accommodations); *Baer v. Nat'l Bd. of Med. Examiners*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) ("[I]t is not certain that [plaintiff] will suffer the predicted harm; she may pass the test.") (denying preliminary injunction).

## III.   MS. DOHERTY IS NOT LIKELY TO SUCCEED ON THE MERITS

Ms. Doherty's motion also must be denied because he has not made a clear showing that he is likely to succeed on the merits.  Ms. Doherty has not shown that her ability to read or learn is substantially limited compared to most people in the general population.

### A.   Disability Under The ADA, As Amended:  Substantial Limitation In A Major Life Activity Compared To Most People In The General Population.

NBME is subject to a specific provision of Title III the ADA, 42 U.S.C. § 12189, which provides in relevant part as follows:

> Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189.   Thus, the ADA requires NBME to offer the USMLE in a place and manner that is accessible to individuals with disabilities.

An individual is disabled within the meaning of the ADA if he or she has "a physical or mental impairment that substantially limits one or more major life activities ...." 42 U.S.C. § 12102(1)(A).  In the ADA Amendments Act of 2008 ("ADAAA"), Congress noted that the statute should be construed to provide "broad coverage."  42 U.S.C. § 12102(4)(A). Nevertheless, an individual seeking disability-based accommodation or pursuing a claim of disability discrimination must still prove that he is, in fact, disabled within the meaning of the statute.  *See* 42 U.S.C. § 12102(4)(A); *see also, e.g., Neely v. PSEG Texas, LP*, 735 F.3d 242, 245 (5th Cir. 2013) ("Although the text of the ADAAA expresses Congress's intention to broaden the definition and coverage of the term 'disability,' it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination.").

It remains true under the ADAAA that not every diagnosed impairment constitutes a covered disability, as confirmed by the statute's legislative history:

> By retaining the essential elements of the definition of disability including the key term 'substantially limits' we reaffirm that not every individual with a physical or mental impairment is covered by the . . . definition of disability in the ADA.  An impairment that does not substantially limit a major life activity is not a disability under [the first prong of the definition].  That will not change after enactment of the ADA Amendments Act....

> We believe that the manner in which we understood the intended scope of "substantially limits" in 1990 continues to capture our sense of the appropriate level of coverage under this law for purposes of placing on employers and other covered entities the obligation of providing reasonable accommodations and modifications to individuals with impairments.  As we described this in our committee report to the original ADA in 1989:

> A person is considered an individual with a disability for purposes of the first prong of the definition when [one or more of] the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people.  A person who can walk for 10 miles continuously is not substantially limited in walking merely because on the eleventh mile, he or she begins to experience pain because most people would not

be able to walk eleven miles without experiencing some discomfort.  S. Rep. No 101-116, at 23 (1989) . . . .

Thus, we believe that the term "substantially limits" as construed consistently with the findings and purposes of this legislation establishes an appropriate functionality test for determining whether an individual has a disability.

Statement of the Managers to Accompany S. 3406, The Americans with Disabilities Act Amendments Act of 2008, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008).  This is reiterated in the regulations implementing Title III of the ADA, which provide:  "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population*.  An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity to be considered substantially limiting.  Nonetheless, *not every impairment will constitute a disability* . . . ."  28 C.F.R. § 36.105(d)(1)(v) (emphases added).

Thus, although it is no longer necessary for an individual to show that he is "prevented" or "severely restricted" in his ability to perform a major life activity to establish a disability under the ADA, he still must show that, as a result of an impairment, he is *substantially limited in his ability to perform a major life activity as compared to most people in the general population*.  *See, e.g., Mann v. Louisiana High Sch. Athletic Assoc.*, 535 Fed. Appx. 405, 410 (5th Cir. 2013) ("Although the ADA Amendments Act of 2008 lowered the standard that plaintiffs must meet to show that they are disabled, . . . a plaintiff must still show substantial limitation....") (reversing grant of preliminary injunction because diagnosis of anxiety disorder, standing alone, was insufficient to show disability under the ADAAA).

Moreover, and importantly, Ms. Doherty's alleged impairment must be measured against most people in the general population, not other college graduates or medical students, and not

compared to her own actual or perceived intellectual potential. *See Singh v. George Washington Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007); *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F.Supp.3d 1247, 1249-50 (M.D. Fla. 2017) ("Although Black insists that the Board must compare Black's performance to her 'medical-school peers,' under 28 C.F.R. § 36.105(d)(1)(v) the substantial-limitation determination depends on a person's performance in comparison to 'most people in the general population.'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 U.S. Dist. LEXIS 48181, *18 (E.D. Pa. 2016) ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population") (holding that plaintiff was not disabled within the meaning of the ADA, notwithstanding her dyslexia diagnosis, and therefore was not entitled to extra testing time on a medical licensing exam).[5]

**B**      **Ms. Doherty is Not Likely to Succeed in Establishing That She is Disabled Within the Meaning of the ADA.**

There is a significant question whether Ms. Doherty suffers from a physical or mental impairment. Although Ms. Doherty has been diagnosed by with a learning disability and ADHD, those diagnosis do not appear to be consistent with applicable diagnostic criteria.[6]

---

[5] *See also Bach v. Law Sch. Adm. Council,* 2014 U.S. Dist. LEXIS 124632, *5 (M.D.N.C. 2014) (holding that examinee with ADHD diagnosis needed to be compared "to the general population"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 651 (E.D. Pa. 2013) (relevant comparison group is "the general population"), *aff'd*, 582 Fed. App'x 114 (3d Cir. 2014) (judgment for defendant); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011) ("The relevant comparison is not with other test-takers or future doctors, but rather, with members of the general population.") (judgment for defendant); *Love v. Law Sch. Adm. Council*, 513 F. Supp. 2d 206, 226 (E.D. Pa. 2007) (holding that plaintiff with LD and ADHD diagnoses was not disabled under the ADA and thus was not entitled to testing accommodations); *cf. Malone v. Dep't of the Air Force*, 2016 U.S. Dist. LEXIS 39345, *20 (M.D. Ala. 2016) ("The mere fact that Malone may have been diagnosed with ADD is insufficient under the [ADA] to establish that her impairment rises to the level of a disability.") (judgment for defendant employer).

[6] *See generally* J. Joy, "Assessment of ADHD Documentation from Candidates Requesting [ADA] Accommodations for the National Board of Osteopathic Medical Examiners COMLEX Exam," 14(2) J. of Attention Deficit Disorders 104, 106 (2010) (discussing results of an independent professional review

The Court need not resolve that issue now (nor could it, on the current limited record). Even if one accepts Ms. Doherty's diagnoses at face value, that is not enough to warrant testing accommodations.  Having a diagnosis is not enough to show that a person is disabled within the meaning of the ADA.  *Costello v. UNC*, No. 03-1050, 2006 U.S. Dist. LEXIS 90519, at *12 (M.D.N.C. 2006) ("[A] mere medical diagnosis of an impairment is insufficient to prove disability status.") (summary judgment to defendant on Rehabilitation Act claim); *Rawdin v. Amer. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 649 (E.D. Pa. 2013) ("[T]he changes reflected in the ADAAA were not intended to make 'every impairment . . . a disability within the meaning of this section.'")(citations omitted), *aff'd on other grounds*, 582 Fed. Appx. 114 (3d Cir. 2014).

Individuals who perform at the level Ms. Doherty has performed without any accommodations -- academically and on other high-stakes standardized tests -- are not substantially limited in their reading, learning or testing abilities and do not have a reading or attention disorder that rises to the level of a disability under the ADA.  *See, e.g., Black v. Nat'l Bd. of Med. Exam'rs*, 281 F.Supp.3d at 1251 (relying, among other evidence, on plaintiff's average or above-average  performance on the MCAT and other standardized examinations in holding that plaintiff was not disabled within the meaning of the ADA despite being diagnosed with ADHD by a qualified professional, and stating that "average (or above-average) performance presumptively establishes the absence of substantial limitation" when evaluating a person's ability to perform "in comparison to 'most people in the general population'"); *Bibber*

of requests for testing accommodations from 50 individuals who claimed to have ADHD:  of the 50 files reviewed, "only 14% (7 out of 50) of applicants provided sufficient clinical information to meet the criteria for ADHD"); W. Mehrens, J. Millman & P. Sackett, "Accommodations for Candidates with Disabilities," 63 The Bar Examiner, No. 4, at 33, 36 (1994) ("There is great difficulty in accurately diagnosing a learning disability, and it is well known that many [such diagnoses] are done … in error.") (citing, among others, a study which found that "approximately 60 percent of the pupils identified [in the study] as learning disabled were misclassified").

*v. Nat'l Bd. of Osteopathic Med. Exam'rs*, No. 15-4987, 2016 U.S. Dist. LEXIS 48181, at *25 (E.D. Pa. 2016) (individual who scored in the 71st percentile on the GRE (a graduate school admission test) and in the "average" range on the reading section of the MCAT without accommodations was not substantially limited compared to most people in reading); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 621 (S.D. Ind. 2012) ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, . . . stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); . *Love v. Law Sch. Adm. Council,* 513 F. Supp. 2d 206, 214 (E.D. Pa. 2007) (holding that plaintiff with LD and ADHD diagnoses was not disabled under the ADA and denying accommodations on the LSAT, where, among other evidence, plaintiff had ACT and SAT scores "within the average range" with no accommodations); *Biank v. Nat'l Bd. of Med. Exam'rs*, 130 F.Supp.2d 986, 991 (N.D. Ill. 2000) (noting that plaintiff had passed Step 1 "without an accommodation of additional time" and that both Step 1 and Step 2 "must each be taken in one 8-hour day," and entering final judgment in favor of NBME on plaintiff's request for an injunction requiring NBME to grant double testing time on Step 2).

Ms. Doherty argues that accommodations are warranted on the USMLE Step 2 CK exam because her medical school allows her to test with extra testing time. However, receiving accommodations in an academic context is very different from receiving accommodations on a standardized test used for licensure purposes, and it was entirely appropriate for NBME to conduct its own assessment of Ms. Doherty's documentation and determine whether she is entitled to accommodations on the USMLE. *Cf. Ware v. Wyoming Bd. of Law Exam'rs*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997) ("Although information regarding past accommodations may

be helpful..., the fact that a person has been granted a particular accommodation in the past does not mean that such accommodations are presumptively reasonable.  Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis."), *aff'd mem.*, 161 F.3d 19 (10th Cir. 1998).

Indeed, the more relevant accommodation history for Ms. Doherty is the fact that she has *never* been accommodated in any of her prior academic history or on any national standardized test, yet she has always performed extremely well.  The relevance of her prior testing history is indirectly confirmed by the ADA regulations, which call upon testing organizations to give "considerable weight" to documentation of past accommodations "received in similar testing situations[.]"  28 C.F.R. § 36.309(b)(v).  The other side of that coin, of course, is a history of **not** receiving any accommodations in similar testing situation.  Ms. Doherty has never been accommodated on a timed standardized test.

Ms. Doherty argues that NBME has improperly focused on his prior success in school and on standardized tests without formal accommodations, rather than the slow reading rate diagnosed by Dr. Brockman.  However, it is entirely appropriate to look at Ms. Doherty's real-world functioning to determine whether he is disabled within the meaning of the ADA.  Before and after the amendments to the ADA, courts have looked to objective evidence of individuals' actual performance on other standardized tests and/or in academic or other environments in determining whether they are substantially limited in major life activities such as learning or reading (or any other activities implicated with respect to taking standardized tests).  *See, e.g., Bibber*, 2016 U.S. Dist. LEXIS 48181, at *19-20 (explaining courts have considered numerous factors, including "objective test results," "any pattern of substantial academic difficulties," and "whether the individual has been afforded testing accommodations in the past"); *Healy*, 870 F.

Supp. 2d at 620-21 ("[C]ourts have considered the plaintiff's objective test results as compared to the average person, . . . the plaintiff's other activities, including extracurriculars, . . . whether there exists a pattern of substantial academic difficulties, ... and whether the plaintiff has been afforded testing accommodations in the past ....") (citations omitted); *see also, e.g., Palotai v. Univ. of Maryland*, 38 Fed. Appx. 946, 955 (4th Cir. 2002) (noting that report of plaintiff's psychologist addressing his learning disabilities did not compare his ability to learn with that of an average person in the general population and finding "[t]his deficiency is particularly crucial in a case like this one in which the person claiming a significant limitation on his ability to learn has a demonstrated record of academic achievement...."); *Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 155 (1st Cir. 1998) ("The record shows that Jason never experienced significant academic difficulties, and in fact has excelled academically for most of his years at the Baldwin School."); *Bach*, 2014 U.S. Dist. LEXIS 124632, at *5 ("Mr. Bach's long history of academic success weighs against a finding of disability."); *Rumbin v. Ass'n of American Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Ct. 2011) ("Mr. Rumbin's condition affects aspects of the way in which he leads his life. However, the evidence of his past employment requiring substantial visual focus, his ability to paint and read books, and his prior education and test-taking without accommodations, demonstrate that he is not substantially limited in the major life activities of seeing, learning, and reading."); *Love v. Law School Admission Council*, 513 F. Supp. 2d 206, 228 (E.D. Pa. 2007) ("Given all the evidence presented, including Plaintiff's test scores, clinical evaluations, educational history, and his reported ability to function in both academic and professional environments, we are not persuaded that Plaintiff has a disability as defined under the ADA.").

The objective evidence here shows that Ms. Doherty is not substantially limited in any major life activity relevant to taking the Step 2 CK exam when she is compared -- as she must be -- to most people in the general population.

## IV.   ANY CLAIMED HARM TO MS. DOHERTY DOES NOT OUTWEIGH THE HARM TO NBME IF AN INJUNCTION ISSUES

As discussed above, Ms. Doherty's claim of irreparable harm is speculative, at best.  Her suggestion that NBME would suffer no harm if an injunction is granted is incorrect.

It is true that NBME provides extra testing time to individuals who demonstrate that they are disabled under the ADA and need extra time.  But NBME denies accommodations when the applicant has not established the existence of an impairment that rises to the level of a disability as defined by the ADA.   NBME does so to ensure that its testing program is fair to all examinees, and to protect the comparability and validity of USMLE scores.  *See Powell v. NBME,* 364 F.3d at 88-89.  Because of those concerns, the potential harm to NBME outweighs any claimed harm to Ms. Doherty from not being able to test with accommodations on August 6, 2019.  *See also Rothberg v. LSAC,* 102 Fed. App'x 122, 125 (10th Cir. 2004) (finding that equities favored the testing company and overturning a preliminary injunction that awarded extra time to a test taker).

Moreover, Ms. Doherty admits that, if she is able to get a residency position based on the score she achieves on Step 2 CK with accommodations, that will come at the expense of someone else who wanted that same position.  There is thus a risk of harm to third parties if the requested preliminary injunction is granted.

## VI.   AN INJUNCTION DOES NOT SERVE THE PUBLIC INTEREST

Ms. Doherty argues that the public interest would be served by granting him a preliminary injunction because it will further the purpose of the ADA. This argument assumes—incorrectly—that Ms. Doherty has demonstrated that she is, in fact, disabled within the meaning of the ADA and entitled to his requested accommodations.

Broader interests must also be considered when evaluating the public interest in this context. "Although the public certainly has an interest in the enforcement of the ADA, ... the public also has an interest in the fair administration of standardized tests." *Bach*, 2014 U.S. Dist. LEXIS 124632, at *7-8 (finding that the public interest did not weigh in favor of either party). Other candidates do not want extra testing time to be granted to individuals who are not disabled, as that could provide an advantage that is denied to other test takers. Nor do score users want unwarranted accommodations to be provided, because such accommodations can affect the comparability of the resulting test scores. Factoring these other interests into the mix, the public interest clearly supports not awarding accommodations by way of a preliminary injunction when the record shows that such accommodations are neither needed nor warranted.

## CONCLUSION

Ms. Doherty's motion for preliminary injunction should be denied.

Dated:  August 2, 2019                          Respectfully submitted,


                                                /s/   Robert A. Burgoyne
                                                _____

                                                Robert A. Burgoyne
                                                (admitted pro hac vice)
                                                Perkins Coie LLP
                                                700 Thirteenth Street, N.W. Suite 600
                                                Washington, D.C.  20005-3960
                                                Phone:  202-654-1744
                                                RBurgoyne@perkinscoie.com

                                                Counsel for Defendant NBME


## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing brief on all counsel of record by email on this 2d day of August 2019.

                                                /s/ Robert A. Burgoyne
                                                _____