1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5  MEAGHAN DOHERTY              *
                               *   Docket No.: 19-CV-11790
6  versus                      *   Section "T"
                               *   New Orleans, Louisiana
7  NATIONAL BOARD OF MEDICAL   *   August 1, 2019
   EXAMINERS                   *
8  * * * * * * * * * * * * * * * *

9                  SEALED
         TRANSCRIPT OF PROCEEDINGS BEFORE
10        THE HONORABLE GREG GERARD GUIDRY
          UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13
    For the Plaintiff:        St. Bernard Parish District
14                              Attorney's Office
                             BY:  WILLIAM M. MCGOEY, ESQ.
15                           1101 W. St. Bernard Highway
                             Chalmete, Louisiana 70043
16

17
                             Law Offices of Frances Mae
18                             Olivier, LLC
                             BY:  FRANCES M. OLIVIER, ESQ.
19                           2341 Metairie Road
                             Metairie, Louisiana 70001
20

21
    For Defendant:           Perkins coie, LLP
22                           BY:  ROBERT A. BURGOYNE, ESQ.
                             700 13th Street N.W.
23                           Suite 600
                             Washington, DC 20006
24

25

                     OFFICIAL TRANSCRIPT

1   APPEARANCES:

2

3   Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                    500 Poydras Street
4                                   Room HB-275
                                    New Orleans, Louisiana 70130
5                                   (504) 589-7780

6

7   Proceedings recorded by mechanical stenography, transcript

8   produced by computer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

1                          **I N D E X**

2                                                    <u>Page</u>

3

MEAGHAN DOHERTY

4        Direct Examination By Mr. McGoey:           7
         Cross-Examination By Mr. Burgoyne:         59
5        Redirect Examination By Mr. McGoey:        80

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

1               **<u>PROCEEDINGS</u>**

2               **(August 1, 2019)**

3                  **\*\*\*\*\*\***

4

5          (COURT CALLED TO ORDER)

6          (WHEREUPON, the following proceedings were placed

7   under seal.)

8          **THE COURT:**  Good morning.

9          **THE DEPUTY CLERK:**  This is a sealed matter.  We have

10  Civil Action 19-11790, *Doherty versus National Board of Medical*

11  *Examiners.*

12          Counsel, make your appearance, please.

13          **MR. McGOEY:**  Your Honor, Billy McGoey on behalf of

14  the plaintiff, Meaghan Doherty.

15          **MS. OLIVIER:**  Frances Olivier, co-counsel, on behalf

16  of Meaghan Doherty.

17          **MR. BURGOYNE:**  Robert Burgoyne on behalf of the

18  National Board of Medical Examiners.

19          **THE COURT:**  Okay.  And, again, let the record reflect

20  that this entire proceeding is ordered to be under seal.

21          Okay.  Counsel, are you ready to proceed?

22          **MR. McGOEY:**  Yes, Your Honor.

23          **THE COURT:**  Go ahead.

24          **MR. BURGOYNE:**  Your Honor, I'd just like to mention

25  one thing before we start, if that's okay.

1          THE COURT:  Sure.

2          MR. BURGOYNE:  I just want to make sure that

3    everybody's aware, and Your Honor may not even be aware, but I

4    previously represented the Louisiana Board of Bar Examiners in

5    connection with an ADA investigation by the U.S. Department of

6    Justice, and I believe Your Honor was on the State Supreme

7    Court at that time.

8          THE COURT:  Correct.

9          MR. BURGOYNE:  And I want to make sure that I

10   disclose that fact in case anybody had any concern from a

11   conflicts perspective.

12         THE COURT:  Yeah.  Your name did sound familiar, but

13   I wasn't sure if it was in the context of that issue.  Now, you

14   and I have never met; is that correct?

15         MR. BURGOYNE:  No, Your Honor, we've never met or

16   spoken.

17         THE COURT:  Okay.  And, again, explain the context of

18   your involvement with that earlier issue.

19         MR. BURGOYNE:  I was advising the court indirectly,

20   but the Board of Bar Examiners directly, in connection with the

21   U.S. Department of Justice's investigation of the use of mental

22   health questions on attorney applications.

23         THE COURT:  Right.  And that matter ended with the

24   Supreme Court entered an agreement with the Federal Government

25   to make certain changes to the application questions; is that

OFFICIAL TRANSCRIPT

1  correct?

2          **MR. BURGOYNE:**  That's correct, Your Honor.

3          **THE COURT:**  And there was -- there was no negative

4  finding, if I remember correctly.

5          **MR. BURGOYNE:**  There were no findings of any

6  violations.  That's correct.

7          **THE COURT:**  Okay.  I'm glad you brought that up

8  because I was not aware of all of those connections.  I want to

9  give the attorneys in the room here some time to process that

10 and see if you have any -- if that presents any issues for you.

11          **MR. McGOEY:**  Your Honor, we have no problem with any

12 conflict issue.

13          **THE COURT:**  Okay.  Well, I don't think it really

14 presents a conflict.  But his name did come to my attention as

15 a result of the process that the Supreme Court went through

16 with that earlier issue.

17          Okay.  Anything else before we begin?

18          **MR. BURGOYNE:**  Your Honor, the only other

19 housekeeping matter was the question of my participation today,

20 and, hopefully, the Court received my -- the pro hac papers to

21 the extent I was able to get those prepared this morning and

22 submitted to the Court.

23          **THE COURT:**  All right.  Mr. McGoey, do you have any

24 objection to his participation in that?

25          **MR. McGOEY:**  No, Your Honor.  No objection.

MEAGHAN DOHERTY - DIRECT

1           **THE COURT:**  Because we've looked into it, and I have

2     the authority to allow him to appear pro hac vice, although

3     he's not in complete compliance with our local rules.

4           **MR. McGOEY:**  That's correct, Your Honor.  We're not

5     going to object.  We realize this is a preliminary proceeding.

6           **THE COURT:**  Okay.  Anything else?

7           **MR. BURGOYNE:**  No, Your Honor.

8           **THE COURT:**  All right.  Mr. McGoey.

9           **MR. McGOEY:**  Your Honor, I'd like to call Meaghan

10    Doherty as a witness.

11          **THE COURT:**  Yes.

12          (WHEREUPON, **MEAGHAN DOHERTY**, having been duly sworn,

13    testified as follows**:)**

14          **THE DEPUTY CLERK:**  Please state your full name and

15    correct spelling for the record.

16          **THE WITNESS:**  My name is Meaghan Doherty.

17          **MR. McGOEY:**  Your Honor, I placed a bench book on the

18    stand.  And I will also be referring to everything with the

19    Record Document Number so that Mr. Burgoyne can follow along

20    even though he's not here.

21                          **DIRECT EXAMINATION**

22    BY MR. McGOEY:

23    **Q.**   Ms. Doherty, can you tell us your name and address?

24    **A.**   My name is Meaghan Doherty, and I live at 3840 Bienville

25    Street in New Orleans, Louisiana.

MEAGHAN DOHERTY - DIRECT

1   **Q.**   How old are you?

2   **A.**   I'm 25.

3   **Q.**   Okay.  And where are you in school now?

4   **A.**   I'm at Tulane University, School of Medicine.

5   **Q.**   Okay.  And when did you first learn that you had a medical

6   condition that affected your learning?

7   **A.**   It was right before the start of fifth grade, around my

8   tenth birthday.

9   **Q.**   And how did you find out?

10  **A.**   My parents had me evaluated because of some discrepancy in

11  my performance in school, and so they had me evaluated.

12  **Q.**   And did you learn at that time what disabilities you had

13  or what impairments you had?

14  **A.**   From what I recall at that time, I was told that I had

15  dyslexia and possible dysgraphia with some mention of ADHD.

16  **Q.**   And, Ms. Doherty, if you turn to Exhibit 11, which is tab

17  15.  It's Record Document 1-6.  Can you tell us what that

18  document is?

19  **A.**   Yes.  This is the first evaluation that was completed

20  about me when -- around my tenth birthday.

21  **Q.**   And was that by Denise Nagim?

22  **A.**   It was.

23  **Q.**   And if you look at the top of the page to the right, what

24  grade were you in at that point?

25  **A.**   I was in fifth grade.

MEAGHAN DOHERTY - DIRECT

1  **Q.**   Okay.  And is this one of the evaluations that you were
2  referring to about when you first learned about your condition?
3  **A.**   Yes, it is.
4          **MR. McGOEY:**  Your Honor, I would offer and introduce
5  into evidence Exhibit 11.
6          **THE COURT:**  Any objection?
7          **MR. BURGOYNE:**  No objection, Your Honor.
8          **THE COURT:**  It will be admitted.
9  **BY MR. McGOEY:**
10 **Q.**   And if you turn to Exhibit 10, which is tab 14.  That is
11 Record Document 1-5.  Can you tell us what that is?
12 **A.**   This is another evaluation that was done of me when I was
13 11 years old, and I was in the sixth grade.
14 **Q.**   And do you remember who did that evaluation?
15 **A.**   It was a nun.
16 **Q.**   Okay.  If you look at the last page of the exhibit, is it
17 Sister Sarah Ducey?
18 **A.**   Yes, it is.
19 **Q.**   And did she also give you those -- a report of impairments
20 that you discussed in regard to Ms. Nagim?
21 **A.**   She did.
22         **MR. McGOEY:**  Your Honor, I would offer and introduce
23 into evidence Exhibit 10.
24         **THE COURT:**  Any objection?
25         **MR. BURGOYNE:**  No objection, Your Honor.

MEAGHAN DOHERTY - DIRECT

1          **THE COURT:**  So admitted.

2    **BY MR. McGOEY:**

3    **Q.**   So this was when you were in grammar school; correct?

4          **THE DEPUTY CLERK:**  Mr. McGoey, I just want to make

5    sure.  Somebody walked in; is that with your case?

6          **MR. McGOEY:**  That's my wife, Kathy McGoey.

7          **THE COURT:**  Hello.

8          **MS. McGOEY:**  Sorry.

9    **BY MR. McGOEY:**

10   **Q.**   So this was in grammar school?

11   **A.**   Yes.

12   **Q.**   After you got these diagnoses, did you ask for

13   accommodations back in grammar school?

14   **A.**   I told my parents that I did not want them because

15   there -- I didn't want anyone else to know that I had been

16   diagnosed with anything, and it would have required that I had

17   to leave the classroom to take my exams and go to the Special

18   Ed class, which I was not willing to accept as a 10-year-old

19   and 11-year-old.

20   **Q.**   So what did you do to deal with these issues?

21   **A.**   My parents put me in a variety of tutoring services, as

22   well as using a computer more frequently.

23   **Q.**   What are the most recent diagnoses that you have now?

24   **A.**   My most recent diagnoses are specific learning disability

25   with impaired reading rate, as well as ADHD, and generalized

MEAGHAN DOHERTY - DIRECT

1   anxiety disorder.

2   **Q.**   If you look at Exhibit 2, which is tab 6, Record Document

3   1-4.  Can you tell us what this document is, Exhibit 2?

4   **A.**   Yes.  This was the application for request for testing

5   accommodations that I submitted to the NBME.

6   **Q.**   And is this the request for accommodations for the test

7   that you're going to be taking on next Tuesday?

8   **A.**   Yes.

9   **Q.**   And does it include in it the attachments of your earlier

10  grammar school evaluations by medical professionals?

11  **A.**   It does.

12  **Q.**   Does it also include the reports of the medical

13  professionals who have examined you since you've been in med

14  school?

15  **A.**   Yes, it does.

16  **Q.**   And who are those people?

17  **A.**   One examination was done by Dr. Barbee, who is a

18  psychiatrist, who I've been seeing since my senior year of

19  college, who I see every three months, as well as a

20  psychologist, Dr. Brockman, who redid my psychological

21  evaluation first year of medical school in 2017.

22          **MR. McGOEY:**  Your Honor, I would offer and introduce

23  into evidence Exhibit 2.

24          **THE COURT:**  Any objection?

25          **MR. BURGOYNE:**  No objection, Your Honor.  Just for

MEAGHAN DOHERTY - DIRECT

1  clarification, are both the Dr. Barbee and Brockman evaluations
2  attached as part of Exhibit 2?
3         **MR. McGOEY:**  Yes.  Barbee is at page 47, which the
4  record document stamp's on the top.  And Brockman is -- excuse
5  me, it begins at page 18 of the court stamps at the top of the
6  page.
7         **MR. BURGOYNE:**  Great.  Thank you.
8  **BY MR. McGOEY:**
9  **Q.**   And if we look at page 34, looking at the page numbers at
10  the top of this exhibit, is that the page, Meaghan, where
11  Dr. Brockman does list the three impairments that you mentioned
12  for us in her report?
13  **A.**   Yes.
14  **Q.**   And do you take any medication as a result of your
15  diagnoses?
16  **A.**   I do.  I take medication for ADHD.
17  **Q.**   And what medication do you take?
18  **A.**   I take Adderall.  I take 60 milligrams XR, which is
19  extended release, of Adderall daily.
20  **Q.**   When did you begin taking Adderall?
21  **A.**   I started taking Adderall in eighth grade.
22  **Q.**   And when you were being evaluated most recently by
23  Brockman and Barbee, did you take your medications while you
24  were being evaluated?
25  **A.**   Yes.

MEAGHAN DOHERTY - DIRECT

1  **Q.**   Where did you go to high school?

2  **A.**   I went to Ben Franklin here in New Orleans.

3  **Q.**   And that's the Ben Franklin with a superior academic

4  rating, that high school?

5  **A.**   Yes.

6  **Q.**   What was your grade point average at Franklin?

7  **A.**   It was approximately a 3.75.

8  **Q.**   Okay.  Did you ask for accommodations at Franklin?

9  **A.**   No, I did not.

10 **Q.**   Why not?

11 **A.**   Because, once again, I didn't want my peers to know of my

12 diagnoses, and it would have required me to take my test in a

13 different room.

14 **Q.**   What did you do to deal with your diagnoses and your

15 impairments while you were in high school at Ben Franklin?

16 **A.**   I took two study halls.  We had a block schedule, so it

17 equated to having a study hall every day.  When a lot of other

18 students took more electives, I made sure I had two study halls

19 so that I had extra time to study and do homework every day at

20 school, as well as after school.

21 **Q.**   Yeah.  And what did -- after school, what did you do as

22 far as to deal with your situation?

23 **A.**   It was the same, about -- it just took a lot longer to

24 study.

25 **Q.**   Where did you go to college?

MEAGHAN DOHERTY - DIRECT

1    **A.**    I went to University of Wisconsin in Madison.

2    **Q.**    What did you -- what did you major in?

3    **A.**    I majored in biology with minors in global health and

4    environmental studies.

5    **Q.**    Did you notice any of the effects of your impairments

6    while you were at Wisconsin?

7    **A.**    Yes, I did.

8    **Q.**    What issues did you have?

9    **A.**    Once again, I knew that I took a lot longer to study and

10   to go through material, so I spent -- luckily, in college you

11   have a freer schedule, and I just spent more time at the

12   library or at home preparing for class.

13   **Q.**    And did you do well in college?

14   **A.**    I did.

15   **Q.**    Did you take the MCAT to try to get admitted into med

16   school?

17   **A.**    Yes.  I took it between my junior and senior year of

18   college.

19   **Q.**    How did you do?

20   **A.**    I did well enough to feel comfortable applying to medical

21   school.  I got a 32.

22   **Q.**    And what med schools did you get into?

23   **A.**    I got into Tulane and LSU.

24   **Q.**    When you took the MCAT, you mentioned you got a 32?

25   **A.**    Yes.

MEAGHAN DOHERTY - DIRECT

1    **Q.**   Did you notice whether or not you had any issues with time
2    and completing the MCAT test?
3    **A.**   Yes.  I used every second that was allowed.
4    **Q.**   Okay.  Did you ask for any accommodation to take the MCAT
5    test?
6    **A.**   No, I did not.
7    **Q.**   And why not?
8    **A.**   Because it was a test that could be taken more than once,
9    and I figured that it should -- I should take it to see if I
10   could at least do it, as well as because I knew I could retake
11   it.  But, mainly, I was terrified that if I got accommodations
12   on this test that medical schools would find out somehow that I
13   had accommodations for this and then had a learning disability
14   and that may hurt me in my application for medical school.
15   **Q.**   You mentioned that you are at Tulane's medical school.
16   When did you start?
17   **A.**   August of 2016.
18   **Q.**   Once you started -- obviously, once you started med
19   school, you had to take tests in med school; correct?
20   **A.**   Yes.
21   **Q.**   Once you started taking tests in med school, did any
22   issues arise for you in relation to your impairments?
23   **A.**   Yes.
24            (WHEREUPON, the Court took a recess.)
25            **THE COURT:**  We'll pick up where we left off.

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1   BY MR. McGOEY:

2   **Q.**   Ms. Doherty, once you started taking tests in med school,

3   did any issue arise implicating your impairments?

4   **A.**   Yes.

5   **Q.**   Can you tell us how you realized that?

6   **A.**   Pretty immediately I saw a discrepancy in my scores on

7   exams that were given that were NBME style exams with the long

8   questions, as well as the -- and compared to the other exams

9   that we took known as practical exams at the beginning, which

10  were sentences -- like a question was about a sentence or two

11  long.  These tests were taken on the same day about the same

12  material.  The only difference was the format.

13  **Q.**   Okay.  So on the practical tests, which were short

14  questions and not like the NBME Step-type questions, how did

15  you perform?

16  **A.**   I was averaging 85 to 95 percent correct.

17  **Q.**   Okay.  And then on the type tests that were similar to the

18  NBME Step 2 type tests, what were your scores like?

19  **A.**   They were approximately 65 percent correct to 75 percent

20  correct.

21  **Q.**   So almost a 20 percent difference in your results?

22  **A.**   Yes.

23  **Q.**   And the tests were on the same day?

24  **A.**   Yes.

25  **Q.**   And about the same type of material?

MEAGHAN DOHERTY - DIRECT

1  **A.**   Yes.

2  **Q.**   And what was it about the National Board of Medical

3  Examiners Step 2 type tests that presented a difficulty in

4  relation to your diagnoses?

5  **A.**   It's the amount of reading that is required in the short

6  time frame.

7  **Q.**   So what did you do once you realized that you were having

8  this testing disparity when you had to take a test with long

9  reading parts for the questions?

10  **A.**   I asked for accommodations from Tulane.

11  **Q.**   And what did you have to do to have them evaluate whether

12  or not you were entitled to get accommodations?

13  **A.**   I had to submit the evaluations that were completed when I

14  was in elementally school, as well as a letter from Dr. Barbee,

15  who I was under treatment with at that point too, as well as a

16  personal statement.

17  **Q.**   Okay.  And as a result of that, what did Tulane decide as

18  far as accommodations?

19  **A.**   They granted me accommodations.

20  **Q.**   And what were the accommodations they granted you?

21  **A.**   They granted me a time and a half, as well as a

22  different -- a quiet testing area, which kind of went

23  hand-in-hand at Tulane.  Because if you get a time and a half,

24  they're going to put you in a different room that's smaller

25  because that proctor will be there for a time and a half as

MEAGHAN DOHERTY - DIRECT

1    opposed to the other room.

2    **Q.**   And what does that address, being in a room with a smaller

3    group of people?

4    **A.**   The area that the rest of students take their exams is

5    about 200 kids in a class- -- in one large room, and so there's

6    a lot more disturbances, people are sharing desks, people are

7    getting up and leaving at all points during the exam, and it's

8    very distracting.

9    **Q.**   When you were describing the NBME type test questions that

10   were giving you issues when you took those type tests, how

11   closely are they related?  Like where did those questions,

12   those type tests that Tulane administered, come from?

13   **A.**   Tulane gets their exams -- they're what's known as "shelf

14   exams" because they order them from the NBME, and they take old

15   exam questions that had previously been on Step 1 or Step 2 and

16   compile ones that are of the testing category of information

17   that the school requests, and then they administer them to us.

18   **Q.**   So were those type questions that you noticed immediately

19   in law school where you were scoring much lower than the

20   practical type tests?

21   **A.**   In med school, yes.

22   **Q.**   And what are -- we're here today about the Step 2 test.

23   Tell us what the Step 1 test is and the Step 2 test.

24   **A.**   Step 1 and Step 2 are part of a three-part licensing exam

25   to become a fully licensed physician in the United States.

MEAGHAN DOHERTY - DIRECT

1   **Q.**   And if you look at -- Meaghan, if you turn to Exhibit 26,

2   tab 40 --

3          **MR. McGOEY:**  And, Mr. Burgoyne, this is a -- an

4   excerpt from the Web site on the sample questions.  And it

5   is -- for you to look at it, if you look at -- it is in our

6   memo, Record Document 1-1, page 22.  It is that same question.

7   It's just that for purposes of the Court, that also includes

8   argument on that page.  So this exhibit that I'm examining now

9   has that exact same test question, but it doesn't have my

10  arguments in it.  It's straight from the Web site.

11         **THE WITNESS:**  Yes.

12         **MR. BURGOYNE:**  Okay.  This is a sample Step 2 CK

13  question?

14         **MR. McGOEY:**  Yes.

15         **MR. BURGOYNE:**  Okay.  All right.

16  BY MR. McGOEY:

17  **Q.**   So if we look at that in tab 40, Meaghan, which is

18  Exhibit 26, tell us where this comes from.

19  **A.**   This comes from a sample packet of questions that NBME

20  puts online for Step 2 CK.

21  **Q.**   And is this something that -- where this was downloaded

22  from, is this something that med students rely on to prepare

23  for Step 2?

24  **A.**   Yes.

25  **Q.**   And if you look at the sample question, which is on page

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1    10 at the bottom of the pages for the Court, is that a sample

2    of the questions that are Step 2 questions?

3    **A.**   Yes.

4    **Q.**   And we see there that there's a long paragraph with a

5    factual scenario, a nine-year-old boy, listing all the various

6    factors.  And then, of course, it's a multiple choice question,

7    A through H.  Is this similar to the test questions that were

8    on Step 1 and that are going to be on Step 2?

9    **A.**   It is, and it's not limited to A through H.  It can go to

10   up like Z.

11   **Q.**   Some questions may have like 25 or 26 options?

12   **A.**   Yeah.

13   **Q.**   Okay.  But they all have this long sort of factual

14   scenario --

15   **A.**   Yes.

16   **Q.**   -- which you have to read?

17   **A.**   They all have a long vignette.

18          **MR. McGOEY:**  Your Honor, I would offer and introduce

19   into evidence Exhibit 26, the sample question.

20          **THE COURT:**  Any objection?

21          **MR. BURGOYNE:**  No objection.

22          **THE COURT:**  Okay.  It's admitted.

23   BY MR. McGOEY:

24   **Q.**   And, once again, how do your disabilities impact answering

25   that type of question?

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1  **A.**    With the time constraints, there's no way for me to

2  actually read the entire question, 40 of those, and answer a

3  question in the 60 minutes that is given, which comes to 90

4  seconds per question.

5  **Q.**    And what are the impairments that affect you being able to

6  respond to those type questions with the knowledge that you

7  have?

8  **A.**    Specifically, the specific learning disability of an

9  impaired reading rate, which is the major problem of just my

10  basic reading speed to be able to get through the information

11  for each question, as well as the ADHD definitely plays on top

12  of that.  Because when you're on a crunch for time already, any

13  moment that you may get a little distracted can really throw

14  you completely off, especially when you're already behind.

15  **Q.**    How much time on the Step 2 are you allotted to answer one

16  of the questions like we just looked at?

17  **A.**    90 seconds.

18  **Q.**    Okay.  And what happens if you finish one of the questions

19  earlier, let's say with ten seconds to spare, what happens to

20  that extra ten seconds?

21  **A.**    It's not per question.  It's a block of 60 minutes in

22  which you have 40 questions; but if there is any time to spare

23  at the end of the block, that extra time is added to your break

24  time, but it's not added to any of the other sections of

25  questions.

MEAGHAN DOHERTY - DIRECT

1   **Q.**   So it heightens the time crunch for every single question?

2   **A.**   Absolutely.

3   **Q.**   If you look -- if we turn to Exhibit 7, which is in tab 11

4   of the bench books.  It's Record Document 1-5.  Ms. Doherty,

5   can you tell us what that is?

6   **A.**   Yes.  This is the certification of prior testing

7   accommodations.  It's a form that was required by the NBME when

8   I was asking for accommodations to show proof from Tulane that

9   I had received them.

10  **Q.**   And this lists what accommodations you got; is that

11  correct?

12  **A.**   Yes.

13  **Q.**   Do you remember when Tulane granted you those

14  accommodations?

15  **A.**   Yes, it was January of 2017.

16  **Q.**   And was that before you took the Step 1 test?

17  **A.**   It was.

18  **Q.**   And you already told us the accommodations they granted

19  you.  And you also described for us how your scores at Tulane

20  went up by like 20 percent once you got the accommodations;

21  correct?

22  **A.**   Once I got the accommodations, my scores went from being

23  the 65 to 75th percent correct, which was the bottom of the

24  class, not even the 60 or any high percentile, they went to

25  being between 80 and 90 percent, with the average score being

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1    an 85 for me, as well as for the class.  So I was right in

2    there in the middle of the class with everyone else.

3            MR. McGOEY:  Your Honor, I would offer and introduce

4    Exhibit 7 which is at Rec. Document 1-5, the Tulane

5    certification.

6            MR. BURGOYNE:  No objection.

7            THE COURT:  It's admitted.

8    BY MR. McGOEY:

9    Q.   And, Ms. Doherty, did you notify the National Board of

10   Medical Examiners about the accommodations you had gotten at

11   Tulane and the resulting effect it had on your test scores?

12   A.   I did.  I included that in my personal statement and my

13   original application for testing accommodations.

14   Q.   If you'll look at Exhibit 3, which is at tab 7, can you

15   tell us what that document is?

16   A.   Yes.  This is the personal statement that I submitted as

17   part of my application for accommodations this year, which I

18   also included the same change in scores.

19   Q.   This is -- and this is -- was in the packet for your

20   request for accommodation for the Step 2 test you're taking

21   next week?

22   A.   It was.

23   Q.   And if you look at page 3 of this document, and I'm

24   talking about at the top of the exhibit.  If you look down at

25   the second to last paragraph, I note it reads midway through

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1  the paragraph:
2          "During my third year of medical school, my shelf
3  exam scores ranged from the 40th percentile to the 76th
4  percentile.  This is in stark contrast to the approximately
5  10th percentile I scored on Step 1, for which I received no
6  accommodations."
7  **A.**   Yes.
8  **Q.**   And so is this part of the passage that alerts the
9  National Board that when you get the accommodations, it does
10 reflect in your scores?
11 **A.**   Yes.
12 **Q.**   And in this thing, you mentioned that you were only in the
13 10th percentile on Step 1, and we'll talk about Step 1 in more
14 detail a little bit later, but when you say the 10th
15 percentile, tell us what you're referring to there.
16 **A.**   That's approximately where my score lands on of all the
17 people who took the exam.  That's not the percent correct that
18 I got.
19 **Q.**   Okay.  In this reference that I read out, where it talked
20 about your shelf exam scores ranging from the 40th percentile
21 to the 76th percentile, that's those same tests you were
22 talking about that showed you that once you got the
23 accommodation, your scores went up; correct?
24 **A.**   Yes.  These are also shelf exams which are ordered by
25 Tulane from NBME.  The ones for the clerkships are even more

MEAGHAN DOHERTY - DIRECT

1   standardized across the nation.  So those percentiles are

2   actually nationwide and not just for Tulane students.

3           **MR. McGOEY:**  Your Honor, I would offer and introduce

4   into evidence Exhibit 3, which is Record Document 1-5.

5           **MR. BURGOYNE:**  That's her personal statement.  No

6   objection, Your Honor.

7           **THE COURT:**  It's admitted.

8   **BY MR. McGOEY:**

9   **Q.**   Ms. Doherty, can you tell us what the Step 1 and Step 2

10  exams are used for?

11  **A.**   They were designed originally to be used just as part of

12  the licensing process, but, in reality, they're the most

13  important factor for residency application.

14  **Q.**   Okay.  And residency application, why is that important?

15  What is that?

16  **A.**   Residency application is the training that you receive

17  after medical school, and the first year of residency is your

18  internship, which is required to become a licensed physician.

19  **Q.**   So if you don't get a residency program, you can't become

20  a doctor?

21  **A.**   Exactly.  A licensed doctor.  You're still a -- you still

22  have an MD, but you cannot practice.

23  **Q.**   Given your class schedule and the topics that you're

24  learning in med school, when was the best time or the strategic

25  point in time for you to take the Step 1 test, the one that

MEAGHAN DOHERTY - DIRECT

1  you've already taken?

2  **A.**   It was April of 2018.

3  **Q.**   And what's the reason why that would be a strategic time?

4  **A.**   Because that was at the end of our basic science didactic

5  curriculum, which ended about mid-March of 2018, and our third

6  year of medical school began May 1st of 2018.  So it was ideal,

7  to not force the delay of your third year, to take it in April.

8  **Q.**   And it would also be in time for you to have taken -- to

9  get the material learned that you needed to to take the test?

10  **A.**   Yes.

11  **Q.**   If you turn to Exhibit 18, which is tab 22.  Can you --

12  and for Mr. Burgoyne, that's Record Document 1-8.  Can you tell

13  us what that is?

14  **A.**   Yes.  This is an excerpt from the Tulane Medical Student

15  Handbook.

16  **Q.**   If we turn to page 32, what does it tell us in regards to

17  the importance of the passing the Step 2 test?

18  **A.**   Step 2 is required to be passed before you can graduate

19  from medical school, and Step 1 was required to be passed

20  before you could continue on your third year.

21  **Q.**   If you were to take Step 2 and not pass it, what does that

22  do?  A, you can't graduate, but does that end it, or do you

23  have more time to take it?

24  **A.**   I can take a leave of absence to retake it, but that would

25  delay my graduation, as well as require extra tuition, and even

MEAGHAN DOHERTY - DIRECT

1  further decrease my chances of getting a residency

2  application -- a residency position because you have to explain

3  that at all of your job interviews.

4          **MR. McGOEY:**  Your Honor, I would offer and introduce

5  into evidence Exhibit 18, the excerpt from the Tulane handbook.

6          **MR. BURGOYNE:**  No objection.

7          **THE COURT:**  It's admitted.

8  BY MR. McGOEY:

9  **Q.**   When did you begin the process of applying for Step 1?

10 **A.**   That began in December of 2017.

11 **Q.**   And when did you apply for accommodations for Step 1?

12 **A.**   January 3rd, 2018.

13 **Q.**   And, of course, Step 1 is administered by NBME, as well as

14 Step 2; correct?

15 **A.**   Yes, it is.

16 **Q.**   And you applied for the accommodation.  Can you explain

17 the delay that happens for a student that has to apply for

18 accommodations?

19 **A.**   So, typically, at the beginning of your registration

20 process for Step 1, you have to go through an identification

21 process that involves both the NBME, as well as Tulane Medical

22 School, that verifies your identity.  Once that is done, most

23 other students then proceed to get their scheduling permit.

24 Because I requested accommodations, I was not -- I was not

25 given a scheduling permit until the decision about my

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1    accommodations was made.  So that delayed my ability to even
2    schedule the exam for two months.
3    **Q.**    Okay.  And when you requested the accommodation for
4    Step 1, what was the decision by NBME?
5    **A.**    They denied my request.
6    **Q.**    So did you just have to take the test?
7    **A.**    I did.
8    **Q.**    And why didn't you appeal it in some way?
9    **A.**    Because it had already taken two months, and I was -- I
10   would have had to -- my third year would have been delayed --
11   my third year of medical school would have been delayed if I
12   was to re-appeal it.  Since I found out at the very end of
13   February, I wouldn't have been able to schedule my exam in
14   April.
15   **Q.**    When you took Step 1 without any accommodations, how did
16   not having the time accommodation affect you?
17   **A.**    I was not even able to read all of the questions -- read
18   the full question.  I was beyond crunched for time.  But I
19   had -- my strategy was to read as much of it as I could and try
20   and answer the question.  But you're counted -- if you don't
21   answer a question, it's counted against you as wrong.  So I
22   wanted to try and at least get an answer down for each
23   question, but that wasn't a good strategy.
24   **Q.**    What impairments that you have impacted that?
25   **A.**    My specific disability in regards to the reading rate, as

MEAGHAN DOHERTY - DIRECT

1  well as the ADHD, and, honestly, the anxiety kicks in, too.

2  **Q.**   How did you do?  Numerically, what was your score on Step

3  1?

4  **A.**   My score was a 200.

5  **Q.**   And if we look at Exhibit 5, which is tab 9.  That's

6  Record Document 1-5.  Tell us what that is, Ms. Doherty.

7  **A.**   This is my score for Step 1.

8  **Q.**   What was your score?

9  **A.**   My score was a 200.

10 **Q.**   And you passed the test; is that correct?

11 **A.**   Yes, that was technically a passing score.

12 **Q.**   How does that score impact you being able to practice?

13 **A.**   It greatly reduces the chances that I will be able to get

14 a residency position.

15          **MR. McGOEY:**  Before I forget, Your Honor, I would

16 offer and introduce into evidence Exhibit 5, Record Document

17 1-5.

18          **MR. BURGOYNE:**  No objection.

19          **THE COURT:**  It's admitted.

20 BY MR. McGOEY:

21 **Q.**   What was the mean score for medical students in the United

22 States on Step 1?

23 **A.**   It was a 228.

24 **Q.**   And is that reflected on Exhibit 5?

25 **A.**   Yes, it is.

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1  **Q.**   So you were like 23 points below the mean?

2  **A.**   I was 28 points below the mean.

3  **Q.**   I can't do math.

4          What does that score do as far as your chances for

5  getting matches for residency programs?

6  **A.**   It makes my chances pretty dismal.  The passing score is a

7  194, so I was only six points above failing, which the scores

8  go to residency programs also.  It's not just a pass/fail.

9  **Q.**   And is residency also -- you've testified about how it's

10  required to become licensed.  But is it, when you do residency,

11  you're actually for the first time paid as part of that;

12  correct?

13  **A.**   Yes, you are.

14  **Q.**   If you could turn -- I've introduced Exhibit 5.  If you

15  could turn to Exhibit 22, which is tab 26, and Record Document

16  1-8.  Can you tell us what Exhibit 22 is?

17  **A.**   Yes.  It is a document that is put out by the National

18  Resident Matching Program about the match, and it's called

19  *Charting the Outcomes in the Match*, where it shows the

20  characteristics of each of the different programs' specialties

21  and grade point averages kind of and the scores.

22  **Q.**   And is this document something that med students rely on

23  in trying to deal with the matching process?

24  **A.**   Absolutely.  It is a document that every medical student

25  has.

MEAGHAN DOHERTY - DIRECT

1  **Q.**  And if you turn to page 54.  The page number is on the top
2  of the exhibit.  This is Record Document 1-8, page 54.  Do you
3  see that graph?
4  **A.**  Yes.
5  **Q.**  And do you have -- I have the black-and-white page, but I
6  also have a colored page.  Can you see that?
7  **A.**  Yes.
8  **Q.**  Okay.  Can you tell us what that graph indicates?
9  **A.**  That graph shows the median range of the 25th percentile
10  to the 75th percentile of Step 1 scores by the specialties that
11  are included in the match.
12  **Q.**  If we look at the bottom of the graph, you know, it starts
13  with anesthesiologist, in alphabetical order goes to vascular
14  surgery.  What is that?
15  **A.**  These are 22 of the approximately 25 medical specialties
16  that you can apply to.
17  **Q.**  So these are the -- each one of these, is there a
18  residency program at various med schools?
19  **A.**  Yes, at various locations around the country.
20  **Q.**  And some locations won't have all of these programs?
21  **A.**  It would be very uncommon for them to have all of them.
22  **Q.**  So just by way of example, what type residency program are
23  you hoping to get into?
24  **A.**  Obstetrics and gynecology.
25  **Q.**  And if we look at that, when we look at the chart and we

MEAGHAN DOHERTY - DIRECT

1    see that the vertical lines, there's one line on the left,

2    which in color is blue, and there's one line on the right

3    that's more like a green.  But, anyway, tell us what that

4    graphs tells us, what those vertical lines represent.

5    **A.**   The blue line on the left is the successful applicants

6    that matched into a program, and that range is from

7    approximately 220 to 240.  And then the line on the right is

8    the unsuccessful applicants to OBGYN, and their scores range

9    from a 205 to a 232.

10   **Q.**   And your score?

11   **A.**   Is a 200.

12   **Q.**   Five points less than the lowest group that didn't match.

13   And, of course, the ones -- the grouping that they're showing

14   matched, their scores were roughly around 219 and 245 or

15   something?

16   **A.**   Yes.

17   **Q.**   Compared with your score of a 200?

18   **A.**   Yes.

19           **MR. McGOEY:**   Your Honor, I would like to offer and

20   introduce into evidence Exhibit 22, which is Record

21   Document 1-8.

22           **MR. BURGOYNE:**   No objection.

23           **THE COURT:**   It's admitted.

24   BY MR. McGOEY:

25   **Q.**   And I had you go through obstetrics and gynecology.  The

MEAGHAN DOHERTY - DIRECT

1   various types of residency programs, aren't there some programs
2   that are more sought after by students than others, residency
3   programs?
4   **A.**   Yes.
5   **Q.**   And the ones that are more sought after require higher
6   scores to get into; is that correct?
7   **A.**   Yes.
8   **Q.**   And so if we were to break down, you know, the various --
9   the 22 residency programs, just roughly, in like the top
10  25 percent, hardest to get into, you know, then there would be
11  the second 25 percent, the third, and the fourth 25th percent,
12  where does OBGYN fit in?
13  **A.**   Kind of straddling that third and fourth percentile.
14  **Q.**   So in the lower 50 percent?
15  **A.**   Yes.
16  **Q.**   And closer to the 25 percent range?
17  **A.**   Yes.
18  **Q.**   So you're looking at roughly a program that is in the
19  lower one-fourth of hardness to get into?
20  **A.**   Yes.
21        **MR. McGOEY:**  I can't recall, Your Honor, if I
22  haven't, I'm offering and introducing into evidence Exhibit 22.
23        **THE COURT:**  I think it's already been admitted,
24  hasn't it?
25        **THE DEPUTY CLERK:**  Yes.

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1   BY MR. McGOEY:

2   Q.   If we look at the next page in that exhibit -- and I only

3   have the black-and-white one on that one.  But if you look at

4   the next page, is that -- is this a reflection of the scores

5   that are typically needed to get into residency programs for

6   the Step 2 test that you're about to take next week?

7   A.   Yes, it is.

8   Q.   And if you look at OBGYN, the line on the left, which is

9   the grouping of students that successfully match, what are

10  those ranges in point scores?

11  A.   Approximately a 238 to a 255 -- oh, am I looking at the

12  right thing?  Yes.  Yes.

13  Q.   Do you know what the passing score is for the Step 2 test

14  that you're going to take next week?

15  A.   It's a 209.

16  Q.   Okay.  Given that your Step 1 score is already low, and

17  the matching, the residency programs consider that, what good

18  is Step 2 possibly going to be able to do for you?  What is so

19  important about Step 2 for you?

20  A.   Step 2 is they look at mainly three things.  They look at

21  your Step 1 score, your Step 2 score, and your application

22  other than that, meaning your grades and some of your letters

23  of recommendation.  So this is kind of my -- the tie-breaker to

24  show that Step 1 isn't an accurate representation of my skill

25  level because it doesn't -- it is not congruent with my other

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1  factors on my application.

2  **Q.**   Okay.  To state it simply, you need to get the highest

3  possible score that you can get on Step 2 based on the

4  knowledge you have?

5  **A.**   Yes.

6  **Q.**   Let's talk about your application for Step 2.  When did

7  you -- well, given your core schedule, et cetera, when was the

8  optimal time for you to take Step 2?

9  **A.**   July of this year.

10  **Q.**   And why July?  What's the date crunch for July?

11  **A.**   Because my Step 1 score is so poor, my application is not

12  competitive at all for any interviews in residency without my

13  Step 2 score being a part of it.  Therefore, I need it to make

14  sure I have my Step 2 score for my residency application, which

15  is due on September 15th.  Scores take approximately four to

16  six weeks to be returned once you take the exam.

17  **Q.**   And explain the importance of September 15th.  Why is that

18  so important?  And how the matching process works.

19  **A.**   So the residency matching program is this elaborate

20  program that starts with the electronic residency application

21  service, which is known as ERAS, where all students submit

22  their applications and put all of their things into a computer

23  program.

24        On September 15th is the first day that those begin

25  to be released to residency programs to evaluate and for them

MEAGHAN DOHERTY - DIRECT

1  to make their decisions on who they're going to invite for an
2  interview.
3  **Q.**   And all of the ones, all the students whose scores get
4  there either on September 15th or before, how are they date
5  stamped for the process?
6  **A.**   Every one is date stamped at the same point on
7  September 15th.  After that, you become put at the bottom of
8  the pile, and it shows that you turned it in on September 16th
9  or going forward, so that it shows you turned it in late,
10  essentially.
11 **Q.**   When did you complete your -- first complete your
12 application to take the Step 2 exam?
13 **A.**   April 22nd, 2019.
14 **Q.**   And if you look at Exhibit 2, which is tab 6, which we've
15 already introduced into the record, but does that have the date
16 on the last page where you signed -- not where you signed, when
17 you completed it?  I'm sorry.
18 **A.**   Yes, it does.
19 **Q.**   And that's April the 22nd date; is that correct?
20 **A.**   Yes, it is.
21 **Q.**   Remind us the accommodations that you requested for this
22 test that's going to be next week?
23 **A.**   A time and a half, 1.5.
24 **Q.**   And you know the recommendations for the professionals and
25 the accommodation you requested for Tulane had time, but it

MEAGHAN DOHERTY - DIRECT

1  also had taking it in a separate room, et cetera?

2  **A.**   Yes.

3  **Q.**   As far as taking it in a second room -- or separate room,

4  do you need that for the Step 2?

5  **A.**   Based on my experience with the Step 1, you take it in

6  kind of a cubicle, so it's pretty much already very

7  "distractions have been eliminated" type scenario.  So taking

8  it in a separate room is not fatal.

9  **Q.**   So the only thing you really need is the time

10  accommodation?

11  **A.**   Yes.

12  **Q.**   And the time accommodation is consistent with the medical

13  professionals who examined you, their recommendations; is that

14  correct?

15  **A.**   Yes.

16  **Q.**   Exhibit 2 is the entire packet of what you submitted and

17  which had, as we mentioned before, all of the medical

18  professionals' evaluations; is that correct?

19  **A.**   It did.

20  **Q.**   The Brockman -- the recent Brockman evaluation, what

21  did -- and Dr. -- I call her doctor, Psychologist Brockman.

22  What did Dr. Brockman do to do that evaluation?

23  **A.**    The first evaluation -- or main evaluation was done in

24  March of 2017 over a two-day period where she administered

25  psychological evaluation tests to me, which she reported on in

MEAGHAN DOHERTY - DIRECT

1    her detailed report.

2    **Q.**   And you did take your Adderall while you were being

3    evaluated for that?

4    **A.**   I did.

5    **Q.**   What did Dr. Barbee do?

6    **A.**   Dr. Barbee initially evaluated me between my junior and

7    senior year of college and confirmed the diagnosis of ADHD, and

8    then gave me the additional diagnosis of generalized anxiety,

9    and began treatment for both, and has seen me every three

10   months since that time.

11   **Q.**   Getting back to the application process, when did the

12   NBME, the National Board, get your application for

13   accommodations?

14   **A.**   Although I sent it in on April 22nd, there was a limit to,

15   apparently, the e-mail size that their servers can receive,

16   which is not listed on the documentation, but it's listed on

17   their Web site that I did not see.  So I was out of the country

18   during that time and did not realize that it did not go

19   through.

20        So when I came back and called them, that was

21   revealed to me.  So I resubmitted it at the beginning of May,

22   and they received it, and acknowledged receiving it, and asked

23   for clarification of something.

24   **Q.**   So did they immediately give you a response on the request

25   for accommodation?

MEAGHAN DOHERTY - DIRECT

1   **A.**   No, they did not.

2   **Q.**   As time passed, what did you do?

3   **A.**   By mid to late June, I called them to see if a decision

4   had been made based on the fact that my -- when I received my

5   denial letter for Step 1, the letter was dated six days before

6   they contacted me.  So I figured I would at least call and see

7   if a decision had been made even though I hadn't been notified,

8   and I was told that no decision had been made, and that it was

9   going to take longer than I anticipated, and that -- and I

10  asked them to make note on my file that I had called, as well

11  as that I was hoping to take the exam at the end of July -- by

12  the end of July.

13  **Q.**   And do you remember when you actually got an answer on

14  your request for accommodations?

15  **A.**   Yes.  It was July 16th is when I was notified of the

16  decision.  I was notified on July 15th that a decision had been

17  made, but they did not tell me what the decision was.

18  **Q.**   And if you look at Exhibit 13, which is tab 17, Record

19  Document 1-6.  Can you tell us what that is?

20  **A.**   Yes.  This is a copy of the e-mails that I received from

21  the NBME.  The first one was notifying me that a decision had

22  been made and asked me to clarify my eligibility period, which

23  is just when you sign up to take the exam, they make you choose

24  a three-month section of time that you want to take it.  And so

25  they were clarifying that, although I had specified that I

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1    wanted to take it July through September.

2          Then on -- the next few pages shows each of the times

3    I was e-mailed by them, when I was alerted to the decision, and

4    what the decision was, was on July 16th.

5          MR. McGOEY:  Your Honor, I would offer and introduce

6    into evidence Exhibit 13, which is Record Document 1-6.

7          MR. BURGOYNE:  Clarification, my 1-6 is one of the

8    evaluations.

9          MR. McGOEY:  Hmm.  Oh, I'm sorry.  If you look --

10   yeah.  1-6, if you look at -- Exhibit 13 begins at page 19 of

11   52.

12         MR. BURGOYNE:  I gotcha.

13         MS. OLIVIER:  It goes through 27, Billy.

14         MR. McGOEY:  Yeah.  It goes all the way through page

15   27 of 52.

16         MR. BURGOYNE:  No objection.

17         THE COURT:  It's admitted.

18   BY MR. McGOEY:

19   Q.   So it wasn't until July --

20   A.   16th.

21   Q.   -- 16th that you knew that you were rejected?

22   A.   Yes.

23   Q.   Could you schedule -- once you got the rejection, was that

24   the first time that you could then actually try and schedule

25   the test?

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1   **A.**   No.  I still did not have a scheduling permit.

2   **Q.**   Okay.  And before I forget, if we look at Exhibit 1, which

3   is tab 5, Record 1-4.  Can you tell us what that is?

4   **A.**   Yes.  This is the letter that I received on

5   July 16th stating that I had been denied accommodations.

6   **Q.**   Okay.  And that came from the National Board of Medical

7   Examiners; correct?

8   **A.**   Yes.

9   **Q.**   Okay.  So once you got the rejection, you couldn't

10  immediately schedule.  What did you have to get to be able to

11  schedule the test as soon as possible?

12  **A.**   I had to get another e-mail that had a code on my

13  scheduling permit, that code being necessary to actually go

14  onto the Web site of the company that proctors the exam to

15  reserve a test date.

16  **Q.**   And when did you actually get the permit for that?

17  **A.**   I got that on July 18th, Thursday.

18  **Q.**   Okay.  And if you look at Exhibit 13, which is tab 17,

19  Record Document 1-6, if you look at page 23.

20  **A.**   Yes.  That is the e-mail notifying me that my scheduling

21  permit was available.

22  **Q.**   And that's July 18th?

23  **A.**   Yes.

24  **Q.**   So at that point, you got the scheduling permit, but you

25  don't have the date yet; correct?

MEAGHAN DOHERTY - DIRECT

1  **A.**   Right.

2  **Q.**   So then you send that in?

3  **A.**   So -- no.  Then I took the code that was on the document

4  that they sent along with this e-mail and went onto the Web

5  site for the company that administers the -- proctors the exam

6  to see what availability I could get.

7  **Q.**   What was the first available date?

8  **A.**   The first available date was August 6th.

9  **Q.**   And that's within 300 miles of New Orleans; is that

10  correct?

11  **A.**   Yes.  I checked Mobile, I checked Alexandria, I checked

12  Baton Rouge, Lake Charles, and Houston.  And it just so

13  happened the soonest one available was in New Orleans.

14  **Q.**   And you mentioned that your ideal date would have been

15  July?

16  **A.**   Yes.

17  **Q.**   But what does August 6th allow?  What's the importance of

18  the test actually being next week?

19  **A.**   Based on a bulletin that was posted by the NBME in March,

20  there is -- I had a hard deadline in my mind, and based on the

21  bulletin, of August 8th to be able to get my score in time for

22  the residency application due September 15th.

23  **Q.**   If you look -- if you turn to tab 28, Exhibit 24, can you

24  tell us what that is?

25  **A.**   Yes.  This is the bulletin that was posted and is listed

MEAGHAN DOHERTY - DIRECT

1   on the NBME's Web site saying that there would be a delay in
2   score reporting during the summer, saying that any exams taken
3   between approximately June 24th and August 8th would have their
4   scores by August 28th.  That would, therefore, give me enough
5   time to have my scores for my application on September 15th.
6   **Q.**   Okay.
7           **MR. McGOEY:**  Your Honor, I'd offer and introduce into
8   evidence Exhibit 24.
9           **MR. BURGOYNE:**  No objection.
10          **THE COURT:**  It's admitted.
11  **BY MR. McGOEY:**
12  **Q.**   I want to talk briefly about the specific reading issues.
13  So if you could turn to Exhibit 2, tab 6.  That's Record
14  Document 1-4.  That's the request for accommodation packet.
15  And if you go to page 34 and 35.  Yes, if we turn to page 34,
16  about -- and this is part of Dr. Brockman's report; is that
17  correct?
18  **A.**   Yes.
19  **Q.**   And if you look down to the third full paragraph on -- it
20  notes:  "On the measure of her sight vocabulary, Meaghan's
21  reading speed was slower than 90 percent of the students her
22  age and her decoding speed was slower than 75 percent of the
23  students her age."
24          Then it goes on to say:  "On the timed Nelson-Denny
25  subtest, Meaghan's reading speed fell in the borderline of slow

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1   learner range at the 6th percentile."

2            How does that diagnoses, briefly, because we've

3   talked about it, impact the Step 2 test?

4   **A.**   I'm not able to read all of the information to even

5   evaluate and accurately answer a question in the amount of time

6   that's provided.

7            **MR. McGOEY:**  Excuse me for the delay, Your Honor.

8   I'm checking off stuff she's already covered.

9   **BY MR. McGOEY:**

10  **Q.**   You mentioned how the importance of September 15th,

11  because that's that first date that all the student scores are

12  going to be uploaded.

13  **A.**   Yes.

14  **Q.**   Once the scores are uploaded, what happens next for the

15  students to be able to, hopefully, get a match on a residency

16  program?

17  **A.**   So what happens next is that the applications are sent to

18  residency programs.  They receive a lot of them.  And what they

19  typically do, although they do not publicize the minimum cutoff

20  for all of the programs, they use Step 1 as a filter mechanism

21  to automatically filter out applications to then narrow it down

22  to even consider interviews, people who they might interview.

23            This is all taking place in the first two weeks or so

24  right after those applications go out because interviews begin

25  in October and go through January.

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1   **Q.**   To get into the residency program, you got to get an
2   invite to interview; correct?
3   **A.**   You have to interview, yes.
4   **Q.**   And describe the interview process and when those invites
5   go out about what medical students have to do.
6   **A.**   So when those interview invitations go out, they actually
7   invite more people than they have spots for.  So you are --
8   every medical -- fourth year medical student will have their
9   phone in their hands at all times possible, constantly checking
10  your e-mail because you have to immediately respond and try and
11  reserve a spot because they are -- they get filled very
12  quickly.  So the further you are in that process, the less
13  interview opportunities there are even open.
14  **Q.**   So that's one of the reasons why you want to get your
15  scores in before September 15th?
16  **A.**   Yes, because delaying it would be extremely detrimental to
17  my application.
18  **Q.**   If we look at Exhibit 1, tab 5, Record Document 1-4, which
19  we've already looked at, but that's the rejection letter of
20  your request for accommodation for this Step 2 test?
21  **A.**   Yes.
22  **Q.**   This is the letter that rejects you and then gives the
23  National Board's explanation; is that correct?
24  **A.**   It is.
25  **Q.**   And if we look at page -- do you disagree with some of

MEAGHAN DOHERTY - DIRECT

1  their reasoning?

2  **A.**  Yes.

3  **Q.**  If we look at page 2, the third to last paragraph, there's

4  a reference to the fact that they rejected your accommodation

5  because you didn't need an accommodation for MCAT, and you

6  scored better than 88 percent of a highly select sample of

7  medical school applicants.  Why do you disagree with that as a

8  rationale for denying your accommodation?

9  **A.**  Anyone can take the MCAT.  There is no qualifications that

10  have to be met.  You can take the MCAT many times.  This is a

11  very -- there are a lot of people who take the MCAT and never

12  go to medical school.  So to say it's a highly select group is

13  inaccurate.  As well as comparing it to the USMLE Step 1 or

14  Step 2 is also inaccurate because those people have been

15  successfully admitted to medical school and have successfully

16  completed the course work required to take those exams.  It's a

17  very different population of people.

18  **Q.**  What about the testing format?  And we've covered it, so I

19  don't want you to go -- but the testing format, why do you

20  disagree with this saying that MCAT is a barometer and that you

21  don't need an accommodation for the Step tests?

22  **A.**  On the MCAT, the questions were much shorter, as well as

23  there were occasional times where there were a passage of sorts

24  that were about two paragraphs long.  You would then answer six

25  to seven questions for that two paragraphs.  So it's like three

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1  questions per -- I mean, three sentences per question as

2  opposed to approximately ten sentences per question on the Step

3  1 and Step 2.  And for that one, it's the same or more amount

4  of time on the MCAT.

5  **Q.**   Part of the MCAT test, is there a math section?

6  **A.**   Yes.  Math makes up -- or it used to make up about

7  approximately 25 percent of the MCAT.

8  **Q.**   And is your reading impairment implicated by the math

9  questions that are on MCAT?

10 **A.**   No, it is not.

11 **Q.**   There's also in that same paragraph as a rationale for

12 denying you an accommodation for Step 2, there's a statement:

13 "Our records show that you successfully completed the USMLE

14 Step 1 under standard test conditions without accommodations."

15 **A.**   Uh-huh.

16 **Q.**   Do you disagree with that?

17 **A.**   Yes.  I don't think there are many people in the medical

18 profession that would say that I successfully completed that

19 exam.  That was not a successful score.  I may have passed, but

20 that was barely, and that is not a successful score to get

21 anywhere with, as well as I was only six points above the

22 failure cutoff, and well below the range of the majority of

23 people that take this exam.

24 **Q.**   So for your score compared when we were looking at those

25 graphs indicate that you virtually have a very slim chance to

MEAGHAN DOHERTY - DIRECT

1   get into any residency program?

2   A.   Yes.  You can't -- and one thing with step Step 1, or any

3   of the Steps, you cannot retake the exam if you pass.  My score

4   is considered a score that people would say, "I wish I had just

5   failed," so that they could at least retake it and demonstrate

6   that you can improve your score.  But since I passed, I am not

7   eligible to retake it.

8   Q.   Essentially, why is it that you are requesting, and why do

9   you feel that you are entitled to the accommodation of the

10  50 percent extended time?

11  A.   I have a disability that impairs my reading rate, and I

12  think I've demonstrated that there is a vast difference in my

13  performance, and I really just want to be able to show on this

14  test the knowledge that I have.  I'm not asking anyone to give

15  me the correct answers.  I just want to be able to demonstrate

16  the knowledge that I've worked hard to gain over the past three

17  years for my career.  This isn't getting into a school or

18  something.  This is determining my career outlook for the rest

19  of my life.

20          MR. McGOEY:  Your Honor, I'm going to go through --

21  I'm going to go through the exhibits to make sure I have them.

22  BY MR. McGOEY:

23  Q.   And, Meaghan, I'd like you to follow along in case you

24  have to explain one that we haven't talked about yet.

25          So tab 5 was Exhibit 1.  We've covered tab 6 is

MEAGHAN DOHERTY - DIRECT

1   Exhibit 2.  That's been introduced.  Exhibit 3 at tab 7 is
2   introduced.  Exhibit 8.
3           Meaghan, can you tell us what Exhibit 8 is -- I'm
4   sorry, Exhibit 4 at tab 8, can you tell us what that is?
5   **A.**  Yes.  This was the original denial of accommodations
6   letter sent to me.  I received the letter on February 20th of
7   2018.
8   **Q.**  And this is the Step 1 rejection; is that correct?
9   **A.**  Yes.
10          **MR. McGOEY:**  Your Honor, I'd offer and introduce into
11  evidence Exhibit 4.
12          **MR. BURGOYNE:**  No objection.
13          **THE COURT:**  It's admitted.
14  BY MR. McGOEY:
15  **Q.**  Tab 9 is Exhibit 5, we've introduced.  Exhibit 6 is tab
16  10.  Ms. Doherty, can you explain to us what this is?
17  **A.**  Yes.  This is the original personal statement that I
18  submitted with my Step 1 application for accommodations.
19  **Q.**  And it lists your disabilities in that; is that correct?
20  **A.**  It does.
21          **MR. McGOEY:**  Your Honor, I'd offer and introduce into
22  evidence Exhibit 6.
23          **MR. BURGOYNE:**  No objection.
24          **THE COURT:**  It's admitted.
25

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1  BY MR. McGOEY:

2  **Q.**   Tab 11, this is the Tulane certification, Exhibit 7.  That

3  has already been introduced.

4        **MR. McGOEY:**  Exhibit 8, Your Honor, just to make

5  sure, I'm going to go on and offer and introduce this.  This is

6  the Barbee report that was also in Exhibit 2.  So I would offer

7  and introduce into evidence Exhibit 8.

8        **MR. BURGOYNE:**  I don't object, Your Honor.  If it's

9  already in as part of 2, I don't see the need for it, but I

10  don't object to having it in again.

11        **THE COURT:**  It's admitted.

12  BY MR. McGOEY:

13  **Q.**   I'm going to skip Exhibit 9 because -- well, let's just do

14  it just to make sure.  Exhibit 9, Ms. Doherty, is this

15  Dr. Brockman's evaluation which was done in March of 2017?

16  **A.**   It is, as well as her addendum for April of 2019, which

17  was also included in my application for Step 2 accommodations.

18        **MR. McGOEY:**  And so I would offer and introduce into

19  evidence Exhibit 9.

20        **MR. BURGOYNE:**  No objection.

21        **MR. McGOEY:**  Exhibit 10 is tab 14.  This is the

22  Sister Ducey report from back in grammar school.  Your Honor, I

23  would offer and introduce Exhibit 10.

24        **MR. BURGOYNE:**  No objection.

25        **THE COURT:**  It's admitted.

MEAGHAN DOHERTY - DIRECT

1          **MR. McGOEY:**  Your Honor, I would offer and introduce
2     Exhibit 11, which is the report from grammar school from
3     Ms. Nagim.
4          **MR. BURGOYNE:**  No objection.
5          **THE COURT:**  It's admitted.
6          **MR. McGOEY:**  Give me a second, Your Honor.
7               If you look at Exhibit 13, that is the e-mails
8     regarding the Step denials.  This is already in, Your Honor.  I
9     won't be introducing that.
10    **BY MR. McGOEY:**
11    **Q.**   If we turn to tab 19, this is something we haven't talked
12    about yet, Meaghan.
13         **MR. McGOEY:**  This is -- for Mr. Burgoyne, this is
14    Record Document 1-7.
15    **BY MR. McGOEY:**
16    **Q.**   Can you tell us briefly what Exhibit 15 is?
17    **A.**   Yes.  These are copies of the evaluations completed by the
18    attending physicians, faculty physicians that I worked with as
19    part of my third clear and my clerkships.  This is part of the
20    grading system at Tulane.  At the end of each rotation, which
21    is a month to two months, they are completed by the physicians
22    that you worked with, and all students have these completed.
23    **Q.**   And so what -- in general, we're not going to specifically
24    go through all of them, but what is your -- what did they
25    evaluate you as far as exceeds expectations, meets

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1  expectations, or does not meet?

2  **A.**   In general, I had many exceeds and some meets.  I had no

3  do not -- does not meet expectations.

4  **Q.**   And are these clerk things, these are the -- when you went

5  to the various departments, et cetera, and they correspond with

6  also the written testing in those sections; is that correct?

7  **A.**   Yes.

8  **Q.**   So you get written tests, but then you also get these

9  evaluations?

10  **A.**   Yes.  So this is your evaluation of your performance,

11  actually interacting with patients, discussing cases with

12  physicians, as well as your performance in the hospital doing

13  things.

14          **MR. McGOEY:**  Your Honor, I would offer and introduce

15  into evidence Exhibit 15.

16          **MR. BURGOYNE:**  No objection.

17          **THE COURT:**  It's admitted.

18  BY MR. McGOEY:

19  **Q.**   Meaghan, we haven't talked about this one, Exhibit 16 at

20  tab 20.  Briefly tell us what this is.

21  **A.**   These are similar evaluations, slightly different

22  questions, that are completed by the residents that we work

23  under on our third year.  Under -- working below each attending

24  physician are also the residents that are completing their

25  residency programs that are kind of in charge of the medical

MEAGHAN DOHERTY - DIRECT

1  students.  These are not completed by interns.  These are all
2  by doctors that are fully licensed and have completed at least
3  one year of medical training outside of medical school.
4        MR. McGOEY:  Your Honor, I would offer and introduce
5  into evidence Exhibit 16.
6        MR. BURGOYNE:  No objection.
7        THE COURT:  It's admitted.
8  BY MR. McGOEY:
9  Q.  The next document, Your Honor, and, Meaghan, is in tab 21.
10  It's Exhibit 17, Record Document 1-8.  It's the Bulletin of
11  Information 2019 for the National Board of Medical Examiners.
12  A.  Yes.
13  Q.  Ms. Doherty, is this the publication from the National
14  Board that describes the things that you've testified to about
15  the length of questioning, et cetera, on Step 2?
16  A.  Yes.  This is the document that medical students use to
17  know what the testing environment will be like during this exam
18  and what they should expect to be tested on.
19  Q.  So when you were testifying about the 90 seconds and how
20  you go from one step to the other, that's all contained in
21  here?
22  A.  Yes.
23        MR. McGOEY:  Your Honor, I would offer and introduce
24  into evidence Exhibit 17.
25        MR. BURGOYNE:  No objection.

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1           **THE COURT:**  It's admitted.

2  **BY MR. McGOEY:**

3  **Q.**   The next tab is the Tulane handbook, Exhibit 18.  We've

4  already introduced.

5           The same, Exhibit 19.

6           **MR. McGOEY:**  Oh, just to make sure, I'm not sure we

7  did this, Your Honor.

8  **BY MR. McGOEY:**

9  **Q.**   Tab 23, Exhibit 19, Ms. Doherty, can you tell us what that

10  is?

11  **A.**   Yes.  This is from the national residency matching

12  program, which is the program that does the whole match.  This

13  is their match calendar that they list on their Web site.

14  You'll see it -- it says that September 15th is the

15  registration opens.  That's when you can -- that's when they

16  begin to be sent to programs.

17  **Q.**   And actually the end of the process is much later; is that

18  correct?

19  **A.**   Yes.  This process does not end until match day, which is

20  in March of 2020.

21           **MR. McGOEY:**  Your Honor, I'd offer and introduce into

22  evidence Exhibit 19.

23           **MR. BURGOYNE:**  No objection.

24           **THE COURT:**  It's admitted.

25

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1  BY MR. McGOEY:

2  Q.   Exhibit 20, which is Record Document 1-8.  It's entitled

3  "ERAS Timeline."  Is this the document that backs up what you

4  testified to about when ERAS uploads the students' residency

5  applications?

6  A.   Yes.  Page 39 under here shows how the ERAS application

7  service opens in June of 2019.  So at this point, I've already

8  been able to put in information to my application.  Starting on

9  September 5th, you can click "Submit" and say, I'm done, and I

10 don't want to work on my application anymore.  But it don't

11 matter until September 15th because that is the day they send

12 them to the residency programs.

13         MR. McGOEY:  Your Honor, Exhibit 21.

14 BY MR. McGOEY:

15 Q.   Ms. Doherty, this is --

16         MR. BURGOYNE:  Are you offering -- I'm sorry.  Are

17 you offering Exhibit 20?

18         MR. McGOEY:  Oh, I'm sorry.  Hang on for a second.

19 Yes.  I'm offering and introducing into evidence Exhibit 20.

20         MR. BURGOYNE:  Okay.  Your Honor, that may be the

21 only one I have an objection to.  I think it -- it doesn't

22 appear to be from the Association of American Medical Colleges,

23 which is the entity that operates the ERAS program.  It looks

24 to me like some kind of test prep Web page.  And I don't know

25 whether the -- if that's so, I don't know whether the

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

 1    information it provides is accurate or not.  So I would object
 2    to that one.
 3           **MR. McGOEY:**  Let me try and establish that, and then
 4    the Court can rule if it's not satisfied.
 5           **THE COURT:**  Sure.
 6           **MR. BURGOYNE:**  Okay.
 7    BY MR. McGOEY:
 8    **Q.**   Ms. Doherty, Exhibit 20, where is this information taken
 9    out of, this exhibit?
10    **A.**   This information comes from a Web site online, and the
11    information matches with what I've been told by Tulane
12    University in PowerPoints and lectures, as well as what is --
13    the notifications that have been sent to me via e-mail.
14    **Q.**   Is this Web site one of the ones that traditionally med
15    students look at to get information about how to deal with the
16    match process?
17    **A.**   It's one of the variety of ones, yes.
18           **MR. McGOEY:**  Your Honor, I believe that's enough to
19    have the exhibit admitted.
20           **MR. BURGOYNE:**  Same objection, Your Honor.  I don't
21    think that gets it across the line.
22           **THE COURT:**  I'll allow it to be admitted.
23    BY MR. McGOEY:
24    **Q.**   The next exhibit is --
25           **MR. McGOEY:**  And we're almost finished, Your Honor.

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - DIRECT

1  BY MR. McGOEY:
2  Q.    -- Exhibit 21.  This is the ranking applicants -- it's --
3          MR. McGOEY:  Oh, sorry, Mr. Burgoyne.  This is
4  Document 1-8.  It comes from www.nrmp.org.
5  BY MR. McGOEY:
6  Q.    Where does this come from, Meaghan?
7  A.    This comes from the National Resident Matching Program.
8  This is the same Web site.  These are the instructions for
9  residency programs on how to rank applicants and submit the
10  list of that rank order.  So this is for the program directors
11  that are completing that.
12          MR. McGOEY:  Your Honor, I'd offer and introduce into
13  evidence Exhibit 21.
14          MR. BURGOYNE:  No objection.
15          THE COURT:  It's admitted.
16  BY MR. McGOEY:
17  Q.    Exhibit 22, we've already admitted.
18          I believe we've admitted Exhibit 23, but just to make
19  sure, Meaghan, tell us what Exhibit 23 is.
20  A.    This is from the USMLE's Web site, which describes how to
21  interpret your score and your transcript.  It also lists the
22  passing scores for Step 1, Step 2 CK, and Step 3.
23  Q.    And Step 2, the score you're going to need to pass next
24  week is 209; is that what's reflected on here?
25  A.    Yes.

MEAGHAN DOHERTY - DIRECT

1      **MR. McGOEY:**  Your Honor, I'd offer and introduce into
2  evidence Exhibit 23.

3      **MR. BURGOYNE:**  No objection.

4      **MR. McGOEY:**  We've introduced Exhibit 24 already.  As
5  also we've introduced Exhibit 26.

6              So, Your Honor, that concludes -- give me one
7  second, Your Honor.

8              Your Honor, if Exhibit 12, which is Record
9  Document 1-6 -- Mr. Burgoyne, this is the settlement agreement
10  between the USA and the National Board of Medical Examiners.
11  Your Honor, I'd offer and introduce into evidence Exhibit 12.

12      **MR. BURGOYNE:**  No objection.  Are you including the
13  press releases with it?

14      **MR. McGOEY:**  Yes.  It's actually -- and just so
15  you -- so I give you the exact, it's Document 1-6, page 11 of
16  52 through -- I'm sorry, page 18 of 52.

17      **MR. BURGOYNE:**  No objection.

18      **THE COURT:**  It's admitted.

19      **MR. McGOEY:**  Your Honor, that concludes the exhibits
20  to be introduced as part of the hearing.  If you would like
21  argument.

22      **THE COURT:**  Does Mr. Burgoyne have any questions?

23      **MR. BURGOYNE:**  I was going to say, Your Honor, I got
24  kind of shut out there for a minute.

25      **MR. McGOEY:**  I'm rolling a little too fast.

MEAGHAN DOHERTY - CROSS

1          **THE COURT:**  I've been away from this for a while, but
2    I thought that was part of the process, to let the other side
3    ask questions.
4          **MR. McGOEY:**  I did that last week.
5          **MR. BURGOYNE:**  Your Honor, I'm happy to proceed now.
6    I don't know if the witness would like a short break.
7          **THE WITNESS:**  We can go.
8          **THE COURT:**  She's ready.
9          **MR. BURGOYNE:**  All right.  Well, we'll plug on then.
10   Great.  I apologize.
11                       **CROSS-EXAMINATION**
12   BY MR. BURGOYNE:
13   **Q.**  Meaghan, I think you said you had a 3.75 GPA in high
14   school?
15   **A.**  Yes, that was on not a 4.0 scale and not a 5.0 scale.
16   It's a very strange Franklin individualized scale where the max
17   is approximately like a 4.5.
18   **Q.**  Do you know what your class rank was?
19   **A.**  I was -- they don't rank us outside of the top 10 because
20   it's such a highly competitive school, and I was not in the top
21   10, and I was not in National Honor Society.  I did not meet
22   the requirement for that.
23   **Q.**  Okay.  And do you recall what your GPA was at the
24   University of Wisconsin?
25   **A.**  It was approximately the same.  It was about a 3.73 or...

MEAGHAN DOHERTY - CROSS

1    **Q.**    Okay.  And then your -- do you know what your either class
2    standing or grades are at medical school?
3    **A.**    I do not know what my class standing is, and that -- I
4    know that my first -- I have not failed a class.  I passed all
5    my first two years' classes.  And then my clerkships, I've
6    gotten three honors and a high pass and a couple of passes.
7    I'm not -- they have not given -- I am unaware of what my
8    actual GPA is because I don't know how they weight all of the
9    classes.  It's confusing.
10   **Q.**    Do you know what your GPA is in the medical sciences part
11   of the medical school program?
12   **A.**    No.
13   **Q.**    You'd agree, I take it, that ADHD and learning
14   disabilities are both lifelong impairments?
15   **A.**    Yes.
16   **Q.**    And I believe you allege in your papers that you were
17   diagnosed with both of those impairments at an early age?
18   **A.**    Yes.
19   **Q.**    And it's correct that you did not use any accommodation in
20   elementary school, middle school, high school, or college?
21   **A.**    I did not.  I did not use any in-class accommodations.
22   **Q.**    Did you get any -- do you recall being asked to identify
23   on your application for accommodations on these Step exams
24   whether you received accommodations in any of your educational
25   history?

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - CROSS

1   **A.**   Yes.

2   **Q.**   And do you recall that you didn't provide any information

3   there?

4   **A.**   Yes.

5   **Q.**   Okay.  So the only accommodation that I think you've

6   received as reported to NBME is the -- are the accommodations

7   you received on -- or you're receiving in medical school,

8   50 percent extra testing time?

9   **A.**   Yes.

10  **Q.**   Would you look -- make sure I get the right number here...

11          **THE COURT:**  I'm sorry, what --

12          **MR. McGOEY:**  Mr. Burgoyne, could you be a little bit

13  louder?

14          **MR. BURGOYNE:**  No, I'm just looking here, Your Honor.

15  I've got my notes, and then I've got just notes from her

16  testimony this morning.

17  **BY MR. BURGOYNE:**

18  **Q.**   I'm looking for ECF-1, which I think was part of your

19  package to the NBME which included your performance on the ACT

20  and the SAT and the MCAT.  Are those all in Exhibit 2?

21  **A.**   Yes.

22  **Q.**   Okay.  Could you look at that Exhibit 2 and then go to

23  page 51 for me?

24  **A.**   Yes.

25  **Q.**   Could you tell the Court what this document is?

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - CROSS

1  **A.**   It's my score report from the ACT.

2  **Q.**   And the ACT is a standardized test taken under time

3  limits?

4  **A.**   Yes.

5  **Q.**   And you scored a composite score of 32, which was in the

6  99th percentile of everybody who tested in the country; is that

7  correct?

8  **A.**   I did.

9  **Q.**   And your verbal score was -- your English score was also

10 in the 99th percentile?

11 **A.**   Yes.

12 **Q.**   And that means that you were in the top one percent of

13 everyone who took the ACT at that time; is that correct?

14 **A.**   For the English, yes.

15 **Q.**   Okay.  And your composite score as well; correct?

16 **A.**   Yes.

17 **Q.**   You were able to do that regardless of any functional

18 limits you might have been experiencing because of LD or ADHD

19 diagnoses?

20 **A.**   What's "LD"?

21 **Q.**   Learning disabilities.

22 **A.**   Oh, yes.  Yes.

23 **Q.**   All right.  Look at that same document at page 50, and is

24 this your score report for the SAT?

25 **A.**   Yes.

MEAGHAN DOHERTY - CROSS

1  **Q.**   And it's a little hard for me to read, but it looks like
2  your critical reading score was a 620?
3  **A.**   Yes.
4  **Q.**   Do you recall what percentile that was?
5  **A.**   No.
6  **Q.**   Well, would you agree that was a very good SAT score?
7  **A.**   To get into a competitive college, yes, but not to get
8  into an Ivy League or anything.  It wasn't groundbreaking.
9  **Q.**   Okay.
10 **A.**   I used my ACT scores not my SAT scores for college.
11 **Q.**   Okay.  I don't blame you.  Those were good scores.
12         Let's look at page 49.  This is your MCAT score
13 report?
14 **A.**   Yes.
15 **Q.**   And when you take the MCAT, it has several component
16 sections, and then you also -- so you get scored on that, and
17 then you also get a score -- an overall score; is that correct?
18 **A.**   Yes.  It's a composite score.
19 **Q.**   Okay.  And your composite score puts you in the 88th
20 percentile?
21 **A.**   According to the score report.
22 **Q.**   Okay.  Any reason we should be -- we should think the
23 score report is inaccurate?
24 **A.**   No.  No.  It's just this is the -- I took the MCAT before
25 it was changed.  It changed a few months after I took it, so

MEAGHAN DOHERTY - CROSS

1  the scoring system is completely different now.

2  **Q.**  Gotcha.  But for that year, the cohort of people you were

3  testing with, you scored in the 88th percentile?

4  **A.**  Yes.

5  **Q.**  Okay.  And then looking at the other sections, it looks

6  like your best score was on verbal reasoning; is that correct?

7  **A.**  Yes.

8  **Q.**  And in that section --

9  **A.**  It was the same -- it was the same score.  That was just

10  my best percentile ranking.

11  **Q.**  Gotcha.  That's exactly where I was going.  Thank you.

12      So your best percentile performance on that exam was

13  verbal reasoning?

14  **A.**  Yes, but that's an abnormal section.  That section has a

15  strange distribution.  You might notice that it says I scored

16  in the 95th percentile, but I only got an 11 out of 15 points

17  for that section.  That section is also purely you read a

18  paragraph or two, which is an English passage or a historical

19  passage, and it's reading comprehension with sentences that --

20  questions that are about a sentence long, and it's about six to

21  seven questions per two paragraphs.  So it's not a comparable

22  amount of reading to the NBME.

23  **Q.**  Right.  The vignettes in that part of the exam, they're

24  longer than the individual paragraphs than the Step exams,

25  aren't they?

MEAGHAN DOHERTY - CROSS

1  **A.**   No.

2  **Q.**   Well, the vignettes, focus on the vignette as opposed to

3  the questions that follow the vignette?

4  **A.**   Well, in the sense that one vignette would have more than

5  one question?  Are you talking -- are you saying the passages

6  are vignettes?

7  **Q.**   Well, I'm saying that each question -- each of the series

8  of MCAT questions in the verbal section starts with a vignette,

9  which is fairly lengthy, and then it's followed by a series of

10  individual questions; is that correct?

11  **A.**   I don't think the way that you're -- I don't understand

12  totally the way you're characterizing it.  It's not -- it

13  doesn't go with how I remember the exam being.

14          **MR. BURGOYNE:**   Okay.  Well, I'm not in court, Your

15  Honor, and I'm at a disadvantage here because of time

16  constraints so I can't put a sample MCAT in front of her.

17  **BY MR. BURGOYNE:**

18  **Q.**   But in all events, whatever that exam looked like, you

19  performed on the verbal reasoning section at the

20  95th percentile?

21  **A.**   Yes.

22  **Q.**   Correct?

23          Okay.  And then so the Court understands, like the

24  Step 2 CK exam, that is a computer-based examination; correct?

25  **A.**   It is a computer-based exam.

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - CROSS

1   **Q.**   And it's multiple choice?

2   **A.**   It is.

3   **Q.**   And it lasts, as I recall, approximately five hours?

4   **A.**   This one was -- I feel like it was about -- it might have

5   been about five hours.  I feel like it was more like four.  I

6   know it is approximately twice as long now.  I don't -- this

7   was like five or six years ago at this point.

8   **Q.**   Okay.  Do you recall finding a statement when you took --

9   one of the things you said that surprised me was that anyone

10  can take the MCAT.

11  **A.**   Yes.

12  **Q.**   I think that -- do you recall signing a statement when you

13  took the MCAT in which you verified your intention to apply to

14  a health profession school?

15  **A.**   No.

16  **Q.**   Okay.  And are you aware that in order to be eligible to

17  take the MCAT, you have to be planning to attend a health

18  profession school?

19  **A.**   Yes, because there would be no point in taking the MCAT if

20  you were not intending to use the score for that purpose.

21  **Q.**   Okay.

22          **MR. BURGOYNE:**  Your Honor, I'll represent that

23  students do, in fact, sign such a statement, and it is, in

24  fact, a relatively -- a relatively competitive exam that are

25  taken by a big group of very high-performing students.

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - CROSS

1   BY MR. BURGOYNE:

2   **Q.**   Let's look at -- did you take AP classes in high school?

3   **A.**   I did.

4   **Q.**   And did you get AP credit that were -- that you were able

5   to use in college for credit?

6   **A.**   A few, but not a substantial amount.  I didn't -- I only

7   took a couple of the AP exams, and I scored a 3, which happened

8   to be enough to get some minor credits at University of

9   Wisconsin.

10  **Q.**   And you were not given any accommodations on the AP exam?

11  **A.**   I was not.

12  **Q.**   Okay.  And you took the SAT without any accommodations?

13  **A.**   Yes.

14  **Q.**   And you took the ACT without any accommodations?

15  **A.**   Yes.

16  **Q.**   And all those exams are standardized exams with time

17  limits?

18  **A.**   They are.

19  **Q.**   Switch gears here to the evaluations that you received.

20  When you submitted your request to the National Board of

21  Medical Examiners, did you rely on all the evaluations or just

22  the Brockman evaluation?

23  **A.**   I submitted all of the evaluations.

24  **Q.**   Okay.  Do you recall whether in this court case you're

25  relying just on the Brockman evaluation, or are you relying

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - CROSS

1    here on all of the evaluations?
2           MR. McGOEY:  Your Honor, that would be a question for
3    me, and it would be all of the evaluations.
4           MR. BURGOYNE:  Okay.  Thank you.
5    BY MR. BURGOYNE:
6    Q.   Look at Exhibit 10.
7           MR. McGOEY:  That would be tab 14 in the bench books.
8    BY MR. BURGOYNE:
9    Q.   I believe this is the Ducey evaluation; is that correct?
10   A.   Yes.
11   Q.   And look, if you would, at the page that has -- starting
12   on page -- at the top I think it's 54, if I'm looking at the
13   right one.
14          And if it's the right page, it should -- it should be
15   the page that is beginning to report your performance on the
16   various assessments that were administered to you.  Do you see
17   that?
18   A.   Which page?
19   Q.   It's 1-4 with page 54 at the top.
20   A.   Oh, that is -- that's not the Sister Sarah Ducey
21   evaluation.
22   Q.   Which one is that?
23   A.   1-4?
24          MR. McGOEY:  1-4 is in Exhibit 2.
25          THE WITNESS:  Okay.  Yes.

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - CROSS

1          **THE COURT:**  Which tab is that?

2          **THE WITNESS:**  That's under tab 6, which is the whole

3   application that I submitted to the NBME, and it is the section

4   of that application with Sister Sarah Ducey's evaluation in

5   part of it.

6   **BY MR. BURGOYNE:**

7   **Q.**   Okay.  Do you have the page that's page 56 at the top?  Or

8   54, I'm sorry, is when they start.

9   **A.**   Yes.

10  **Q.**   Okay.  And am I correct, these are the pages where she

11  provides information regarding your performance on the various

12  assessments that were administered to you?

13  **A.**   Yes.

14  **Q.**   Okay.  And on that first page, are there any assessments

15  on which you performed below average?

16  **A.**   I don't know what the -- the subset score tests, I don't

17  know how that would fit.  I only see the one on the top where

18  it describes where the scores align.

19  **Q.**   Okay.  For the scores on the top, the overall composite

20  scores, you'd agree with me that they range from "Average" to

21  "High Average" to "Very Superior"?

22  **A.**   Yes.

23  **Q.**   And those scores, as you understand it, are all based on

24  the subtest scores below?

25  **A.**   I believe so.

MEAGHAN DOHERTY - CROSS

1  **Q.**   And then the next page, a different series of tests, the

2  Woodcock-Johnson III tests were administered.  And would you

3  agree again that your performance on all of those assessments

4  ranged from "Average" to "High Average" to "Very Superior"?

5  **A.**   Yes.

6  **Q.**   Continuing in that same document, let's look at the other

7  evaluation, I believe it was at 11, which was the Nagim

8  evaluation.  And would you look at the page that is 67.

9  **A.**   Okay.

10 **Q.**   All right.  And would you agree that all of those

11 performance evaluations were -- ranged from "Average" to

12 "Superior"?

13 **A.**   Yes.

14 **Q.**   And then the Brockman report, if you find that one.  And

15 I'm looking -- the page I'm looking at has Document 1-4 and

16 starts at page 36.

17 **A.**   Yes.

18 **Q.**   You got that in front of you?

19        And for your -- the first one is your performance on

20 the WAIS-IV assessment.  And, again, as before, this composite

21 score, then a series of subtests scores on page 36; correct?

22 **A.**   Yes.

23 **Q.**   And would you agree that your performance on the WAIS-IV

24 reflected, at worst, "Average" and at best "Very Superior"

25 scores on all of the scales?

MEAGHAN DOHERTY - CROSS

1   **A.**   Yes.

2   **Q.**   And then the next page is the WIAT-III.  I'm not quite

3   sure what that stands for, but you got your subtest scores

4   there, and there's percentile ranks in the middle of the page?

5   **A.**   Yes.

6   **Q.**   And subtest -- and would you agree that all of your scores

7   there are "Average" to "Superior"?

8   **A.**   No.  It just says the percentile rank.  It doesn't say if

9   they're average.  Because, I mean, there's a 27.  I don't know

10  if that's average.

11  **Q.**   I'll represent to you my understanding, which is that

12  anything above 25 percentile would be average.

13  **A.**   Okay.  Then yes.

14  **Q.**   Okay.  And then same with the percentile ranks reflected

15  on the next page?  This one is a little more helpful because it

16  gives us the "Average" or "Above Average" designations.

17  **A.**   Yes.

18  **Q.**   And then, I think, the next page is a duplicate of the

19  WIAT scores.  The following page, it looks like this is page

20  40, and all of your scores on this assessment were in the

21  "Average" to "Superior" range?

22  **A.**   Yes.  Isn't that the duplicate?

23  **Q.**   I think there were a couple duplicates, and I just wasn't

24  really sure, but you may be right that that does duplicate

25  earlier pages.

MEAGHAN DOHERTY - CROSS

1  **A.**    Okay.

2  **Q.**    So let's look at 41, and this is the last one.  This has

3  your performance on the Wide Range Assessment of Memory and

4  Learning, Second Edition, with the exception of one score in

5  story memory that was "Average," all your scores were "High

6  Average"?

7  **A.**    For the wide range, yes.

8  **Q.**    Yes.  And then we get to the Nelson-Denny test, which I

9  think is one of the tests that you were asked about earlier?

10 **A.**    Yes.

11 **Q.**    Okay.  And this has you, looks like, in the "Average"

12 percentile range with the exception of that 6 on reading rate?

13 **A.**    Yes.  The scores other than the reading rate are in the

14 "Average" range.

15 **Q.**    Okay.  And that reading rate is a one-minute test; is that

16 correct?

17 **A.**    From what I can recall, yes.

18 **Q.**    Okay.  Basically, you read along, and then after a minute,

19 you're asked to stop reading?

20 **A.**    I think so.

21 **Q.**    Okay.  And with the exception of that single assessment,

22 it looks like all of your performance was "Average" to

23 "Superior" on the diagnostic assessments that you were given

24 over the years?

25 **A.**    Yes.

MEAGHAN DOHERTY - CROSS

1   **Q.**   Let me ask you a little bit -- a few questions here about
2   residency programs and the suggestion that you're going to face
3   irreparable harm if you can't test on August 8th.
4          So let's look at your ECF-1.  Let's start with the
5   match calendar.  Do you have that one?  I apologize, I'm not
6   seeing quickly what the exhibit number was.
7   **A.**   Yes.  It's Exhibit 19.
8   **Q.**   Exhibit 19.  Okay.  And I'm looking at that --
9          **MR. McGOEY:**  Your Honor, that would be tab 23.
10          **MR. BURGOYNE:**  Okay.  And it should have Document 1-8
11   on it.
12          **MR. McGOEY:**  Yes.
13   **BY MR. BURGOYNE:**
14   **Q.**   Okay.  All right.  Page 36.  So, first of all, if you
15   don't participate in this year's match, you can participate in
16   next year's match; correct?
17   **A.**   That would mean that I would have to pay another year of
18   tuition --
19   **Q.**   What happens --
20   **A.**   -- but, yes.
21   **Q.**   But yes.  When you're on a leave of absence, what is your
22   tuition if you're not taking courses?
23   **A.**   I'm not sure.
24   **Q.**   Okay.  So looking at the match calendar --
25   **A.**   But that would also delay my employment for a year and

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - CROSS

1  delay my training.

2  **Q.**   Okay.  So the Court understands how all this works,

3  basically, registration will open September 15th?

4  **A.**   By registration being open, that means that the

5  applicants' applications will begin being sent to the programs.

6  **Q.**   Right.  Okay.  And applicants have until November 30th to

7  submit applications?

8  **A.**   Technically, yes.

9  **Q.**   And then?

10  **A.**   On a rolling submission.  It's not --

11  **Q.**   Right.

12  **A.**   They look at them as they're going, and the invitations

13  for interviews begin going out at the beginning of October.

14  Those decisions are being made in September, who gets an

15  interview, and there are a limited number of interview spots.

16  **Q.**   And then ranking opens on January 15th?

17  **A.**   Yes.

18  **Q.**   Correct?

19        And then February 26th, it says you have to have your

20  rank order list certification deadline.  So is that the

21  deadline for students and programs to submit their rank order

22  list?

23  **A.**   Yes.  But in order to rank a program, you must have

24  interviewed at that program.

25  **Q.**   Would you explain to the Court what the scramble is or the

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - CROSS

1    SOAP program that's mentioned that starts on March 9th?
2    **A.**   Yes.  On March 9th, students are notified that they have
3    either matched or not matched.  Those people who have not
4    matched are eligible to participate in what's known as the
5    scramble, which is a complicated procedure that I am not
6    entirely clear on.  But as far as my understanding goes is that
7    schools that also have unmatched spots, because sometimes they
8    don't match people to fill all their spots, tell Tulane
9    which -- how many spots they have, and then Tulane kind of
10   helps -- the medical schools kind of help connect students.
11         And it's very complicated, and there are three
12   rounds, but students aren't allowed to contact schools.  It's
13   called the scramble because it's a mad dash for five days to
14   try and find spots for the people who did not match.
15   **Q.**   Okay.  Well, if you participate in the match this year and
16   you didn't match, you'd have the opportunity to participate in
17   the scramble in March 2020?
18   **A.**   Yes.
19   **Q.**   And when you're participating in the match -- or the
20   scramble component of that exercise, you would not have already
21   interviewed with those programs; is that correct?
22   **A.**   I believe that is the case.  You then have to try and go
23   to some programs and interview at them there.  I'm not totally
24   familiar with the process.
25   **Q.**   Okay.

MEAGHAN DOHERTY - CROSS

1   **A.**   It's not a process that anyone aims to be a part of.

2   **Q.**   I could imagine.  Let's look at the Tulane handbook.  I

3   believe that was Exhibit 18.

4   **A.**   Yes, it's Exhibit 18, tab 22.

5           **MR. McGOEY:**  Tab 22.

6   BY MR. BURGOYNE:

7   **Q.**   22.  Okay.  Great.  Would you look at the page that has

8   page 32 at the top?

9   **A.**   Yes.

10  **Q.**   And according to paragraph 5, "All senior students are

11  recommended to sit for USMLE Step 2 CS and Step 2 CK before

12  December 31st of their senior year"?

13  **A.**   Yes, that is Tulane's requirement.

14  **Q.**   Okay.  Yeah.  And their recommendation?

15  **A.**   Yes.

16  **Q.**   And then the next paragraph discusses the fact that

17  students can take leave of absence, it looks like, in order to

18  take and pass the Step 2 exams; is that correct?

19  **A.**   Yes.  But these leave of absences, once again, delay your

20  ability to train, as well -- when you're training, you're

21  getting paid.  It's a job -- and as well as, you then have to

22  explain that on any application to residency programs

23  afterwards.

24  **Q.**   Right.  And that --

25  **A.**   It's not confidential.

MEAGHAN DOHERTY - CROSS

1  **Q.**   Backing up to paragraph 3, it looks like Tulane wants you
2  to pass your Step 2 CK exam by April of your fourth year of
3  medical school; is that correct?
4  **A.**   Yes.
5  **Q.**   And that -- so that for you that means April of 2020?
6  **A.**   Yes, based on Tulane's requirement.
7  **Q.**   Okay.  And if you don't pass by April 2020, then it looks
8  like you have to take a mandatory leave of absence?
9  **A.**   Yes.
10 **Q.**   Okay.  And then under paragraph 6, it looks like if you,
11 from that point forward, April 2020, you've got another 24
12 months to pass the Step 2 CK exam?
13 **A.**   Yes.
14 **Q.**   I take it from the fact that students have -- Tulane
15 students have 24 months to take the Step 2 CK exam that there
16 are Tulane students who do not pass Step 2 CK in their senior
17 year?
18 **A.**   I am unaware of any students who have not passed Step 2
19 CK.  That 24 months also includes taking time for Step 1, as
20 well as any time in general.  24 months is the maximum amount
21 of time that anyone is allowed to take off while being enrolled
22 at Tulane.
23 **Q.**   So you're not aware of anybody who has not passed the
24 Step 2 CK exam in their senior year of medical school at
25 Tulane?

MEAGHAN DOHERTY - CROSS

1    **A.**    No one that I know personally.  I cannot testify to if
2    anyone at Tulane University has ever failed Step 2 CK in their
3    senior year.
4    **Q.**    Yeah.  Well, I assume if they hadn't, they wouldn't need
5    to rule.  In all events, am I correct that residency programs
6    are very competitive, including the residency programs that you
7    want to apply to?
8    **A.**    Yes.  All residency programs are very competitive.
9    **Q.**    And you'd agree, I take it, that if you get a position in
10   a given residency program, that means someone else who might
11   want to get that position is not going to be chosen?
12   **A.**    Yes, because only one person can have a single position.
13   **Q.**    You said based on your Step 1 CK score that your chances
14   of getting a residency position, I think the words you used
15   were pretty dismal?
16   **A.**    Yes.  If I were to submit my application to residency
17   programs by the September 15th deadline without my Step 2 CK
18   score, it would be highly unlikely that I would get any
19   interviews, other than the one that I am guaranteed by Tulane's
20   OBGYN program who interviews everyone from Tulane that is
21   interested in staying at Tulane.
22           And that is not a common feature in all departments
23   at Tulane, that just happens to be the policy of OBGYN's for
24   the approximately eight students per class that are going into
25   the field, and they want them to at least be able to interview

MEAGHAN DOHERTY - CROSS

1   there if they want to stay.

2   **Q.**   So you'll be able to interview there?

3   **A.**   That would be the only place I would likely be able to

4   interview if I submitted my application on September 15th

5   without my Step 2 CK score.

6   **Q.**   I can't recall if -- was that one of the residency

7   programs?  I saw a footnote somewhere to the effect that you

8   want to stay in New Orleans.  So is that one of the residency

9   programs you're interested in applying to?

10  **A.**   It is a residency program that I will apply to.

11  **Q.**   Bear with me here.  I'm still here.  I'm just looking

12  through my notes to see what else I needed to cover with you.

13          If you were to participate in next year's match

14  without -- rather than this year's match and simply delayed

15  taking the Step 2 CK exam, what information would residency

16  programs see beyond the fact that you didn't take the exam in

17  your fourth year of medical school?

18  **A.**   I would need to justify my leave of absence from school in

19  all of my residency applications; and in interviews, I will be

20  specifically asked about it, as I will already be asked about

21  my Step 1 score.

22  **Q.**   Are you aware whether students who take their Step 2 CK

23  exam after their fourth year of medical school get positions in

24  residency programs through the match?

25  **A.**   I have no idea.  I have not seen any data on that point.

MEAGHAN DOHERTY - REDIRECT

1   **Q.**   Is it your position, Meaghan, that your reading ability is
2   substantially worse than the general population?
3   **A.**   Yes.
4   **Q.**   And what is the -- what is the comparative group you'd
5   like the Court to compare your reading and learning abilities
6   to in evaluating whether or not you're disabled?
7            **MR. McGOEY:**   Objection, Your Honor, that calls for a
8   legal conclusion.
9            **THE COURT:**   Sustain the objection.
10           **MR. BURGOYNE:**   That's fine, Your Honor.  I withdraw
11   the question.
12               I'm just looking through my notes, Your Honor.
13   I may be done.  Bear with me here.
14               I have no further questions, Your Honor.
15           **THE COURT:**   Redirect?
16           **MR. McGOEY:**   Very brief.
17                      **REDIRECT EXAMINATION**
18   BY MR. McGOEY:
19   **Q.**   We talked about the MCAT differences in testing questions,
20   the reading functions versus Step 1, Step 2, but I didn't ask
21   you, how do you -- how would you compare the reading components
22   of SAT questions and ACT questions compared to the reading
23   components of Step 2 questions?
24   **A.**   They are not similar.
25   **Q.**   And why aren't they similar?

OFFICIAL TRANSCRIPT

MEAGHAN DOHERTY - REDIRECT

1  **A.**   They were similar to the MCAT in the sense that it would

2  be a passage that would be one paragraph to two paragraphs

3  long, maybe three, that would -- you would then answer six to

4  seven short questions about the comprehension of what you just

5  read, and the time was -- I believe was even probably greater

6  than what is allotted on Step 1.  So the amount of actual

7  reading, I have more time for the reading on those tests which

8  is why I didn't have a problem with them.

9        **MR. McGOEY:**  That's all I have, Your Honor.

10       **MR. BURGOYNE:**  Your Honor, I -- yeah.  I apologize,

11  Your Honor.  I see I overlooked one question, and I'm happy to

12  have redirect afterwards.  I apologize.

13       **THE COURT:**  No, I don't allow recross examination.

14  Sorry.

15            I just have a follow-up about the last aspect we

16  were speaking of, the difference between the -- the exhibit

17  which has an example of the Step question is a passage to be

18  read with one question to be asked.  Is that -- is that the way

19  that it --

20       **THE WITNESS:**  Every single question is a passage.

21       **THE COURT:**  As opposed to the MCAT or ACT/SAT which

22  has a passage with multiple questions?

23       **THE WITNESS:**  Yes.

24       **THE COURT:**  Okay.  Thank you.

25            Any other witnesses, Mr. McGoey?

OFFICIAL TRANSCRIPT

1          **MR. McGOEY:**  No, Your Honor.

2          **THE COURT:**  Any argument?

3          **MR. McGOEY:**  Yes, Your Honor.

4                Your Honor, we believe that Meaghan Doherty is

5     entitled to this preliminary injunctive relieve because she's

6     entitled, clearly, by the law of the Americans with

7     Disabilities Act to be accommodated.  And it's the express

8     language of the ADA itself.  Ms. Doherty has shown that she's a

9     person with a disability and that she has mental impairments

10    that substantially limit one or more of her major life

11    activities.

12                The ADA and the regulations that go along with

13    the ADA make it clear that emotional illnesses such as

14    dyslexia, learning disorders, and ADHD are mental impairments

15    covered by the ADA.  The student, in this instance, has to show

16    that the impairment has -- substantially limits one or more,

17    but can meet it by showing that it substantially limits one

18    major life activities.

19                Here we have the three diagnoses, first of which

20    is learning disorder with impairment in reading rate; ADHD,

21    which affects that as well; and then the generalized anxiety

22    disorder.  All of the medical evaluators who have examined

23    Ms. Doherty agree that she has a limitation on the major life

24    activities of learning, reading, and concentrating, and the

25    reading part is especially crucial here because of the long

OFFICIAL TRANSCRIPT

1    passages on the Step 2 that require quick reading to
2    demonstrate the knowledge that the student has.
3                    The time doesn't give them much -- you either
4    know it or you don't, but you've got to read all of those
5    factors in --
6           **THE COURT:**  Let me ask you this with the ADA
7    requirements:  Is it an objective standard or a subjective
8    standard?  In other words, either the medical requirements are
9    met or they're not met; is that correct?
10          **MR. McGOEY:**  You have to have the diagnosis, and you
11   have to be able to show that it does limit a major activity.
12   If you have a diagnosis --
13          **THE COURT:**  But there's no -- but there's no --
14   Mr. Burgoyne, you can respond to this as well.  Is there any
15   subjective aspect?  If you're bright, you wouldn't qualify for
16   an accommodation, but if you're not so bright, you do?  Or is
17   it just an objective standard where if you have the impairment
18   and it affects you in the appropriate manner, then you're
19   qualified for the accommodation?
20          **MR. McGOEY:**  I'll answer it, and, of course,
21   Mr. Burgoyne can answer it as well.  And one of the cases I
22   cite answers that question.  A brilliant person who has an
23   impairment that affects a major life activity is entitled to an
24   accommodation.  And I'll submit, I've got a brilliant -- I
25   mean, obviously, she went to Ben Franklin.  She's done well.

OFFICIAL TRANSCRIPT

1    The fact that she is really smart doesn't
2    disqualify her from being able to get an accommodation when she
3    has an impairment that substantially affects a major life
4    activity.  And here that impairment is the reading speed.
5    The experts found that she is in the 6th
6    percentile of reading speed, and in the report, quotes it to --
7    attributes it as a slow learner.  So even though Meaghan is
8    brilliant, and she's really smart, the problem is her
9    impairment, the ADHD, combined with the learning disorder,
10   reading with the dyslexic components that she has substantially
11   limits her ability to read, and it's really a problem here
12   because reading speed is crucial to demonstrating the knowledge
13   that she has on that test.
14   And I submit to you that we've proven that
15   that's actually what happens.  In the cases I've cited, the
16   courts talk about, does the test indicate the person's
17   disability or does it indicate their knowledge?
18   And we believe that because Meaghan has the --
19   at Tulane took the test with no accommodations, that those
20   tests that are very similar to the Step 2, in fact, are old
21   Step 2 questions, once she got the accommodation of extra time,
22   her scores went up 20 percent.  And before she did the
23   accommodation, when she had the practical tests, which were
24   testing her knowledge on the same material -- stuff as the Step
25   2 type test in med school, she had that 20 percent disparity.

1    But then when she gets the accommodation, time,

2  and not having the distractions of being in a big room, her

3  percentages go up 20 percent.  It's like exact proof that if

4  you don't give her the accommodation, what's going to result is

5  that the test is going to show her disability not the knowledge

6  she has.  And that's what the Americans with Disabilities is

7  all about, it's to give people with impairments that

8  substantially limit their major life activities an even playing

9  field.

10    It doesn't allow her not to know the stuff she's

11  supposed to know.  It just allows her to be able to take the

12  test in a way that she can show the knowledge she has.  And

13  that's what this case is all about, getting a reasonable

14  accommodation with someone who has an impairment that

15  substantially limits their major life activity of reading and

16  learning, especially reading.

17    One of the reasons the NBME rejected Meaghan is

18  because she -- is the idea that she didn't get these

19  accommodations in the other tests, but those tests don't have

20  the time crunch of the reading.

21    **THE COURT:**  Well, is there any lose-it-or-use-it

22  aspect to the law?  In other words, if you didn't seek an

23  accommodation at earlier points in your career that you're

24  somehow waiving or indicating that you don't need an

25  accommodation at a present point?

1           **MR. McGOEY:**  There's not any of that.  And part of

2    the purpose of some of the ADA regulations is for the people

3    who have impairments to overcome the stigmas.  And the fact

4    that a student is willing to achieve and work harder should not

5    be held against the student.  She was able to overcome all of

6    those things, but when she needed the extra time, it's the

7    Step 2 because it's that long testing format with the short

8    period of time.

9           So there's no law that says because you didn't

10    need it before, you don't need it now.  And I submit to you, I

11    guess I would have a problem if the testing --

12           **THE COURT:**  Well, let me phrase it, because you chose

13    not to seek one before, you're somehow prohibited from seeking

14    one now?

15           **MR. McGOEY:**  Exactly.  And, you know, one of the

16    things, she scored a 32 on the MCAT, which was enough for her

17    to get into Tulane and LSU's med schools.  What we don't

18    know -- and, obviously, the reading component wasn't as

19    impacted on the MCAT because you don't have the long question

20    with the answer and only 90 seconds.  If you got a long

21    question and you get to answer seven or eight, the time

22    differential changes.

23           It's like the 90 second -- I don't know how to

24    describe it, but it's a lot different.  Meaghan was explaining

25    it.  She had enough time to do the MCAT stuff, but that doesn't

OFFICIAL TRANSCRIPT

1   mean that she's not entitled to an accommodation for this test.

2   It can't be held against her that she didn't want the stigma,

3   and that those other tests didn't highlight her disability

4   because you didn't have the long passage on every question and

5   the time constraints involved.

6            So I believe the law is clear that she is

7   entitled to the accommodation.  And the courts have addressed

8   that issue in cases involving exams.

9            I want to talk about the -- oh, the other thing

10  is that she's asking for a reasonable accommodation.  Their own

11  applications suggest that for persons who are entitled to

12  accommodations, they can request a 25 percent extended time, a

13  50 percent extended time, or 100 percent.  She's only requested

14  the mid-level, the 50 percent, part of time.

15           The other thing I want to address, Your Honor,

16  and opposing counsel was alluding to this in cross-examination

17  is the irreparable injury, and what I have to meet to prove

18  that I'm entitled to this preliminary injunction.

19           One is substantial likelihood of success.  We

20  believe we've demonstrated that by the diagnoses, and the fact

21  that the learning disorder, reading, clearly shows up in the

22  testing results.  She can prove that when she gets the

23  accommodation of extra time, it dramatically increases her

24  scores.

25           Because it allows her to show the knowledge she

OFFICIAL TRANSCRIPT

1    has and not be limited because she doesn't have enough time to

2    read the passages.  In the *Bonnette* case, you know, there's

3    this idea that, "Oh, she could sit out a year and take it

4    later.  We don't have to have an injunction, maybe we could

5    litigate for a year."

6              Here's the problem with that, here's the

7    irreparable injury:  The *Bonnette* case, which was a bar exam

8    case, says, "Delaying somebody by another year" -- because they

9    made that argument, "Oh, let's just litigate it first.  You can

10   take the bar exam next year," in *Bonnette*, and the court said

11   that any delay in someone's ability to endeavor in their chosen

12   occupation is irreparable injury.  There's no, oh, we'll just

13   wait a year; it's an irreparable injury.

14             If she has sit out a year perhaps, she's got --

15   she doesn't get to get any -- you know, it delays when she's

16   actually going to earn money, student loans, et cetera.  That's

17   irreparable injury to say, oh, just come back in another year.

18   Not to mention the fact that it causes a further problem on her

19   match because then she's going to have to explain that way.

20   Under *Bonnette*, waiting until a further time to be able to

21   endeavor in your profession is irreparable injury.

22             The other thing we have to show is the threat of

23   injury outweighs the damage to the National Board.  There is no

24   damage to the National Board.

25             **THE COURT:**  Did she also mention in addition to not

1    being able to work for the year that there would be a tuition
2    cost also associated with the delay?
3             MR. McGOEY:  Oftentimes students who have to delay to
4    test more, they wind up taking more courses, or maybe you try
5    and get a fellowship to bolster your application, but that's an
6    additional cost.  Sitting out is a cost in and of itself
7    because you have to live.  You're not -- you know, while we're
8    in school, we don't make money, but the longer we take, that's
9    a financial cost to us.  So there's irreparable injury, A,
10   because it delays her; B, it makes it even harder for her to
11   get into the match.  So we believe she's met that clearly.
12            If she doesn't get her scores in, it will
13   drastically reduce the likelihood of her getting into residency
14   programs.
15            The other issue is, if she fails this test, she
16   may never be able to graduate, and she just barely got by
17   Step 1 by a couple of points.  We don't know what's going to
18   happen in Step 2.  But the fact -- the purposes of the ADA is
19   to allow her to demonstrate what she knows and not have tests
20   show what her disability is.
21            So we believe the irreparable injury is clear.
22   It could wind up causing her not to be able to graduate from
23   medical school, certainly causes a problem for her matching
24   abilities, and would then delay her, which is an obvious cost.
25            The threat of injury to her, we just discussed.

 1   The damage to the opposing party is there isn't really any.
 2   They have to give her extra time.  They're set up to do that.
 3   As part of the Americans with Disability Act, they can give
 4   tests with additional time.  So there's no damage to them.
 5              Then the last factor is that the granting of the
 6   injunction would not be adverse to the public interests.  And
 7   here the granting of the injunction serves the public interest
 8   because it effectuates the purposes of the ADA, and that's to
 9   allow persons with disabilities to demonstrate their actual
10   abilities and not the disabilities by testing.
11              So we believe we've clearly met the burdens of
12   requirement for injunctive relief.  One of the things, you
13   asked that question about, and I said a really bright person or
14   whatever, are they disqualified from the ADA?
15              In the Sixth Circuit *Yingling* case where they
16   were discussing that, they noted that -- the House Committee on
17   the ADA noted that it was critical to reject the assumption
18   that a person who performs well academically cannot be
19   substantially limited in a major life activity.  When they were
20   debating in passing the ADA, legislatures were making that
21   point, just because somebody does well academically does not
22   mean that they might not need an accommodation and be entitled
23   to one under the act.
24              And, finally, we cited the *Rush* case.  And in
25   the *Rush* case, the court noted that the plaintiff in that

OFFICIAL TRANSCRIPT

1  case's reading impairment seriously decreased the speed at
2  which that plaintiff read with comprehension.  And the court
3  found that if they didn't grant the time extension
4  accommodation, the test will reflect the disability and not
5  that plaintiff's knowledge.  And we believe that's the same
6  thing here, and it's proven by once Tulane gave her the extra
7  time, her scores went up by 20 percent, which proves that
8  obviously this testing format shows her disability and not what
9  she actually knows.
10            And that's basically what Meaghan's asking for,
11  the chance to be able to show what she really knows, and to be
12  placed where she deserves to be placed.
13            So on those grounds, we believe that we've met
14  all of the burdens for showing likelihood of success, and the
15  irreparable injury factor to my client, and the fact that it
16  cases no damage to the National Board, and it serves the public
17  interest by effectuating the purposes and requirements of the
18  Americans with Disabilities Act.
19            **THE COURT:**  Thank you.
20            **MR. McGOEY:**  Thank you, Your Honor.
21            **THE COURT:**  Mr. Burgoyne.
22            **MR. BURGOYNE:**  Thank you, Your Honor.
23            I'll start with the standard, of course, since
24  we are here on an emergency motion.  Preliminary injunctions
25  have been described as a drastic and extraordinary remedy that

OFFICIAL TRANSCRIPT

1   can only be awarded on a clear showing that the plaintiff is

2   entitled to such relief under the Supreme Court's decision in

3   *Winter versus National Resource Defense Council.*

4            And the claimed irreparable harm, Your Honor,

5   has to be actual and imminent, not speculative or

6   unsubstantiated.  It has to be shown that irreparable harm is

7   likely absent injunction, not just possible.

8            In this case, Your Honor, we don't think she can

9   meet any of the standards for a preliminary injunction, and

10  I'll start with the likelihood of success factor.  Under

11  Section 12189 of the ADA, a testing company like the National

12  Board of Medical Examiners has to administer its exams in a

13  place and manner that is acceptable to individuals who have

14  disabilities.

15           What that means as a practical matter is that if

16  a plaintiff comes in and wants to take the bar exam or another

17  licensing exam like the Step examinations administered by our

18  client, you've got to establish a few things.

19           First, they have to show that they have a

20  physical or mental impairment, and that's where the diagnosis

21  comes in.  But having a physical impairment or mental

22  impairment in itself is not sufficient to be disabled under the

23  ADA.

24           Under the ADA, that physical or mental

25  impairment has to substantially limit the person as compared to

1   most people in the general population.  And this gets back to
2   your question, Your Honor, about whether it's an objective or
3   subjective standard.
4             The standard set forth in the regulation is most
5   people in the general population.  It is not whether or not a
6   given individual is performing to the level of their IQ or
7   their anticipated level of performance, nor is it appropriate
8   to compare a student to their peer group, in this instance,
9   other students in medical school or getting ready to take a
10  licensure exam.
11            Here the objective evidence -- what she's saying
12  is, "I have a very difficult time reading, and my reading rate
13  is really slow, as evidenced by that one score on the
14  Nelson-Denny one-minute reading test."  Your Honor, that, we
15  submit, is flatly contradicted by her performance on the other
16  standardized tests which cannot be explained away by saying,
17  oh, well, they had much shorter questions, or they were much
18  easier.
19            In the first place, the MCAT, if you saw those
20  questions, you would appreciate that they are very challenging
21  questions, very difficult, require a great deal of mental
22  concentration and processing, and are not simply short
23  vignettes that can be answered without required reading speed,
24  required concentration, required knowledge.
25            Her performance on that very challenging exam as

1  compared to a very talented population, not the general

2  population, was in the 95th percentile when it came time to the

3  reading skills that are --

4        THE COURT:  Let me stop you there.  There was

5  testimony concerning the requirements of the MCAT, but there

6  are no academic requirements; correct?

7        MR. BURGOYNE:  For what, Your Honor?

8        THE COURT:  To apply to take the MCAT?

9        MR. BURGOYNE:  In order to take the MCAT, you have to

10  be a college graduate, and you have to be on a path that gets

11  you into medical school or another health care profession

12  school.

13        THE COURT:  Right.  I'm sorry, "academic" was not the

14  correct word.  There are no grade point average requirements.

15        MR. BURGOYNE:  There is no grade point average to

16  take it, Your Honor.  But as you can appreciate, people --

17  medical school is extremely competitive, and individuals with

18  low grade point averages from other colleges -- less well

19  regarded colleges are not applying and investing in going to

20  medical school and taking the MCAT.

21        THE COURT:  Right.  But the point is, is that

22  anyone -- there's no grade point requirements to sign up for it

23  and take it.  There's the degree requirements, and you have to

24  state your intention to pursue a career, but, obviously,

25  there's no commitment there.  And many people, I'm sure, take

OFFICIAL TRANSCRIPT

1    the MCAT -- many more take it than actually end up going to law

2    school, or certainly not all of them end up going to medical

3    school having taken the exam.

4           MR. BURGOYNE:  Right.  Well, it's certainly true,

5    Your Honor.  Although I'd submit that, frankly, the cohort of

6    college graduates is already at a level that is higher than --

7    well above the reading and learning abilities of the general

8    population.  I think that's fairly well established.  So we've

9    already got not only have they gotten through college, but

10   these are individuals who are getting ready to go on to a

11   challenging profession.

12          THE COURT:  But, Mr. Burgoyne, where I keep getting

13   hung up here is you talk about the general population, and to

14   me this has to be an objective inquiry not subjective.  Because

15   you're not saying that if you're smarter or do better than the

16   bottom 50 percent of the general population that you're not

17   entitled to an accommodation.  That can't be the standard.

18          MR. BURGOYNE:  The standard, Your Honor, is we have

19   to determine is she substantially limited in her ability to

20   read or to think or to concentrate, which I assume are the

21   major life activities that are in play here.  Is she

22   substantially limited compared to most people in the general

23   population.  And that's the standard that the Department of

24   Justice has put in place and that Congress has put in place

25   under the ADA.

OFFICIAL TRANSCRIPT

1               And so then the question is:  How do we

2    determine whether she is?  What do we look at?  And the answer

3    cannot be, Your Honor, let's look at a one-minute reading test

4    that suggests she's got a slow reading rate.

5               THE COURT:  No.  No.  But isn't the answer you look

6    at how the impairment affects her?  For example, a person could

7    operate between zero and ten.  Some people might operate at a

8    nine with a disability, some people may operate at a seven with

9    a disability, but they both have disabilities.

10              MR. BURGOYNE:  Well, yes.  Your Honor, they may well

11   both have diagnosed impairments --

12              THE COURT:  Right.

13              MR. BURGOYNE:  -- but the question is, is that --

14              THE COURT:  That affect them.  That affect them.  The

15   person who's operating at a six with an accommodation may then

16   rise to an eight.  A person who's operating at an eight with

17   the impairment might rise to a ten.  So you're not comparing

18   them against each other; you're comparing how the disability

19   affects them and their ability to function.

20              MR. BURGOYNE:  You absolutely have to look at how

21   they perform.  You have to look at them.  And so the question

22   is:  What evidence do we look at to evaluate how Meaghan

23   performs?  And our point is, as recognized in the cases, is in

24   order to determine if someone has a learning disability or

25   whether or not ADHD has impacted them, you must look at

1  objective real-world performance and see how the individual has

2  performed.

3       **THE COURT:**  Right.  Now, you made an emphasis of the

4  point that she never received an accommodation prior to medical

5  school and that she did well up until that point.

6       **MR. BURGOYNE:**  Extremely well.

7       **THE COURT:**  Right.  But where is the requirement that

8  you -- in other words, she may not have felt like she needed an

9  accommodation until that point.  She may have been suffering

10 from the impairment.  It may have been affecting her grades or

11 ability to perform, but it didn't matter to the point, or she

12 just those not to seek accommodation until later.

13          Where is the requirement that you have to do it

14 at the earliest possible point where you can or you somehow

15 lose that ability?

16      **MR. BURGOYNE:**  It isn't a use-it-or-lose-it

17 situation, Your Honor.  We're not contending that.  What we are

18 contending is that if you don't need it in those other

19 contexts, that your performance in demanding context is

20 evidence that you do not have functional limitations that rise

21 to the level of a substantial limitation in a major life

22 activity.

23          She's got to demonstrate substantial limitations

24 in those major life activities.  She's not being penalized for

25 not having requested accommodations before.  All we're saying

1    is, let's look at how she has performed in real-life context to
2    see if she is experiencing functional limitations that are, in
3    fact, substantially limiting.
4          **THE COURT:**  Or we're looking at how she's performing
5    at this point in her life in this situation that she's in in
6    medical school as opposed to how she performed when she was in
7    third grade at a -- or second grade at a French immersion
8    program in New Orleans.
9          **MR. BURGOYNE:**  Well, Your Honor, it isn't as if you
10   become learning disabled or your ADHD becomes a disability once
11   you get to medical school, but it wasn't one when you were a
12   child.  Those are impairments that are lifelong.  And in order
13   for her to be diagnosed -- properly diagnosed for those
14   impairments, she wouldn't be performing at this level.
15                 But in all events, you don't need to get into
16   that issue, whether the diagnoses were proper, because it's
17   clear that her -- whatever functional impairment she's
18   experiencing don't rise to the level of a substantial
19   limitation.
20                 You don't -- you don't just say, well, she's in
21   a very hard academic environment now so maybe now she does have
22   a disability.  And I could certainly, and have them right here,
23   could give the Court --
24         **THE COURT:**  Well, but the flip side of that is you
25   could say she's always had the disability, it's just the first

OFFICIAL TRANSCRIPT

1  time she's chosen to seek an accommodation.

2         **MR. BURGOYNE:**  She may always have had a diagnosed

3  impairment, and I haven't -- you know, there is a question

4  whether those early diagnoses are, in fact, correct under the

5  DSM criteria.  But even if we accept they are, yes, she's had

6  these diagnoses, but are they resulting in functional

7  limitations that prevent her from accessing the exam?  And

8  that's what the ADA is getting at.

9         It is not intended as a vehicle for letting

10 someone maximize their performance on a licensure test.  And

11 that doesn't come without consequences for other individuals.

12        As she acknowledged, if she takes this exam and

13 ultimately gets a score where she's competing against someone

14 else, someone who is just as desirous of getting that residency

15 position, than that other person could end up not getting the

16 position.  And that shouldn't happen by way of extended testing

17 time unless the individual has shown that they're substantially

18 limited in their reading or concentrating or thinking.

19        And the thought that someone who performs at

20 this level is substantially limited under the Americans with

21 Disabilities Act, I have to say, Your Honor, it's one of the

22 more extreme cases I've seen.  And as I say, we're happy to --

23 you know, there are certainly cases in the Fifth Circuit where

24 people came in with ADHD diagnoses -- this is after the ADA was

25 amended in 2008, and they said, well, that's fine, but that's

1  not enough.

2              It isn't enough that you have this diagnosis

3  that has an impact on you.  It's got to be substantially

4  limiting as compared to most people.

5              And so in other testing context, we'll -- you

6  know, *Black versus National Board of Medical Examiners*, the

7  court went through and looked at a candidate whose profile is

8  very similar to Meaghan's profile and ruled as a matter of law

9  that she was not entitled to accommodations.  Ruled as a matter

10 of law that she was not substantially limited in any major life

11 activity.

12             There's the *Bibber* case that was decided in the

13 Eastern District of Pennsylvania where the individual who had

14 been diagnosed with dyslexia, and the court emphasized, you

15 know, it isn't a question of whether she performs up to her

16 abilities.  It isn't a question whether she's performing as

17 well as her medical school peers.  The question is whether or

18 not she's substantially limited as compared to most people in

19 the general population.

20         **THE COURT:**  Or I would imagine that there are many

21 medical students that have been awarded accommodations based

22 upon disabilities, as we sit here today.  Would you agree with

23 that?

24         **MR. BURGOYNE:**  Absolutely.  And those individuals --

25 many medical school students have, many college students have,

1 many people who take the USMLE exams have.  But they've been

2 awarded accommodations in the testing context because they

3 demonstrated a substantial limitation in a major life activity.

4        **THE COURT:**  But they've all managed to make it into

5 medical school.  So they obviously all had very good scores on

6 their MCATs, very good scores on their ACTs.  What is to

7 differentiate them from the plaintiff in this case?

8        **MR. BURGOYNE:**  Well, the question is, Your Honor,

9 what if they had those very good scores, but they got them

10 because when they took the ACT, they were accommodated?  That's

11 a very different profile than someone who performs in the 99th

12 percentile of everybody in this country without accommodations

13 and then later comes to -- comes to a more technical exam.

14        **THE COURT:**  Well, there you're saying -- we're coming

15 right back in full circle.  You're saying that if you don't

16 seek accommodation earlier, then somehow that fact will be used

17 against you later --

18        **MR. BURGOYNE:**  Right.

19        **THE COURT:**  -- and I just don't -- I just don't

20 understand that point.  It doesn't make logical sense to me.

21 Because this is apparently someone that has a very high IQ, was

22 able to overcome her disability to the point where she did well

23 on these prior exams, prior periods in school, and probably

24 could have done much better had she took advantage of the

25 accommodation that she might have been able to get at that

OFFICIAL TRANSCRIPT

1   time.

2   **MR. BURGOYNE:**  Well, Your Honor, I'm not saying that

3   she should be disadvantaged in the slightest.  What I'm saying

4   is if she's able to perform at a level that puts her in the top

5   one percent of everyone who's gone to college in this country,

6   that is not the population that the ADA is intended to protect.

7   Simply because she is not -- reads slower than someone else

8   might read.  All of us have relative strengths and weaknesses,

9   Your Honor, but that isn't what the ADA is intended to do.

10              I don't doubt for a minute that Meaghan will be

11  a fabulous doctor.  I don't doubt for a minute that if she got

12  extra testing time, she might do better on the Step 2 CK exam.

13  But that's true of everybody, Your Honor.  I could go in and

14  take the bar exam, and if you gave me double time, I'd probably

15  do better than I would otherwise.  Research has shown that

16  everybody does better if they get extra testing time; it's not

17  just --

18      **THE COURT:**  But you're overlooking the point that she

19  has the medical documentation to establish a disability.

20      **MR. BURGOYNE:**  She has the medical documentation to

21  establish a diagnosed impairment.  What she doesn't have is a

22  record that establishes that she is substantially limited as

23  compared to most people in the general population, and I'm not

24  the one who set that standard.  That's what the Congress has

25  said when they set the ADA, it is not intended as a vehicle for

OFFICIAL TRANSCRIPT

1    allowing people to maximize performance unless they meet the

2    standard to show that they're disabled within the meaning of

3    the statute.

4              Again, there's a distinction between being

5    diagnosed with an impairment and having a disability that

6    entitles you to take a standardized test used for licensure for

7    physicians purposes with extended time or with other

8    accommodations.  It's a question of fairness to all examinees,

9    Your Honor, and it's a question of protecting the integrity of

10   the scores.

11             I know it's temping because you have an

12   individual who's worked very hard, and, you know, everybody --

13   who wouldn't like extra time.  And that's just the merits, Your

14   Honor, on the irreparable harm part.  So we feel very strongly

15   that this is a case, and we'd be happy to submit a short brief

16   to Your Honor discussing all the cases that are directly

17   analogous in which courts have said, let's go through and look

18   at how this individual has actually performed in real-life

19   context in order to evaluate whether her diagnosed impairment

20   results in substantial limitation within the meaning of the

21   statute.

22             Under irreparable harm, Your Honor, that has to

23   be immediate and non-speculative.  She said she has to take the

24   test by, I don't know, August 8th or 9th, and that's not

25   accurate.  She's got a testing window that extends, I think,

1    until -- I can't remember the exact date, but she don't have to

2    test on the date she currently has.  Her current window goes

3    until, it looks like, September 30th, 2019.

4              And then she could extend that, and she could

5    take this exam -- even if it's just a question of participating

6    in this year's match, she can still test all the way up, her

7    school says, until December and participate in this year's

8    match.  That's what Tulane recommends they test by.

9              And then even if she can't participate in the

10   match, it's not unheard of delay for an individual to not take

11   the Step exam in their fourth year.  We're not talking about an

12   aberrational delay here, the type of delay where her career is

13   getting unusually off track here.

14             Tulane has these provisions allowing for up to

15   24 months of time to take your Step 2 CK exam because that does

16   happen sometimes.  Which is just to say, Your Honor, you know,

17   and that's all in the context of it has to be immediate and

18   irreparable, and we're looking at a case here where, you know,

19   short notice to the opposing party with no discovery in the

20   case, and no opportunity for the Court to hear from NBME's

21   experts who separately evaluated her documentation and

22   concluded that she was not disabled and did not have

23   substantial limitations.  You know, we're facing the situation

24   where we're being told you have to do something to administer

25   an exam in a nonstandard format.

1          All we're saying, Your Honor, is that's not

2   immediate and irreparable harm sufficient to warrant a

3   mandatory preliminary injunction.  This isn't the standard

4   preliminary injunction which just preserves the status quo.

5   They want you to alter the status quo and affirmatively award

6   relief that she is otherwise entitled to under the ADA only if

7   she wins on the merits.

8          THE COURT:  All right.  Thank you.

9          I would like for you to submit a post-hearing

10  brief.  Mr. Burgoyne?

11         MR. BURGOYNE:  Yeah.  No, that would be great.  I'd

12  appreciate that opportunity, Your Honor.  As I say, we've been

13  at a little bit of a disadvantage, and I don't mean to say that

14  critically, just it's a short time frame.  And I certainly

15  understand why this is important to Meaghan and her family.

16         MR. McGOEY:  Your Honor, brief reply?

17         THE COURT:  Sure.

18         MR. McGOEY:  On the substantially limits a major life

19  activity as compared to the general population.  We've talked

20  about it a lot, 6th percentile.  The doctor in her report says

21  she got -- the 6th percentile was "slow learner range," and

22  that 90 percent of the students of her age would be faster, and

23  on decoding, 75 percent would be faster.  But the

24  6th percentile is slow learner range.  So we believe that shows

25  you the substantial limit of the major life activity of

 1  reading.

 2          Also in the case I cited in the memo that we

 3  filed with the original application, the *Root* case.  The expert

 4  in that case, and the Court referred to it, said that anybody

 5  below the 16th percentile would be lower than most of the

 6  population.  So the 6th percentile qualifies Meaghan clearly.

 7  I don't think an expert has to testify to that, but the

 8  6th percentile is way below most of the population.

 9          So we believe we've addressed that.  Also, in

10  the doctor's report, Dr. Brockman, she in the addendum, which

11  is in the exhibit, she addresses this criticism of the Denny

12  test which yielded that 6th percentile result.  And she, in her

13  report, reveals that experts in her field generally rely on

14  that test, and it is a respected test.

15          The other issue on the most -- the population

16  that she has to show that it substantially limits her major

17  life activity in comparison with the general population or most

18  of the population.  We beat that with the 6th percent.  But

19  also we've cited cases, and I don't have to win this point,

20  because I think we win it with the 6th percentile, but there

21  are cases that say you compare the person to the group that

22  they're in.  And so for Meaghan, that would be other med

23  students, not people who just have high school degrees.  So

24  there are two ways that you could rule in her behalf in that

25  regard.

OFFICIAL TRANSCRIPT

1          As far as the irreparable injury.  It's clear

2     the match thing -- I'm got going to go over it all -- over it

3     all, but, basically, theoretically, you could send your scores

4     in a couple of months later from now.  But it's almost like if

5     you're a college football fan, you know, there's an early

6     signing period.  And, technically, until the last day of

7     national signings, there are some spots, but every school is

8     filling up their 20 or 22 scholarships all during that period.

9          And if you've got to wait until the very end,

10    you're really risking not getting anything.  And what this is,

11    is she's risking, A, not ever being able to graduate from

12    Tulane.  Because if she never gets this accommodation, we don't

13    know that she's ever going to be able to pass Step 2.  But if

14    Step 1 is any barometer, she won't be able to get a good enough

15    score to match, and then she won't be able to practice in

16    medicine.  Or at the very best for her, it delays her for a

17    year, and the cases say that that is irreparable injury.

18         So we believe, Your Honor, we've met all of the

19    requirements.  And as far as post-hearing memos, the problem I

20    have with that, and it's certainly up to the Court, but

21    Meaghan's got to take this test on Tuesday, and she's got

22    anxiety issues.  We believe she's entitled to the

23    accommodation, and I know it impinges upon the Court, but we

24    need a decision as soon as possible so that Meaghan could be in

25    the best shape she can to take that test on Tuesday.

OFFICIAL TRANSCRIPT

1    **THE COURT:**  I understand.

2    **MR. McGOEY:**  Your Honor, thanks for your time.

3    **THE COURT:**  All right.  Thank you very much.

4         Court will be adjourned.

5    (WHEREUPON, the proceedings were concluded.)

6                        *****

7                    <u>CERTIFICATE</u>

8         I, Jodi Simcox, RMR, FCRR, Official Court Reporter

9    for the United States District Court, Eastern District of

10   Louisiana, do hereby certify that the foregoing is a true and

11   correct transcript, to the best of my ability and

12   understanding, from the record of the proceedings in the

13   above-entitled and numbered matter.

14

15

16                    <u>*s/Jodi Simcox, RMR, FCRR*</u>
                      Jodi Simcox, RMR, FCRR
17                    Official Court Reporter

18

19

20

21

22

23

24

25

                    OFFICIAL TRANSCRIPT